UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

FILED-CLERK
U.S. DISTRICT COURT

01 OCT 26 PM 4: 54

TEXAS-EASTERN
BY_____

| | | |
|---|---|---|
| TOMMIE WELLS, JR., AND | § | |
| CHERYL WELLS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS | § | JURY DEMANDED |
| AND EDWARD THORNTON | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**NOW COME** NACOGDOCHES COUNTY and EDWARD THORNTON, Defendants in the above styled and numbered cause, and file this their motion for summary judgment as to the claims filed against them herein by TOMMIE WELLS and CHERYL WELLS, Plaintiffs, and in support thereof would respectfully show the following:

### I. INTRODUCTION

In their complaint, Plaintiffs allege that Defendants violated their right to be free from unlawful arrest, actionable under 42 U.S.C. § 1983, and that Defendants maliciously prosecuted them and tortiously interfered with their business relationships. Plaintiffs further allege that Nacogdoches County is liable because it maintained a policy, practice, procedure, or custom of harassing and/or unlawfully arresting citizens and because the county failed to provide adequate training and supervision to its employees.

Jointly, Nacogdoches County, Texas and Edward Thornton move for summary judgment on the grounds that Plaintiffs cannot prove any of their alleged causes of action. The Plaintiffs will never be able to establish a prima facie case of unlawful arrest or malicious prosecution because probable cause existed for their arrest. Similarly, Plaintiffs will not be able to establish the necessary elements of their claim for tortious interference



with business relationships because Defendants did not commit any independently tortious or wrongful act.

In addition to the joint grounds for summary judgment, Nacogdoches County, Texas moves for summary judgment on the following grounds:

1.    There is no evidence that the Plaintiffs were unlawfully arrested due to an official custom or policy or practice of Nacogdoches County. In order to impose liability on the County, Plaintiffs must identify an unconstitutional policy or custom that caused their unlawful arrest. Nacogdoches County does not maintain any custom or policy of effecting unlawful arrests.

2.    Nacogdoches County is not liable for failing to train its employees because there was no obvious need for additional training so as to impose liability on the County.

3.    Regarding Plaintiffs' state law claims, Nacogdoches County is not liable for the intentional torts of malicious prosecution and tortious interference with business relationship pursuant to Texas Civil Practice and Remedies Code § 101.057(2).

Edward Thornton also moves for summary judgment on the following grounds:

1.    Edward Thornton did not violate clearly established constitutional or statutory rights of which a reasonable person would have known and is therefore entitled to qualified immunity with regard to Plaintiffs' federal causes of action;

2.    Edward Thornton performed discretionary duties, in good faith, within the scope of his employment and is therefore entitled to official immunity with regard to Plaintiffs' state law causes of action.

## II. STATEMENT OF MATERIAL FACTS

1. Material Facts from the Affidavit of Edward Thornton

Edward Thornton was Director of the Nacogdoches County Department of Health and Environmental Services from February 1996 to November 2000. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 1. During the course of his employment, Mr. Thornton received three days of initial training at the Texas Natural Resources Conservation Commission (also, the "Commission") school at Texas A&M. *Id.* Thereafter, Mr. Thornton received an additional 8 hours training each year and supervision by the Commission. *Id.*

During the years 1998 and 1999, Mr. Thornton investigated the Naconiche Village Trailer Park, owned and operated by Cheryl Wells and Tommie Wells, Jr. *Id.* In the course of his investigation and dealings with the Wells, Mr. Thornton observed that the Wells were in violation of numerous statutes and rules relating to the disposal of human waste. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 1-2. The Wells had "bootlegged" septic systems serving the trailer park by adding waste pipes from additional mobile homes to an existing septic system for a different home.     Affidavit of Edward Thornton, attached hereto as Exhibit A, page 2. This had the effect of overloading the sewage input to the septic system and causing waste to pool on the surface of the property. *Id.* The Wells also improperly installed septic systems themselves, and failed in some instances to obtain proper permits and licenses for their systems. *Id.* The Wells also pumped improperly treated human waste into ditches along the public roadways and into the yards of the trailer park residents. *Id.* Tommie Wells also personally installed septic systems without an installer's license. *Id.* The Wells' activities created a hazardous

and dangerous environment for the residents of Naconiche Village Trailer Park. *Id.* By accepting tenants' rent and making improvements to her real property, Cheryl Wells aided and encouraged Tommie Wells in the commission of each charged offense and is equally criminally responsible for those offenses. *Id.*

In July of 1998, Tommie Wells came into Thornton's office and talked to Benny Serrano and Mr. Thornton about putting in a mobile home park. Mr. Wells said he wanted to do everything by the letter; he had big plans for the parks and was in the process of getting a professional engineer to draw up plans for a constructive wetlands that would handle the sewage. *Id.* Mr. Serrano and Mr. Thornton informed Mr. Wells that we needed a plat of the park, a flood plain map, a site evaluation, and a topographical map. *Id.*

On July 31,1998, Mr. Wells came back into the office and said he was having trouble with his time line and his engineer. *Id.* The Wells had already allowed some mobile home owners to move their homes into the trailer park. *Id.* Tommie Wells asked if it was acceptable to use on-site systems in lieu of the constructive wetlands program originally proposed. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 2-3. Mr. Serrano and Mr. Thornton told Mr. Wells that he could use on-site systems, but that output of 5000 gallons per day was exclusively regulated by the Commission and had to be permitted through that agency. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 3. Mr. Wells said he was not going to put in that many trailers now and his engineer was handling permitting with the Commission on the constructive wetlands. *Id.* Mr. Wells said he wanted to permit 11 systems, but he wanted to know if he could put in just one tank and field line. *Id.* Mr. Serrano and Mr. Thornton told Mr. Wells "no," all systems should be put in according to the state's minimum standards by a licensed

installer. *Id.* Mr. Wells argued and asked for a list of installers. *Id.*

On August 8,10, and 11, 1998, Benny Serrano evaluated the soil conditions at Naconiche Village Trailer Park. *Id.* He found all but a few sites were in Class IV soil. *Id.* The Class IV nature of the soil meant that Mr. Wells could not install a conventional field line system. *Id.* Mr. Serrano met with Mr. Wells that day to show him the results, and Mr. Wells stated he understood and had talked to Mark Perkins who would install the systems. *Id.* On August 31, 1998, Keith Socia, a licensed installer, put in a conventional system for Mr. Wells. *Id.* Mr. Thornton inspected that system. *Id.*

On August 12,1998, Mr. Thornton received a complaint of sewage surfacing at the Naconiche Village Trailer Park. *Id.* Mr. Serrano went out to the property on August 12, 1998 to inspect the problem, and he found sewage surfacing in five different locations. *Id.* The five systems were "bootlegged" with one tank each, 60' field line, and 8' graveless. *Id.* Mr. Serrano asked Mr. Wells who installed these systems, and Wells replied that he himself had installed them. *Id.* Mr. Serrano then asked him why, when he knew that the County would find out about it and make him fix it. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 3-4. Mr. Wells said that they couldn't get anyone to install the systems anytime soon and people were already moving in. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 4. Wells asked if Mr. Serrano could let it go, Mr. Serrano said no and told Mr. Wells that he needed to see Mr. Thornton. *Id.* Mr. Thornton met with Mr. Wells, and Mr. Wells explained that he already had these places promised and leases signed when he found out all the installers couldn't get to him right away, so he was just going to do a quick fix until they could. *Id.* He promised he had an installer that said he could get to it in a few weeks, and he would have everything fixed then. *Id.* Mr.

Wells seemed like a very trustworthy man that had gotten into an unforseen bind, so Mr. Thornton agreed to not file a complaint in justice court and gave him time to get things fixed. *Id.*

On September 3, 1998, the Texas Natural Resources Conservation Commission faxed Edward Thornton a complaint that it had received relating to the Naconiche Village Trailer Park. *Id.* On September 9, 1998, Mr. Thornton received another complaint. *Id.* Mr. Wells had brought in another home. *Id.* Mr. Serrano investigated and talked to Mr. Wells and told him he needed an aerobic system in that type of soil. *Id.* Mr. Wells said Keith Socia was going to put one in. *Id.* Mr. Serrano called Mr. Socia, and he confirmed that one would be installed. *Id.*

On September 9, 1998, Mr. Thornton received yet another complaint on the property. *Id.* This time, there was sewage backing up in a woman's home. *Id.* Mr. Wells had added an additional 20 feet of field line, but he still needed an aerobic system due to the nature of the soil. *Id.* Mr. Serrano talked with Mr. Wells and told him before any additional homes were brought in, he would have to bring the five other places up to state standards. *Id.*

On November 25, 1998, Benny Serrano called Mr. Wells into the office and told him not to install any more systems until the ones that were previously installed were brought up to the state's minimum standards. *Id.* The Wells had eleven tenants with mobile homes in the park, and eight of the eleven systems were failing. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 4-5 . Mr. Wells had still not provided Thornton with a plat of the area. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 5.

On January 20, 1999, Mr. Thornton sent Mr. Wells a letter explaining that if he did not fix the problems that were previously discussed, legal action would be taken. *Id*. On January 27, 1999, Mr. Serrano spoke with Mr. Wells on the telephone and told Mr. Wells that he had to get a registered sanitation expert and bring all systems into compliance, obtain permits for all systems not permitted, and repair all failing systems. *Id*. Mr. Wells was not to do the work himself, but was to use a licensed installer. *Id*.

On February 1, 1999, Mr. Serrano went to check Mr. Wells' progress. *Id*. Mr. Wells had dug another hole for a septic tank, but said he was only helping Installer Kevin Dillon. *Id*. Mr. Wells said that Mr. Serrano should give him a break and back off. *Id*. Mr. Serrano said that they had given him a break and that he still hadn't resolved the problems. *Id*. Mr. Wells said they hadn't given him a break and he said that he had done everything they asked. *Id*.

On April 15, 1999, Mr. Wells came into Mr. Thornton's office and said that Reliable had ordered a system but the weather was bad and he would install it as soon as he could. *Id*. On April 15, 1999, sewage was surfacing on lot 38, and Mr. Thornton sent Mr. Wells a letter requesting the problem be fixed within 10 days. *Id*.

On September 30, 1999, another complaint on Naconiche Village came in; there was sewage surfacing behind the trailer at 165 Claywells Road. *Id*. Mr. Thornton's office sent Mr. Wells a letter requesting he get the problem fixed. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 5-6. Mr. Thornton had not been able to reach the Wells by telephone, and Mr. Thornton requested that Mr. Wells call the department office. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 6.

On October 6, 1999, sewage was surfacing onto Road 165, Claywells Road. *Id*.

On October 25, 1999, Mr. Serrano observed that new systems had been put in at the trailer park, but that the Wells had altered the systems. *Id.* Mr. Serrano explained that this was illegal, and that Mr. Wells had not notified Mr. Thornton's office or the registered sanitation expert and installer. *Id.* Additionally Mr. Wells had given his word to Mr. Thornton, Mr. Serrano, and to Kevin Dillon that he would bring all systems into compliance and not bring in any other homes until the problems were fixed. *Id.* After all these months, the Wells had made no attempt to comply with the state statutes or commission regulations, and Mr. Thornton made the decision to file a complaint in justice court. *Id.*

In December 1999, Judge Johnson of Precinct One asked what day would be good to have a hearing. *Id.* Mr. Thornton told him it was close to Christmas and asked if it could be postponed until after the New Year. *Id.* Judge Johnson agreed. *Id.*

On December 10, 1999, Mr. Thornton's office received another complaint on Mr. Wells. *Id.* He had dug a ditch, put in plastic pipe, and was pumping effluent through it to the ditch on Simmons Road. *Id.* Mr. Thornton went to justice court and filed a complaint relating to this latest offense by Mr. Wells. *Id.*

Mr. Thornton swore out complaints against both Cheryl Wells and Tommie Wells for violations of the Texas Health and Safety Code. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 7. At the time that Mr. Thornton swore out the complaints, he believed that Cheryl Wells and Tommie Wells had violated certain statutes and regulations that carried criminal penalties. *Id.* Specifically, Tommie Wells had acted as a licensed installer, constructed on-site sewage facilities that did not comply with applicable statutes and rules, and discharged sewage into a county road ditch. *Id.* Cheryl Wells was an owner of the property, had constructed non-conforming on-site sewage facilities, and

caused sewage to be discharged to a county road ditch. *Id.* Both of the Wells had failed to properly dispose of human excreta on their property, and had failed to install disposal systems sufficient to prevent the pollution of the surface soil, the contamination of drinking water, or the creation of a public health nuisance. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 7-8. Each of these acts was subject to criminal enforcement. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 8. The statutes under which the Wells were charged had not been repealed at the time of the charges, nor have they been repealed now. *Id.*

Mr. Thornton tried repeatedly to get Mr. Wells to comply with the regulations governing the installation of septic systems. *Id.* Mr. Thornton tried to work with him. *Id.* For a period of approximately 17 months, Mr. Thornton tried to help Mr. Wells get his system in compliance. *Id.* However, Mr. Wells kept putting him off and was uncooperative. He acted as if he were going to fix his systems, but then kept adding additional homes and additional lines that worsened the problem. *Id.*

Mr. Thornton did not file the complaints against the Wells out of any malice towards them. *Id.* To the contrary, he filed the complaints because the Wells simply would not follow the law and get their systems in compliance with applicable statutes and rules. *Id.* Mr. Thornton still believes that the Wells were in violation of state standards and guilty of the crimes with which they were charged. *Id.*

Mr. Thornton did not arrest the Wells or cause them to be arrested. *Id.* Mr. Thornton was unaware that the Wells would be arrested. *Id.* Mr. Thornton did not desire that the Wells be arrested, but only that they be made to comply with applicable state standards for waste disposal. *Id.*

During the time that Mr. Thornton was Director of the Nacogdoches County Department of Health and Environmental Services, there was no county or department policy of harassing or making false complaints against citizens. *Id.* In fact, it was the department's policy to try to help residents with their problems and get all septic systems to comply with the applicable laws. *Id.* Out of the numerous complaints that he investigated, Mr. Thornton only filed criminal complaints against three people. Affidavit of Edward Thornton, attached hereto as Exhibit A, pages 8-9. Other than the Wells' lawsuit, Mr. Thornton never received any other complaint or negative comment regarding his investigation of sewage complaints. Affidavit of Edward Thornton, attached hereto as Exhibit A, page 9. Other than the Wells' lawsuit, there have been no other oral or written complaints regarding unlawful arrests or unwarranted complaints ever made against the Nacogdoches County Department of Health and Environmental Services. *Id.*

2. Material Facts from the Deposition of Tommie Wells

Cheryl Wells and Tommie Wells were the sole shareholders of Naconiche Village, Inc. Deposition of Tommie Wells, Jr., excerpt of which are attached hereto as Exhibit B, p. 11. Cheryl Wells was CEO of the corporation, and Tommie Wells its registered agent. *Id.*, p.11-12. Tommie Wells was not a licensed installer of septic systems. *Id.*, p. 75. Yet, Tommie Wells installed some of the septic systems at Naconiche Village. *Id.*, p. 74-76. There were complaints with the septic systems failing from the time the property was opened. *Id.*, p. 93. Eighteen people moved from the trailer park in less than a year. *Id.*, p. 94. Bennie Serrano and Edward Thornton visited with Tommie Wells about his septic system problems and told Tommie Wells that they wanted him to get his systems in compliance. *Id.*, p. 94. Tommie Wells had problems with the septic system for six months.

*Id.*, p. 95.  By October of 1999, sewage problems at Naconiche Village had continued for more than a year.  *Id.*, p. 100.  Tommie Wells' septic systems caused numerous incidents of "effluent, sewage, raw sewage" surfacing at the trailer park.  *Id.*, p. 100-01.  Tommie Wells pumped effluent through a drain into a ditch on Simmons Road.  *Id.*, p. 107-08. Tommie Wells knew that effluent had been surfacing at Naconiche Village.  *Id.*, p. 85.  Yet, he allowed families with children to move into the trailer park.  *Id.*  Tommie Wells was aware of the health hazards and knew that people could get very sick with harmful diseases, but he let them move in anyway.  *Id.*

3. Material Facts from the Affidavit of Lloyd Plunkett

Mr. Plunkett and his wife have lived in the Naconiche Village Trailer Park since November 1999. Affidavit of Lloyd Plunkett, attached hereto as Exhibit C.  Mr. Plunkett testified in his affidavit that Tommie Wells and Cheryl Wells violated health department rules and regulations.  *Id.*  Lou Marshall's family lived across the street from him.  *Id.*  The Marshalls' yard was covered in human waste and smelled very bad.  *Id.*  The Marshalls had to wade through human waste to get to their truck.  *Id.*  Mr. Plunkett and his wife have smelled septic odors in the park for the last two years.  *Id.*  Mr. Plunkett and his wife complained to the Wells, but the Wells never did anything.  *Id.* Mr. Plunkett saw Tommie Wells pump sewage from the trailer park onto the land across the street.  *Id.*  Wells also pumped sewage from Plunkett's neighbors into Plunkett's tank.  *Id.*  Many people had serious problems with sewage and had to move.  *Id.*

Mr. Plunkett testified that Tommie Wells installed most of the aerobic systems in the park and charged $500 to hook up a trailer to electricity, water, and septic tank service. *Id.*  When the County would not let Tommie Wells install more tanks, Wells pumped waste

from one tank into another for months at a time. *Id.* Mr. Plunkett testified that the septic problems were so bad that Melanie Lyles' children could not play outside due to sewage flooding the trailer park. *Id.* Tommie Wells lied repeatedly. *Id.* Tommie Wells and Cheryl Wells were always looking for a free dollar. *Id.*

4. Material Facts from the Affidavit of Bonnie Daniels

Bonnie Daniels was forced to move from the Naconiche trailer park because Tommie and Cheryl Wells refused to fix the septic system at their trailer park. Affidavit of Bonnie Daniels, attached hereto as Exhibit D. The Wells did, however, keep collecting the rent. *Id.* The Wells would not do anything out at the park. *Id.* The situation was so bad at the park that Ms. Daniels had sewage backing up into the shower, bathtubs, and coming out all around the house. *Id.* The Naconiche trailer park was dirty and a health hazard to anyone who stayed there. *Id.*

5. Material Facts from the Affidavit of Dwayne Brook

Dwayne Brook and his family have lived at the Naconiche Village trailer park since April of 1999. Affidavit of Dwayne Brook, attached hereto as Exhibit E. They have had human waste standing in their front yard since they moved in. *Id.* Mr. Brook talked to Tommie Wells and Cheryl Wells about the problem. *Id.* Tommie said he would fix it, but he did not. *Id.* Mr. Brook has four children and is concerned for their health. *Id.* He knows that it is a health hazard to have septic water in the yard. *Id.* Mr. Brooks thinks that the Wells should have gone to jail. *Id.*

6. Material Facts from the Affidavit of Melissa Dixon

Ms. Dixon's home was in one of the worst sections of the trailer park. Affidavit of Melissa Dixon, attached hereto as Exhibit F. She had green slime in her yard everyday

and her family got sick at their stomachs. *Id.* There was wet slime in the yard even during a dry summer. *Id.* Ms. Dixon knows that Tommie Wells put in concrete culverts as septic tanks. *Id.* Ms. Dixon put her children in daycare so that she could work and earn enough money for the Dixons to move. *Id.*

7. Material Facts from the Affidavit of Lloyd Gillespie

Lloyd Gillespie lent money to Tommie Wells and Cheryl Wells to finance Naconiche Village trailer park. Affidavit of Lloyd Gillespie, attached hereto as Exhibit G. He observed Tommie Wells pumping sewage from the trailer park with a hose into a ditch across the street. *Id.*

8. Material Facts from the Affidavit of Luther Frazier

Luther Frazier has lived in the Naconiche trailer park for about two years. Affidavit of Luther Frazier, attached hereto as Exhibit H. Tommie Wells installed an aerobic sprinkler in his yard that sprayed in front of his door. *Id.* Mr. Frazier told the Wells to fix the septic problems in the park, but the Wells did nothing. *Id.* Mr. Frazier can smell human waste in the park. *Id.*

9. Material Facts from the Affidavit of Melanie Lyles

Melanie Lyles and her two children lived in the Naconiche trailer park from November of 1999 to July of 2001. Affidavit of Melanie Lyles, attached hereto as Exhibit I. That premises owned by Tommie Wells and Cheryl Wells was grossly contaminated on numerous occasions by human waste from the septic system. *Id.* Tommie Wells made promises about improving the lot, putting in grass, building a playground and putting in an aerobic septic system. *Id.* Tommie Wells did not follow through on his promises and installed a septic tank without field lines. *Id.* Ms. Lyles had repeated problems with the

septic system. *Id.* Tommie Wells ran a hose from Ms. Lyles' tank to the neighbor's tank, but the tank continued to flood the yard. *Id.* Ms. Lyles observed that her children would use the bathroom, flush the toilet, then run to the yard to watch the waste come up in the yard. *Id.* Cheryl Wells and Tommie Wells lied to Ms. Lyles about the work they planned to do. *Id.* Ms. Lyles thinks that the only thing the County did wrong was to release the Wells from jail. *Id.*

10. Cheryl Wells' Motion to Dismiss, provided in Plaintiffs' Disclosures as Bates nos. 000004-000005. Cheryl Wells moved to dismiss the prosecution against her on grounds that her arrest was based on a repealed statute.

11. Cheryl Wells' Order of Dismissal, provided in Plaintiffs' Disclosures as Bates no. 000002. Justice of the Peace Hubert Johnson granted Cheryl Wells' motion.

12. Tommie Wells' Motion to Dismiss, provided in Plaintiffs' Disclosures as Bates nos. 000006-000007. Tommie Wells moved to dismiss the prosecution against him on grounds that his arrest was based on a repealed statute.

13. Tommie Wells' Order of Dismissal, provided in Plaintiffs' Disclosures as Bates no. 000003. Justice of the Peace Hubert Johnson granted Tommie Wells' motion.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is authorized if the movant establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A material fact creates a "genuine issue" if the evidence is such that the trier of fact reasonably could resolve the

factual dispute in favor of either party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. The

Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of

summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party moving for summary judgment bears the initial burden of identifying those portions

of the record that it believes demonstrate the absence of a genuine issue of material fact.

*Id.*

If the party moving for summary judgment meets the initial burden, Rule 56(c)

requires the nonmovant to go beyond the pleadings and show by affidavits, depositions,

answers to interrogatories, admissions on file, or other admissible evidence that specific

facts exist over which there is a genuine issue for trial. *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994). The party opposing summary judgment is required to identify

specific evidence in the record and to articulate the precise manner in which that evidence

supports that party's claim. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994).

Unsupported allegations or affidavit or deposition testimony asserting ultimate or

conclusory facts and conclusions of law are not sufficient to defeat a motion for summary

judgment. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citing

*Anderson*, 447 U.S. at 247, 106 S. Ct. at 2509-10). Factual controversies are to be

resolved in favor of the nonmovant, "but only when there is an actual controversy, that is,

when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075.

"Rule 56 does not impose upon the district court a duty to sift through the record in search

of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tennessee Resins, Inc.,* 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S. Ct. at 2511.

## IV. ARGUMENT AND AUTHORITIES

A. Plaintiffs are unable to establish the essential elements of their claims.

    1. Unlawful arrest under the Fourth Amendment

The right to be free from illegal arrest or seizure is guaranteed by the Fourth and Fourteenth Amendments. *Sorenson v. Ferrie,* 134 F.3d 325, 328 (5th Cir. 1998). Violation of this right may be grounds for suit under 42 U.S.C. § 1983. *Duckett v. City of Cedar Park,* 950 F.2d 272, 278 (5th Cir. 1992). An arrest is illegal and therefore violative of the Fourth Amendment if it was made without probable cause. *Baker v. McCollum,* 443 U.S. 137, 144-45, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). If a plaintiff cannot demonstrate that there was no probable cause for his arrest, the plaintiff has failed to establish the violation of a constitutional right and cannot recover under section 1983. *Sorenson,* 134 F.3d at 328.

Probable cause exists where an officer possesses knowledge that would warrant a prudent person's belief that the plaintiff had already committed or was committing a crime. *See Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1305 (5th Cir. 1995).

Plaintiffs were charged with numerous violations of the Texas Health and Safety Code. Each of those violations is not merely a code violation, but is also subject to criminal enforcement.

a.  Acting as a licensed installer.  "A person may not operate as an installer in this State unless the person is registered by the commission [Texas Natural Resources Conservation Commission]."  TEX. HEALTH & SAFETY CODE ANN. § 366.071 (Vernon 1992 & Supp. 2000).[1]  This section is subject to criminal enforcement under Texas Water Code § 7.172 (Vernon 2000).[2]

b.  Discharging sewage to a county road ditch.  "Sewage, human excreta . . . deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons" constitutes a public health nuisance.  TEX. HEALTH & SAFETY CODE ANN. § 341.011(5) (Vernon 1992).[3]  This section is subject to criminal enforcement under Health and Safety Code section 341.091(a) (Vernon 1992).[4]

c. Altering an existing on-site sewage facility to discharge to county road ditch.  This conduct also constitutes a public health nuisance under Health and Safety Code section 341.011(5) and is subject to criminal enforcement under Health and Safety Code section 341.091(a).

d.  Discharging sewer.  "Human excreta in a populous area shall be disposed of through properly managed sewers, treatment tanks, chemical toilets, or privies constructed and maintained in conformity with the department's specifications, or by other methods approved by the department.  The disposal system shall be sufficient to prevent the pollution of surface soil, the contamination of a drinking water supply, the infection of flies

---

[1]Effective September 1, 1995 and not repealed.

[2]Effective September 1, 1997 and not repealed.

[3]Effective September 1, 1989 and not repealed.

[4]Effective September 1, 1989 and not repealed.

or cockroaches, or the creation of any other public health nuisance." Tex. Health & Safety Code Ann. § 341.014(a) (Vernon 1992).[5]  This section is subject to criminal enforcement under Health and Safety Code section 341.091(a).

e. Constructing or causing to be constructed an on-site sewage facility that does not comply with applicable standards. "A person may not construct, alter, repair, or extend, or cause to be constructed, altered, repaired, or extended, an on-site sewage disposal system that does not comply with this chapter and applicable rules." TEX. HEALTH & SAFETY CODE ANN. § 366.004 (Vernon 1992 & Supp. 2000)[6]; 30 TEX. ADMIN. CODE § 285.58(a)(6). This section is subject to criminal enforcement under Texas Water Code section 7.173(a) (Vernon 2000).[7]

Edward Thornton and Nacogdoches County did not violate Plaintiffs' rights by swearing out criminal complaints without probable cause.  Edward Thornton had probable cause to believe that Tommie Wells and Cheryl Wells had already committed and continued to commit numerous Health and Safety Code violations.  Thornton knew that Tommie Wells was not a licensed installer, but acted as a licensed installer by installing septic systems anyway.  Thornton received numerous complaints that Tommie Wells was discharging sewage to a county road ditch.  Thornton's assistant, Benny Serrano, observed sewage surfacing at the trailer park.  Thornton and Serrano both observed human waste at Naconiche Village that the Wells had allowed to pool on the ground instead of disposing through properly managed sewers or tanks.  Thornton also knew that Tommie Wells had bootlegged, that is, altered and extended, a system that did not comply with the Health and

---

[5]Effective September 1, 1989 and not repealed.

[6]Effective September 1, 1995 and not repealed.

[7]Effective September 1, 1999 and not repealed.

Safety Code. Further, Cheryl Wells owned part of Naconiche Village and assisted or Tommie Wells in the commission of the offenses. The summary judgment evidence overwhelmingly demonstrates that Edward Thornton had probable cause to sign complaints regarding the activities of Tommie Wells and Cheryl Wells.

### 2. Malicious prosecution

A plaintiff in a malicious criminal prosecution claim must establish the following elements: a) the commencement of a criminal prosecution against the plaintiff; b) causation (initiation or procurement) of the action by the defendant; c) termination of the prosecution in the plaintiff's favor; d) the plaintiff's innocence; e) the absence of probable cause for the proceedings; f) malice in filing the charge; and g) damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515 (Tex. 1997). The dismissal of a criminal prosecution on the motion of the accused is not such an end of the prosecution as will warrant an action for malicious prosecution. *Ellis v. Sinton Sav. & Loan Assn.*, 455 S.W.2d 834, 842 (Tex. Civ. App. - Corpus Christi 1970, writ ref'd n.r.e.). Probable cause is the "existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983). In malicious prosecution actions, there is a presumption that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings. *Akin*, 661 S.W.2d at 920. Where the facts leading up to the arrest are not in dispute, the existence of probable cause is a question of law for the court. *Richey*, 952 S.W.2d at 518. "Malice," as required in a malicious prosecution case, is "ill will, evil motive, gross indifference, or reckless disregard." *Martin v. Thomas*, 973 F.2d 449, 457 (5th Cir. 1992); *Thrift v. Hubbard*,

974 S.W.2d 70, 82 (Tex. App. - San Antonio 1998, pet. denied).

The summary judgment evidence establishes that neither Nacogdoches County nor Edward Thornton maliciously prosecuted Plaintiffs. First, the criminal prosecution did not "terminate in the plaintiff's favor." Dismissal by the court on Plaintiffs' motion is not a dismissal in their favor. Further, the dismissal was procured at least mistakenly, if not under false pretenses. Plaintiffs filed Motions to Dismiss on the ground that the Texas Legislature had repealed the Health and Safety Code statutes with which Plaintiffs were charged. This was simply not true. Each of the statutes remains in effect to this date.[8] Second, the Plaintiffs cannot establish their innocence. Tommie Wells admitted that he was not a licensed installer, but that he installed septic systems at Naconiche Village. Tommie Wells also admitted that he discharged sewage to a county road ditch. He also admitted that he knew that effluent, that is, human waste, was surfacing at Naconiche Village. Cheryl and Tommie Wells' facility maintained a disposal system that created a public health nuisance. In addition to the Plaintiffs' own admissions, Lloyd Plunkett and Lloyd Gillespie saw Plaintiffs discharging untreated human waste into yards and ditches. The Wells made promises that they could not keep, collected rent from their tenants, exposed their tenants to harmful human waste, were repeatedly warned by Edward Thornton about the condition of Naconiche Village, and did not attend to the problems. Third, probable cause existed for Plaintiffs' arrest.[9] Edward Thornton had worked with the Wells for 17 months to assist them with the installation of adequate sewage facilities at Naconiche Village. He was deluged with evidence that established that the Wells had

---

[8] See *supra* at notes 1-7.

[9] See *supra* at section I.A. detailed discussion of probable cause to support Thornton's complaints.

committed crimes in the operation of that facility. Finally, no defendant acted maliciously in filing the charge. To the contrary, Edward Thornton filed the complaints because the Wells simply would not follow the law and get their systems in compliance with applicable statutes and rules. Mr. Thornton still believes that the Wells were in violation of state standards and guilty of the crimes with which they were charged.

### 3. Tortious Interference with Business Relationships

In order to prevail on a cause of action for tortious interference with prospective business relationships, a plaintiff must prove the following elements: a) a reasonable probability that the plaintiff would have entered into the prospective relationship or contract, b) the defendant's conduct must have been independently tortious or wrongful, c) the defendant's interference must have resulted in actual harm or damage to plaintiff, and d) the defendant's acts were the proximate cause of damages to the plaintiff. *See Wal-Mart Stores, Inc. v. Sturges*, 44 Sup. Ct. J. 486, 493 (March 8, 2001); *Lone Star Steel Co. v. Wahl*, 636 S.W.2d 217, 222 (Tex. App. - Texarkana 1982, no writ). Tortious interference with business relationships is an intentional tort. *See Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 471 (Tex. 1992); *Inman v. City of Katy*, 900 S.W.2d 871, 873 (Tex. App. - Corpus Christi 1995, no writ).

Plaintiffs cannot establish any tortious or wrongful act of either Edward Thornton or Nacogdoches County. Plaintiffs have alleged that they were unlawfully arrested on Mr. Thornton's false complaint, but these complaints were not false and were made on probable cause. Plaintiffs further allege that they were maliciously prosecuted. However, Plaintiffs' malicious prosecution claims must also fail because they cannot establish numerous requirements of that cause of action.

B. Nacogdoches County's independent grounds for summary judgment

    1. Nacogdoches County did not have a policy, practice, or custom of unlawfully arresting its citizens

    Under 42 U.S.C. § 1983, a county is not vicariously liable for the acts of its employees. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A person seeking to impose such liability on a county must do more than simply prove that the county employed a tortfeasor. *Monell*, 436 U.S. at 692. A county is only liable under section 1983 for acts for which the entity itself is responsible. *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988). Under section 1983, a municipality may be liable for constitutional violations caused by any of the following:

    1.    An officially promulgated policy of the municipality, *Monell*, 436 U.S. at 690, 694;

    2.    A custom or persistent practice of the municipality, *Monell*, 436 U.S. at 690-91;

    3.    Deliberately indifferent training, *City of Canton v. Harris*, 489 U.S. 378 (1989).

The Fifth Circuit has defined official policy as:

    1.    A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

    2.    A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality

> or to an official to whom that body had delegated policy-making authority.

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984).    Actions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy.  *Id.*

The uncontroverted summary judgment evidence demonstrates that Nacogdoches County did not maintain a policy, practice, or custom of committing unlawful arrests of its citizens. In fact, the Nacogdoches County Department of Health and Environmental Services tried to help citizens to make their septic systems comply with the law.

2. Nacogdoches County is not liable for failing to train its employees because there was no obvious need for additional training so as to impose liability on the County.

A municipal "policy" must be a deliberate and conscious choice by a municipality's policymaker.  *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 1204-05, 103 L. Ed. 2d 412 (1979).  In order to impose liability on a county for failing to adopt a policy, a plaintiff must establish that the failure to adopt the policy constituted an intentional choice of the county, not a negligent oversight.  *Id.*

If a plaintiff asserts that the alleged custom or policy of a municipality was a failure to act, then that plaintiff must demonstrate that the municipality's inaction resulted from deliberate indifference to the rights of the plaintiff.  *City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1204.  Further, if the inaction theory rests on an alleged failure to train, the plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the municipality can reasonably be said to have been deliberately indifferent to the need" for additional training.  *City of Canton*, 489 U.S. at 390, 109 S. Ct. at 1205.  The deliberately

indifferent failure to train must be the proximate cause of the violation of the plaintiff's protected right. *Id.*

The summary judgment evidence establishes that Nacogdoches County was not deliberately indifferent to the rights of its citizens or to the need for more training for its employees. In fact, no previous no other citizens of Nacogdoches County had committed such egregious acts threatening the health and safety of citizens so as to warrant criminal prosecution. No citizen of the county had ever complained that the Nacogdoches County Department of Health and Environmental Services had harassed them or unlawfully arrested them. No events put Nacogdoches County officials on notice of the need for additional training in the area of enforcement for health and safety code violations. Because the situation had not arisen before, the need for further training was not so obvious that county officials could have been deliberately indifferent to that need. *See City of Canton*, 489 U.S. at 390 n.10.

3. Nacogdoches County is not liable for the intentional torts of malicious prosecution or tortious interference with business relations.

The Texas Tort Claims Act provides a limited waiver of sovereign immunity for those injured by acts of governmental entities. However, the Act does not waive governmental immunity for intentional torts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2) (Vernon 1997). Malicious prosecution and tortious interference with business relations are intentional torts for which the Act does not waive governmental immunity. *See City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex. App. - Houston [1st Dist.] 1995, no writ); *Inman v. City of Katy*, 900 S.W.2d 871, 873 (Tex. App. - Corpus Christi 1995, no writ).

Nacogdoches County has governmental immunity for intentional torts. Plaintiffs

have alleged that Nacogdoches County is liable to them for malicious prosecution and tortious interference with business relations. However, both of these torts are characterized as intentional torts, and therefore, not within the waiver of immunity provided by the Texas Tort Claims Act. Nacogdoches County cannot be liable for either of these intentional torts.

C. Edward Thornton's independent grounds for summary judgment

    1. Edward Thornton enjoys qualified immunity for claims arising under federal law

    "The doctrine of qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S. Ct. 1827, 1833, 118 L. Ed. 2d 504 (1992). On one hand, the doctrine recognizes the private desire to obtain redress for governmentally imposed injuries as well as the public interest in both punishment and deterrence of official wrongdoing. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736-38, 73 L. Ed. 2d 396 (1982). On the other hand, there is the public aim of shielding officials from liability so that they do not become overly cautious in the performance of their duties. *Id.*

    The doctrine of qualified immunity shields government officials from liability for civil damages so long as the officials' conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. Evaluation of qualified immunity requires a three-step analysis. *See Kipps v. Caillier*, 192 F.3d 765, 768 (5th Cir. 1999), *cert. denied*, 531 U.S. 816, 121 S. Ct. 52, 148 L. Ed. 2d 21 (2000); *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999). First, a court must determine whether a plaintiff has alleged the deprivation of a constitutional

right. *Kipps*, 192 F.3d at 768 (quoting *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999)). Second, a court must determine whether that right was clearly established at the time of the official's conduct. *Id.*; *see also Siegert v. Gilley*, 500 U.S. 226, 231-32, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). A court must determine whether the record presents a genuine issue of material fact as to whether the defendant actually engaged in the conduct that violated the clearly established right. *Kipps*, 192 F.3d at 768. If the court determines that the official's conduct was unconstitutional, the court must then decide whether the official's conduct was objectively reasonable and the official therefore immune from liability. *Id.* Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter for the jury. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

Plaintiffs have alleged that Edward Thornton falsely accused them based on repealed statutes, and that they were unlawfully arrested. At the time that Edward Thornton swore out complaints against the Wells, the applicable Health and Safety Code sections were effective and had not been repealed. Further, Thornton swore out the complaints based on 17 months' observation of the Wells repeated violation of the Health and Safety Code and refusal to comply with that Code. The complaints were based on probable cause. Finally, Thornton's actions were objectively reasonable. Both he and his assistant had observed the Wells violate the Code. They had numerous reports and complaints from individuals and the Texas Natural Resources Commission relating to the Wells' illegal acts and mismanagement of the trailer park. The conditions at Naconiche Village posed a serious health risk to the community.

2. Official immunity for claims arising under state law

Official immunity is an affirmative defense for claims arising under state law. *Perry v. Texas A & I Univ.*, 737 S.W.2d 106, 110 (Tex. App. -- Corpus Christi 1987, writ ref'd n.r.e.). Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *Baker v. Story*, 621 S.W.2d 639, 644 (Tex. Civ. App. -- San Antonio 1981, writ ref'd n.r.e.); *Wyse v. Department of Pub. Safety*, 733 S.W.2d 224, 227 (Tex. App. -- Waco 1986, writ ref'd n.r.e.).  The purpose of the doctrine of official immunity is to protect public officers from civil liability for conduct that would otherwise be actionable.  Actions involving personal deliberation, decision and judgment are discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994).  Signing a probable cause affidavit to support a warrant is a discretionary act. *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 121 (Tex. App. - Houston [1st Dist.] 1995, no writ); *see also Wyse*, 733 S.W.2d at 227 (investigatory duties are discretionary).

Edward Thornton is entitled to official immunity from Plaintiffs' claims of malicious prosecution and tortious interference with business relations.  He investigated the complaints against the Wells, tried to help them over an extended period of time, and only swore out criminal complaints against them after more than a year of their noncompliance.

### V. CONCLUSION

Neither Nacogdoches County nor Edward Thornton can be held liable for their actions in prosecuting the Wells.

WHEREFORE PREMISES CONSIDERED Defendants Nacogdoches County, Texas and Edward Thornton respectfully urge this Court to grant summary judgment in their favor.

Respectfully submitted,

FLOWERS DAVIS, P. L.L.C.
815 Rice Road
Tyler, Texas 75703
(903) 534-8063
(903) 534-1560 Facsimile

ROBERT S. DAVIS
State Bar No. 05544200
CHRISTI J. KENNEDY
State Bar No. 00787772

**ATTORNEYS FOR DEFENDANTS
NACOGDOCHES COUNTY, TEXAS and
EDWARD THORNTON**

## CERTIFICATE OF CONFERENCE

I hereby certify that I contacted Curtis Stuckey, Plaintiff's attorney, on October 25, 2001, and Mr. Stuckey opposed Defendants' Motion for Summary Judgment. Therefore, this Motion is presented to the Court for determination.

CHRISTI J. KENNEDY

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing instrument was served upon counsel of record in the above entitled and numbered cause this the 26th day of October, 2001, in the following manner:

_____    Via Facsimile

__✓__    **Via Certified Mail, Return Receipt Requested**

_____    Via First Class Mail

_____    Via Hand Delivery

CHRISTI J. KENNEDY

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| TOMMIE WELLS, JR., AND CHERYL WELLS | § § § | |
| V. | § § | CIVIL ACTION NO. 9:00CV142 JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS AND EDWARD THORNTON | § § § | JURY DEMANDED |

### AFFIDAVIT OF EDWARD THORNTON

STATE OF TEXAS      §
                           §       KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF NACOGDOCHES  §

Before me, the undersigned authority, on this day personally appeared EDWARD THORNTON who, being by me first duly sworn, according to law, upon his oath deposed and stated as follows:

"My name is Edward Thornton, and I reside in Nacogdoches County, Texas. I am over the age of 18 years, of sound mind, have never been convicted of a felony, and I have personal knowledge of every statement herein made."

"I was the Director of the Nacogdoches County Department of Health and Environmental Services from February 1996 to November 2000. During the course of my employment, I received three days of initial training at the Texas Natural Resources Conservation Commission (also, the "Commission") school at Texas A&M. Thereafter, I received an additional 8 hours training each year and supervision by the Commission."

"During the years 1998 and 1999, I had occasion to investigate the Naconiche Village Trailer Park, owned and operated by Cheryl Wells and Tommie Wells, Jr. In the course of my investigation and dealings with the Wells, I observed that the Wells were in



EXHIBIT

A

violation of numerous statutes and rules relating to the disposal of human waste. The Wells had "bootlegged" septic systems serving the trailer park by adding waste pipes from additional mobile homes to an existing septic system for a different home. This had the effect of overloading the sewage input to the septic system and causing waste to pool on the surface of the property. The Wells also improperly installed septic systems themselves, and failed in some instances to obtain proper permits and licenses for their systems. The Wells also pumped improperly treated human waste into ditches along the public roadways and into the yards of the trailer park residents. Mr. Tommie Wells also personally installed septic systems without an installer's license. The Wells' activities created a hazardous and dangerous environment for the residents of Naconiche Village Trailer Park. By accepting tenants' rent and making improvements to her real property, Cheryl Wells acted with intent to promote and assist the commission of the offense, she solicited, encouraged, directed, and aided Tommy Wells in the commission of each charged offense and is equally criminally responsible for those offenses."

"In July of 1998, Tommy Wells came into my office and talked to Benny Serrano and me about putting in a mobile home park. Mr. Wells said he wanted to do everything by the letter; he had big plans for the parks and was in the process of getting a professional engineer to draw up plans for a constructive wetlands that would handle the sewage. Mr. Serrano and I informed Mr. Wells that we needed a plat of the park, a flood plain map, a site evaluation, and a topographical map."

"On July 31,1998, Mr. Wells came back into the office and said he was having trouble with his time line and his engineer. The Wells had already allowed some mobile home owners to move their homes into the trailer park. He asked if it was acceptable to

go with on-site systems in lieu of the constructive wetlands program originally proposed. Mr. Serrano and I told Mr. Wells that he could use on-site systems, but that output of 5000 gallons per day was exclusively regulated by the Texas Natural Resources Conservation Commission and had to be permitted through that agency. Mr. Wells said he was not going to put in that many trailers now and his engineer was handling permitting with the Commission on the constructive wetlands. Mr. Wells said he wanted to permit 11 systems, but he wanted to know if he could put in just one tank and field line. Mr. Serrano and I told him no, all systems should be put in according to the state's minimum standards by a licensed installer. Mr. Wells argued and asked for a list of installers. He then paid for 11 permits."

"On August 8,10, and 11, 1998, Benny Serrano evaluated the soil conditions at Naconiche Village Trailer Park. He found all but a few sites were in Class IV soil. The Class IV nature of the soil meant that Mr. Wells could not install a conventional field line system installed. Mr. Serrano met with Mr. Wells that day to show him the results, and Mr. Wells stated he understood and had talked to Mark Perkins who would install the systems. On August 31, 1998, Keith Socia, a licensed installer, put in a conventional system for Mr. Wells. I inspected that system."

"On August 12,1998,I received a complaint of sewage surfacing at the Naconiche Village Trailer Park. Mr. Serrano went out to the property on August 12, 1998 to inspect the problem, and he found sewage surfacing in five different locations. The five systems were "bootlegged" with one tank each, 60' field line, and 8' graveless. Mr. Serrano asked Mr. Wells who installed these systems, and Wells replied that he himself had installed them. Mr. Serrano then asked him why, when he knew that the County would find out

about it and make him fix it. Mr. Wells said that they couldn't get anyone to install the systems anytime soon and people were already moving in. He asked if Mr. Serrano could let it go, Mr. Serrano said no and told Mr. Wells that he needed to see me. I met with Mr. Wells, and Mr. Wells explained that he already had these places promised and leases signed when he found out all the installers couldn't get to him right away, so he was just going to do a quick fix until they could. He promised he had an installer that said he could get to it in a few weeks, and he would have everything fixed then. Mr. Wells seemed like a very trustworthy man that had gotten into an unforseen bind, so I agreed to not file a complaint in justice court and gave him time to get things fixed."

"On September 3, 1998, the Texas Natural Resources Conservation Commission faxed me a complaint that they had received relating to the Naconiche Village Trailer Park. On September 9, 1998, I received another complaint. Mr. Wells had brought in another home. Mr. Serrano investigated and talked to Mr. Wells and told him he needed an aerobic system in that type of soil. Mr. Wells said Keith Socia was going to put one in. Mr. Serrano called Mr. Socia, and he confirmed that one would be installed."

"On September 9, 1998, I received yet another complaint on the property. This time, there was sewage backing up in a woman's home. Mr. Wells had added an additional 20 feet of field line, but he still needed an aerobic system due to the nature of the soil. Mr. Serrano talked with Mr. Wells and told him before any additional homes were brought in, he would have to bring the five other places up to state standards."

"On November 25, 1998, Benny Serrano called Mr. Wells into the office and told him not to install any more systems until the ones that were previously installed were brought up to the state's minimum standards. The Wells had eleven tenants with mobile homes

in the park, and eight of the eleven systems were failing.   Mr. Wells had still not provided me with a plat of the area."

"On January 20, 1999, I sent Mr. Wells a letter explaining that if he did not fix the problems that were previously discussed, legal action would be taken.  On January 27, 1999, Mr. Serrano spoke with Mr. Wells on the telephone and told Mr. Wells that he had to get a registered sanitation expert and accomplish the following:

1)      he was to bring all systems into compliance;

2)      permit all systems not permitted;

3)      repair all systems failing; and

4)      he was not to do the work himself, but to use a licensed installer.  Mr. Wells said he was having money problems but Claude Singleton was lending him the money to finish everything right."

"On February 1, 1999, Mr. Serrano went to check Mr. Wells' progress.  Mr. Wells had dug another hole for a septic tank, but said he was only helping Installer Kevin Dillon. Mr. Wells said that my should give him a break and back off.  Mr. Serrano said that they had given him a break and that he still hadn't resolved the problems.  Mr. Wells said they hadn't given him a break and he said that he had done everything they asked."

"On April 15, 1999, Mr. Wells came into my office and said that Reliable had ordered a system but the weather was bad and he would install it as soon as he could. On April 15, 1999, sewage was surfacing on lot 38 and I sent Mr. Wells a letter requesting the problem be fixed within 10 days."

"On September 30, 1999, another complaint on Naconiche Village came in; there was sewage surfacing behind the trailer at 165 Claywells Road.  My office sent Mr. Wells

a letter requesting he get the problem fixed. I had not been able to reach the Wells by telephone, and I requested that Mr. Wells call my office."

"On October 6, 1999, sewage was surfacing onto Road 165, Claywells Road. On October 25, 1999, Mr. Serrano observed that new systems had been put in at the trailer park, but that the Wells had altered the systems. Mr. Serrano explained that this was illegal, and that Mr. Wells had not notified my office or the registered sanitation expert and installer. Additionally Mr. Wells had given his word to me, Mr. Serrano, and to Kevin Dillon that he would bring all systems into compliance and not bring in any other homes until the problems were fixed. After all these months, the Wells had made no attempt to comply with the state statutes or commission regulations, and I made the decision to file a complaint in justice court."

"In December 1999, Judge Johnson of Precinct One asked what day would be good to have a hearing. I told him it was close to Christmas and asked if it could be postponed until after the New Year. Judge Johnson agreed."

"On December 10, 1999, my office received another complaint on Mr. Wells. He had dug a ditch, put in plastic pipe, and was pumping effluent through it to the ditch on Simmons Road. Mr. Thornton went to justice court and filed a complaint relating to this latest offense by Mr. Wells."

"On December 29, 1999, I received notice of two hearings to be held on January 1, 2000. On January 4, 2000, I again received a complaint of sewage running off onto the highway. Mr. Serrano and I went out and took pictures."

"On January 7, 2000, I received a complaint of sewage coming out from under a trailer. Mr. Serrano and I went out and found that Mr. Wells had moved a trailer onto the

field line of another system.  Again, Mr. Serrano and I took pictures."

"On January 11, 2000, we took water samples at all the problem areas in the mobile home park.  On January 20, 2000, Mr. Thornton's office sent out another letter to Mr. Wells.  During this period of time there were more complaints that were coming into the office.  On January 28, 2000, I received additional complaints of sewage in the yards at Naconiche Village."

"On March 2, 2000, water samples were taken again at the problem sites.  On March 10, 2000, the results were returned as still dangerous, some areas were worse.  On March 20, 2000, Heather Ross and George Volz of the Texas Natural Resources Conservation Commission met with Mr. Serrano and me and went over all the paperwork relating to the Wells' problems at Naconiche Village.  They went out to the property and took pictures. Ms. Ross and Mr. Volz told me that if we received any additional complaints from the mobile home park, we should take notes and fax it over to their office.  At that time, Naconiche Village was using over 5000 gallons per day and therefore fell under TNRCC jurisdiction.  There were now 39 homes on the property."

"I swore out complaints against both Cheryl Wells and Tommie Wells for violations of the Texas Health and Safety Code.   At the time that I swore out the complaints, I believed that they had violated certain statutes and regulations that carried criminal penalties. Specifically, Tommie Wells had acted as a licensed installer, constructed on-site sewage facilities that did not comply with applicable statutes and rules, and  discharged sewage into a county road ditch.  Cheryl Wells was an owner of the property, had constructed non-conforming on-site sewage facilities, and caused sewage to be discharged to a county road ditch.  Both of the Wells had failed to properly dispose of human excreta

on their property, and had failed to install disposal systems sufficient to prevent the pollution of the surface soil, the contamination of drinking water, or the creation of a public health nuisance. Each of these acts was subject to criminal enforcement. The statutes under which the Wells were charged had not been repealed at the time of the charges, nor have they been repealed now."

"I tried repeatedly to get Mr. Wells to comply with the regulations governing the installation of septic systems. I tried to work with him. For a period of approximately 17 months, I tried to help Mr. Wells get his system in compliance. However, Mr. Wells kept putting me off and was uncooperative. He acted as if he were going to fix his systems, but then kept adding additional homes and additional lines that worsened the problem."

"I did not file the complaints against the Wells out of any malice towards them. To the contrary, I filed the complaints because the Wells simply would not follow the law and get their systems in compliance with applicable statutes and rules. I still believe that the Wells were in violation of state standards and guilty of the crimes with which they were charged."

"I did not arrest the Wells or cause them to be arrested. I was unaware that the Wells would be arrested. I did not desire that the Wells be arrested, but only that they be made to comply with applicable state standards for waste disposal."

"During the time that I was Director of the Nacogdoches County Department of Health and Environmental Services, there was no county or department policy of harassing or making false complaints against citizens. In fact, it was our policy to try to help residents with their problems and get all septic systems to comply with the applicable laws. Out of the numerous complaints that I investigated, I only filed criminal complaints against three

people. Other than the Wells' lawsuit, I never received any other complaint or negative comment regarding my investigation of sewage complaints. Other than the Wells' lawsuit, there have been no other oral or written complaints regarding unlawful arrests or unwarranted complaints ever made against my department, the Nacogdoches County Department of Health and Environmental Services."

"Further Affiant sayeth not."

<u>EDWARD THORNTON</u>

BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this day personally appeared EDWARD THORNTON, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed

GIVEN UNDER MY HAND AND SEAL OF OFFICE this <u>25</u> day of <u>October</u>, 2001.



Notary Public - State of Texas

CHRISTY L. HORTON
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 10-20-2002

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

TOMMIE WELLS, JR. AND          )
CHERYL WELLS                   )
                               )
VS.                            )          CA NO. 9:00CV142
                               )
NACOGDOCHES COUNTY, TEXAS      )
AND EDWARD THORNTON            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
TOMMIE WELLS, JR.
OCTOBER 17, 2000

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF TOMMIE WELLS, JR., produced as a

witness duly sworn by me at the instance of the DEFENDANT,

taken in the above styled and numbered cause on the 17th day

of September, 2000 from 10:56 a.m. to 3:35 p.m., before DEENA

L. WHITFIELD, Certified Shorthand Reporter No. 3241 in and

for the State of Texas, reported by oral stenography method

at the Stuckey, Garrigan & Castetter Law Offices, 2803 C

North Street, Nacogdoches, Texas; taken pursuant to Notice

and in compliance with the Federal Rules of Civil Procedure

and Local Rules by the Eastern District of Texas; signature

required.



EXHIBIT
B

A P E A R A N C E S

APPEARING FOR THE PLAINTIFFS, TOMMIE WELLS, JR. AND CHERYL
WELLS:

    Mr. Curtis B. Stuckey, Attorney in Charge
    Stuckey, Garrigan & Castetter Law Offices
    P.O. Box 631902
    Nacogdoches, Texas 75963-1902

APPEARING FOR THE DEFENDANTS, NACOGDOCHES COUNTY, TEXAS AND
EDWARD THORNTON:

    Mr. Robert S. Davis, Attorney at Law
    Flowers, Davis, Fraser, Derryberry & Van Cleef, L.L.P.
    815 Rice Road
    Tyler, Texas 75703

ALSO PRESENT:

    Ms. Cheryl Wells, Plaintiff
    Mr. Edward Thornton, Defendant
    Mr. Benny Serrano, Nacogdoches County representative

```
 1                         TOMMIE WELLS, JR.,

 2    having been first duly sworn, testified as follows:

 3                         EXAMINATION

 4    BY MR. DAVIS:

 5         Q.   Good morning, sir, how are you?

 6         A.   Morning.

 7         Q.   Would you state your name for the record, please?

 8         A.   Tommie Earl Wells, Jr.

 9         Q.   Mr. Wells, have you ever given deposition testimony

10    before?

11         A.   No, I have not.

12         Q.   Then before we start your deposition in earnest,

13    I'd like to get some agreements with you about how we're

14    going to conduct it.  If I ask you a question that you don't

15    understand, if you will, ask me to repeat it or rephrase it

16    until you do understand it, okay?

17         A.   Okay.

18         Q.   Because if you answer my question, I'm going to

19    assume that you understood it and I'll ask the jury at trial

20    to assume that you understood it, is that fair?

21         A.   Yes.

22         Q.   And also one thing that's kind of important, this

23    nice lady over here can't take down head shakes or nods or

24    uh-huhs and huh-uhs very effectively, so if you will, always

25    try to answer my questions verbally.  And if you forget, I'll
```

1          A.   No.

2          Q.   Has it always been known as Naconiche Village,

3     Inc.?

4          A.   Yes.

5          Q.   Are you the sole shareholder?

6          A.   No.

7          Q.   Were you initially the sole shareholder?

8          A.   No.

9          Q.   Who all are the shareholders?

10         A.   Cheryl and myself.

11         Q.   Okay.  When you say Cheryl, you're referring to

12    your wife, Cheryl Wells?

13         A.   Cheryl Wells.

14         Q.   Do you each own 50 percent of the stock?

15         A.   I'm not sure on how exactly it's set up, but --

16    actually think -- yeah, it could be, but I'd have to -- to be

17    honest with you, to be perfectly sure, I'd have to look.

18         Q.   And are you an office holder in Naconiche Village,

19    Inc.?  Are you president or vice president, something like

20    that?

21         A.   No.

22         Q.   What's your title with Naconiche Village, Inc.?

23         A.   Registered agent.

24         Q.   That's registered agent for service of process?

25         A.   Just registered agent.

1        Q.   All right.  Does your wife hold a title in the

2   company?

3        A.   Yes, she does.

4        Q.   What's her title?

5        A.   CEO.

6        Q.   Do you have any other office holders in the

7   company?

8        A.   No.

9        Q.   No president, secretary, treasurer, or nothing like

10  that?

11       A.   Not from my -- I mean I'd have to look at it to be

12  honest with you.

13       Q.   Do you keep your own corporate records?

14       A.   H&R Block.

15       Q.   Do you have like a corporate minute book?

16       A.   Yes, we do.

17       Q.   Does H&R Block keep that or do y'all have that in

18  your possession?

19       A.   I guess it's in our possession.

20       Q.   Prior to incorporating Naconiche Village, Inc., did

21  you have any previous experience as a contractor or a

22  subcontractor?

23       A.   Yes.

24       Q.   What was that experience?

25       A.   Working with another subcontractor at Love Homes.

1    permitting for the aerobic systems and a few conventional

2    systems.

3        Q.    Did you ask them for a list of installers, licensed

4    septic tank installers?

5        A.    I think they gave me one, yes.

6        Q.    Did you ask them for it or did they just give it to

7    you?

8        A.    I don't remember if I asked them for it or what,

9    but I remember getting one.

10        Q.    Did you ask any of those -- did you call any of

11    those installers?

12        A.    Yes.

13        Q.    Which installers did you actually use out there?

14        A.    Keith Socia.

15        Q.    Anyone else?

16        A.    And Kevin Dillon on down the road.  Mark Perkins

17    helped put one system in.

18        Q.    And how many systems have actually been installed

19    by licensed installers?

20        A.    Well, they've all been in one way or another

21    installed partly by a licensed installer.  I mean they were

22    all permitted and passed.

23        Q.    But they were not all installed by licensed

24    installers, were they?

25        A.    No.

TOMMIE WELLS, JR.                    74

1    Q.   Okay.

2    A.   Well, the permitted ones are, yes.

3    Q.   Well, the non-permitted ones, were they installed

4    by licensed installers?

5    A.   Some of them were, yes.

6    Q.   And some of them weren't?

7    A.   Right.  Some of them I did, some of them Keith

8    helped me with, other ones, you know, there's several that we

9    -- that I did 99 percent of the work on and they were

10   permitted and passed.

11   Q.   And there's others that weren't permitted and

12   passed?

13   A.   Right.

14   Q.   And of those, a number of those were not done by

15   licensed installers, correct?

16   A.   They were done by myself, yes.

17   Q.   And you're not a licensed installer?

18   A.   No, no, I'm not a licensed installer.  But a lot of

19   those that were done were like these aerobic systems that

20   were permitted, they will do a number of homes which the

21   systems that -- you know, the temporary systems were --

22   what's the word I'm looking for -- they were brought in

23   compliance by the installation of one aerobic system several

24   places.

25   Q.   But not all places, correct?

TOMMIE WELLS, JR.                    75

1       A.    Right now, yes.

2       Q.    Well, back then?

3       A.    Back then, no.  No.

4       Q.    How many of the systems back then were not licensed

5    and permitted?

6       A.    In July?

7       Q.    (Moving head up and down)

8       A.    I can't remember when we permitted our first

9    system, first aerobic system out there.  I can't remember if

10   we did some of the conventional permits first or the aerobic.

11   I'd have to look on, you know, what our date on our permits

12   are.

13      Q.    How many systems were -- say in June of 2000, how

14   many systems had not been permitted that were out there at

15   the time?

16              MR. STUCKEY:  June of this year?

17              MR. DAVIS:  Yeah.

18      A.    June of this year.  It's hard to say, it would be a

19   very few, I'd have to look on who was there and who wasn't

20   there in June.  I don't have that information.

21      Q.    During this period of time, did you have a number

22   of people moving in and out?

23      A.    In June of this year?

24      Q.    No, over this period of time, say from the time you

25   started putting trailers out there --

TOMMIE WELLS, JR.                                    76

1    A.    The question, rephrase the question.  I mean what

2  do you mean by that question?

3    Q.    Well, you're aware of what effluent is, right?

4    A.    Yes.

5    Q.    We've been through that.

6    A.    Basically what you're asking is if we put a system

7  in and this is the first time this system is put in, how can

8  effluent be surfacing if they're just moving in?

9            MR. DAVIS:  I'll object to the nonresponsive

10  nature of the answer to the question.

11    Q.    (BY MR. DAVIS)  I ask that you listen to my

12  question --

13    A.    Okay.

14    Q.    -- and try just to answer the question that I ask

15  you.

16    A.    Okay.

17    Q.    You had families that were moving onto or into

18  Naconiche Village, correct?

19    A.    Correct.

20    Q.    And you had experienced effluent surfacing on the

21  property, is that right?

22    A.    Right.

23    Q.    Did you warn the families that were moving onto the

24  property that y'all had effluent surfacing on the property?

25    A.    No, I didn't.

```
 1          Q.   Well, you had had problems with failing systems,

 2     sir, since you started moving your first trailers onto the

 3     property, hadn't you?

 4          A.   Yes, sir.

 5          Q.   And they had been out there --

 6          A.   Which were systems --

 7          Q.   -- Mr. Serrano and Mr. Thornton had been out there

 8     --

 9               MR. STUCKEY:  Let him finish his answer,

10     Robert, if you would be so kind.

11          Q.   (BY MR. DAVIS)  Were you finished?

12          A.   No.

13          Q.   Okay.

14          A.   These are systems that I was gaven [sic] the okay

15     to put in.

16               MR. DAVIS:  I'm going to object to the answer

17     to the question as being nonresponsive.

18          Q.   (BY MR. DAVIS)  Let me ask you, sir, did you have

19     -- from the very inception of the time that you opened up

20     this property, did you have problems with septic systems

21     failing out there?

22          A.   Yes, we did.

23          Q.   And were numerous complaints made regarding the

24     failures of those systems?

25          A.   To my knowledge, the ones that -- any -- any
```

1    complaint that we had directed to us, we tried to fix the

2    problem.

3              MR. DAVIS:  I'm going to object to the

4    nonresponsive nature of the answer and repeat the question.

5        Q.   (BY MR. DAVIS)  And were there numerous complaints

6    regarding the failures of those septic systems, sir?

7        A.   To me, no, there was not numerous.  There were some

8    complaints, yes, but it wasn't an overwhelming majority.

9        Q.   Well, you had 18 people move off the property in

10   less than a year, didn't you?

11       A.   Yes.

12       Q.   During this period of time, Mr. Serrano and Mr.

13   Thornton were coming out and talking to you and looking at

14   the property and visiting with you about the problems that

15   you were experiencing out there, weren't they?

16       A.   Yes.

17       Q.   And they expressed to you in these conversations

18   the fact that they wanted you to bring the systems up to

19   compliance and repair the systems so that they wouldn't be

20   failing, didn't they?

21       A.   Yes.

22       Q.   And now six months into it, they're still telling

23   you the same thing, aren't they?

24       A.   (No response)

25       Q.   Well, they're -- basically by January 27th of 1999,

TOMMIE WELLS, JR.                              94

1    you're telling them that Claude Singleton's going to loan you

2    the money to fix all this stuff, aren't you?

3        A.   Yes.

4        Q.   I mean you'd had problems with this stuff for six

5    months, hadn't you?

6        A.   Yes.

7        Q.   And you were still experiencing problems with all

8    this, weren't you?

9        A.   Yes.

10       Q.   And they were problems that posed a serious risk of

11   -- well, a serious -- well, strike the question, I'll ask it

12   again.

13            These were situations involving these septic

14   systems where you had effluents backing up and surfacing on

15   the property, wasn't it?

16       A.   We took care of every complaint that we thought --

17   if it was endangering somebody, we took care of the leak, we

18   tried to take care of the problem.  We did the best we could.

19       Q.   But these conditions, these situations had

20   continued over a six-month period, hadn't they?

21       A.   I don't know if it was six months or not, I mean I

22   couldn't tell you --

23       Q.   Well, certainly from July of 1998 up through the

24   end of January of 1990 [sic] when you told them about Claude

25   Singleton, you'd been experiencing problems throughout that

1    A.    In what month?

2    Q.    October of 1999?

3    A.    I'm not sure, but there's been -- I mean, you know,

4    we've had several complaints.  A lot of complaints that were

5    made were not made to us, they'd go straight to the county

6    and we wouldn't know there was a problem until then.

7    Q.    All right.  Well, you became aware of numerous

8    incidents where sewage was surfacing from your septic systems

9    one way or another, didn't you?

10    A.    Right, and we tried to fix the problems as quickly

11    as we could.

12    Q.    And by this time, this is October of 1999, by this

13    time the situation had been going on for well over a year,

14    hadn't it?  I mean there were continued incidences of sewage

15    surfacing and septic system problems by that time for well

16    over a year, correct?

17    A.    Yes, but each problem was different.  A lot of

18    times it could be anywhere from a leaky pipe to somebody's

19    toilet stuck.  Anybody knows that if your toilet sticks and

20    runs, it's going to flood your system.  I don't care if

21    you've got 400 foot of field line, if you let a toilet run

22    for extended period of time, it will flood a system and cause

23    septic problems.

24    Q.    You know I bet that's true, but what we're actually

25    talking about is effluent, sewage, raw sewage surfacing and

1    coming to the surface.  That's what we're talking about,

2    isn't it, sir?

3        A.    That's what you're talking about.

4        Q.    Well, we've just been through these numerous

5    incidents where that has occurred, correct?

6        A.    Yes.

7        Q.    And regardless of what you want to blame it on, it

8    all comes back to the sewage systems, the septic systems that

9    you had in place out there, doesn't it?

10       A.    That's my understanding.

11       Q.    Did you ever alter any systems that had been put in

12   on the property?

13       A.    What's your definition of alter?

14       Q.    Well, did you ever have any systems put in by a

15   licensed septic system installer that you then later went

16   back to and altered in some manner?

17       A.    Yes, we did.  With the consent of Ed Thornton.

18       Q.    How many --

19       A.    We were told -- we were told on several occasions

20   that if a sprinkler -- just because the design and layout of

21   a engineer and a sprinkler doesn't work here, it's okay to

22   move it.  One system we had 11 sprinklers on, we thought that

23   was overkill.  I was told, hey, if you need to, take a

24   sprinkler off.

25       Q.    And you're saying Mr. Thornton told you that?

TOMMIE WELLS, JR.                    101

1    A.   Yes.

2    Q.   And then do you recall that in December of 1999

3  there was another complaint that there was a plastic pipe

4  that was pumping effluent through it to the ditch on Simmons

5  Road?

6    A.   Yes.

7    Q.   And in fact, there was a plastic pipe that was

8  dumping effluent onto the ditch on Simmons Road, wasn't

9  there?

10    A.   No.

11    Q.   Okay.  Are you telling the folks on the jury panel

12  that you were not pumping effluent from septic systems onto

13  the ditch on Simmons Road?

14    A.   That pipe that we had installed in there was a

15  drain.

16    Q.   Were you pumping effluent onto Simmons Road from

17  the septic systems?

18    A.   Yes.

19    Q.   Thank you.

20    A.   But this was water from a aerobic system that had

21  been through treatment process.

22    Q.   On one of the systems that you -- well, strike

23  that.

24         You were pumping effluent through a pipe into a

25  ditch on Simmons Road, weren't you, sir?

1    A.    Not through a pipe.

2    Q.    Well, through a drain?

3    A.    Drain.

4    Q.    Well, it was a plastic pipe, wasn't it?

5    A.    We had a plastic pipe installed back there for a

6    drain, for a drainage problem that we had.

7    Q.    Well, and you were pumping through that pipe onto

8    Simmons Road or into the ditch alongside Simmons Road

9    effluent from your septic systems, weren't you, sir?

10    A.    We were pumping treated water from an aerobic

11    system through there, yes.

12    Q.    Now you're aware that you're not supposed to pump

13    water, even if it's treated, onto a ditch alongside the road,

14    aren't you, sir?

15    A.    I was not aware of that.

16    Q.    Well, you were aware of what a aerobic system is

17    designed to do is spray out water, correct?

18    A.    Correct.

19    Q.    And you were running more houses on the aerobic

20    systems than they were designed for, weren't you?

21    A.    Because of the 5,000 gallon, yes.

22    Q.    And I think you've already testified, you're not

23    any type of expert in sanitation systems or treating water

24    that's in aerobic systems, are you, sir?

25    A.    No, but it's a pretty simple process.

TOMMIE WELLS, JR.                    108

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

TOMMIE WELLS, JR. AND          )
CHERYL WELLS                   )
VS.                            )          CA NO. 9:00CV142
NACOGDOCHES COUNTY, TEXAS      )
AND EDWARD THORNTON            )

REPORTER'S CERTIFICATION
DEPOSITION OF TOMMIE WELLS, JR.
OCTOBER 17, 2000

       I, Deena L. Whitfield, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

       That the witness, TOMMIE WELLS, JR., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

       That the deposition transcript was submitted on _____, 2000 to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2001; and gave proper Notice of delivery in accordance with federal and local rules.

       That the amount of time used by each party at the deposition is as follows:

       Mr. Robert Davis - 5 hours; 2 minutes
       Mr. Curtis Stuckey - none

       That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

       Mr. Curtis Stuckey, Attorney for Plaintiffs
          Tommie Wells, Jr. and Cheryl Wells
       Mr. Robert Davis, Attorney for Defendants,
          Nacogdoches County, Texas and Edward Thornton

       I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

       Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

       Certified to by me this ____ day of _December_, 2000.

       DEENA L. WHITFIELD, Texas CSR #3241
       Expiration Date:  12-31-2000
       Hill & Associates Reporting Agency
       P.O. Drawer 631625
       Nacogdoches, Texas 75963-1625
       936-564-9247

LASER BOND FORM B    PENGAD · 1-800-631-6989

TOMMIE WELLS, JR.                                    150

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _January 15, 2001_;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to __Mr. Robert Davis__, Custodial Attorney;

That $ _459.32_ is the deposition officer's charges to the Plaintiffs Party for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _____ day of _____, 2000.



DEENA L. WHITFIELD, Texas CSR #3241
Expiration Date:  12-31-2000
Hill & Associates Reporting Agency
P.O. Drawer 631625
Nacogdoches, Texas 75963-1625
936-564-9247

LASER BOND FORM B ⓟ PENGAD • 1-800-631-6989

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| TOMMIE WELLS, JR. AND | § | |
| CHERYL WELLS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS and | § | |
| EDWARD THORNTON | § | |

### AFFIDAVIT OF LLOYD PLUNKETT

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF NACOGDOCHES | § |

Before me, the undersigned authority, personally appeared ___Lloyd Plunkett___, who being by me duly sworn, deposed as follows:

"My name is _Lloyd Plunkett_. I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

My wife and I have lived in the Naconiche trailer park at 130 Cheryl St. Garrison Tx. since Nov. 1999. We believe that the County put Tommy and Cheryl Wells in jail for good reason. They knew the problems with the sewage here but never cared. They violated the County Health Departments rules and regulations. After Tommy and his wife was put in jail he told me he was just mad at the county for taking his wife to jail before she could breast feed their baby.

There was a Family(Lou Marshall) who lived across the street from us who had to move. Their yard was covered in gray water ( Human waste),it stunk so bad, and looked like dried crap all the time.. They would wade through it to get to their truck. My wife and I have smelled septic odors in the park for the last two years and we complained to the Well's but they never did anything. Just recently a man named Mitch Uresti, who now collects the lot rent here, bought 100 dollars in septic tablets to help kill the smell. Mitch is trying to do some repairs around here. Before when Tommy was here I saw Tommy pump sewage from the Naconiche trailer park to across the street and he also pumped the neighbors sewage into my tank. In the past I was forced to pump my tank by pugging in the Aerobic System across the street so it would activate to keep sewage from backing up into my house.

Many people had serious problems with sewage in this trailer park and had to move. Tommy Wells installed almost all the Aerobic systems out here and charged everyone five hundred dollars to hook up their trailer houses with Electricity, water and septic. Ralph Holcombe moved a trailer house in next to mine and Tommy dug a hole and installed a septic tank. Tommy said the County would not let him hook any more systems so he run a water hose from Ralph's tank to mine. Tommy pumped Ralph's septic into mine for six months and then he final installed a field line from Ralph's house over to the single wide next door. At one time the the septic problems were so bad Melanie Lyles's kids could not even go out to play because of all



EXHIBIT
C

the sewage flooding the trailer park.

There was another couple by the name of Lance and Christy Feaster, who got so sick of the sewage in their yard that Lance whipped Tommy really bad, but I could tell you about several people who disliked the Wells's.

I never had a personal problem with the Wells's but, Tommy lied and lied, he was the worst liar. Tommy and Cheryl were always looking for a free dollar.

Further Affiant sayeth not."

_Floyd Plunkett_

SWORN TO AND SUBSCRIBED before me on the 16th day of August, 2001.

JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

_Jerri Finchum_
Notary Public, State of Texas

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

TOMMIE WELLS, JR. AND     §
CHERYL WELLS     §
    §
V.     §     CIVIL ACTION NO. 9:00CV142
    §     JUDGE: HOWELL COBB
NACOGDOCHES COUNTY, TEXAS and     §
EDWARD THORNTON     §

### AFFIDAVIT OF BONNIE DANIELS

STATE OF TEXAS     §
COUNTY OF NACOGDOCHES     §

       Before me, the undersigned authority, personally appeared __Bonnie Daniels__ , who being by me duly sworn, deposed as follows:

       "My name is __Bonnie Daniels__ . I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

       James Flanagan and I live at 106 Ponderosa St. Nacogdoches Texas. Before we lived at 120 Cheryl st. Naconiche trailer park in Garrison Texas. We were forced to move because Tommy and Cheryl Wells refused to fix the septic system in their trailer park, but that did not keep them from collecting the rent. They would not do anything out at the park. Everyone was complaining and going to the County for help. It was so bad that we had sewage backing up into the shower, bathtubs and coming out all around the house. We even took pictures. We did not have the money to move but if we had not the sewage backing up would have destroyed our trailer house. It costed us over 1500.00 to move. The Naconiche trailer park was dirty and a health hazard to anyone who stayed there. The County did their job by putting Tommy and Cheryl Wells in jail.

Further Affiant sayeth not."

*Bonnie Faye Daniels*

SWORN TO AND SUBSCRIBED before me on the 4th day of *August* , 2001.

JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

*Jerri Finchum*
Notary Public, State of Texas



EXHIBIT

D

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **TOMMIE WELLS, JR. AND** | § | |
| **CHERYL WELLS** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 9:00CV142** |
| | § | **JUDGE: HOWELL COBB** |
| **NACOGDOCHES COUNTY, TEXAS and** | § | |
| **EDWARD THORNTON** | § | |

### AFFIDAVIT OF DWAYNE BROOK

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF NACOGDOCHES** | § |

Before me, the undersigned authority, personally appeared __Dwayne Brook__, who being by me duly sworn, deposed as follows:

"My name is __Dwayne Brook__. I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

My family and I have live in the Naconiche village trailer park since April, 1999 at 160 Chase Street Garrison Tx. We have had sewage (human waste) standing in our front yard since day one, of us moving in. What were we to do? We did not have the money to move again. I talked to Cheryl and Tommy on the phone and I even told Tommy two or three times to come fix the problem. Tommy always said he was going to do something, but he never did. That's why I stopped paying rent on this lot. I won't pay until they get out here and fix the problem with this sewage system.

Just recently I received a note on my door to pay some one else and not to pay Tommy or Cheryl Wells, they were selling the trailer park or something like that.

I have four children and I am concerned for their health and it is a health hazard to have septic water in your yard. I think that the Wells's should have gone to jail, just like everyone else who breaks the law.

Further Affiant sayeth not."

_Dewayne Brook_

SWORN TO AND SUBSCRIBED before me on the __14th__ day of __August__, 2001.



JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

_Jerri Finchum_
Notary Public, State of Texas

**EXHIBIT**

_E_

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| TOMMIE WELLS, JR. AND | § | |
| CHERYL WELLS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS and | § | |
| EDWARD THORNTON | § | |

## AFFIDAVIT OF MELISSA DIXON

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF NACOGDOCHES | § |

Before me, the undersigned authority, personally appeared ___Melissa Dixon___, who being by me duly sworn, deposed as follows:

"My name is ___Melissa Dixon___. I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

On the evening of the arrest of Tommy and Cheryl Wells, Mr.Wells called Mrs. Wells on his cellular telephone while I was talking to Mr. Wells. He was moving the aerobic sprinklers of Tammy and Billy Pinkerton's first house. Mr. Wells told me that they were being arrested. I offered to babysit his three children, and Mr. Wells accepted my offer. I then took my children in my car and followed him to his house. At this point, a black deputy was there assuring Mrs. Wells that she would not be stripped searched, but the baby could not go in to jail with her. I assured her that everything would be okay. Once again, the deputy reassured her. He told Mr. and Mrs. Wells that they would be able to bond out the same evening if they had someone to bring a money order. Mr. and Mrs. Wells loaded up the children and followed the deputy, and I followed with my children in my car behind Mr. and Mrs. Wells. Upon getting to the Nacogdoches County jail, I took the diaper bag and began to take care of my children (ages 2 & 4) and Mr. and Mrs. Well's three children (approx. 9 month daughter, 4 & 6 year old son). At that time, Cassie (The Wells's baby) was not crying. The only child upset was the oldest-Chase. Upon that time, I watched all 5 children for approximately 2 hours before I left in Mr. and Mrs. Wells's van to get them some supper. I tool all 5 children to McDonald's for happy meals. After taking the children to McDonald's, I took all 5 children to Brookshire Brother's on South St. in Nacogdoches where my husband was the assistant store director. My husband can attest to the fact that all three children were not upset and playing with my two children. When I returned to the Nacogdoches County jail, Mr. Wells's mother was there. At that time, Mr. Wells's mother found out how much money was needed to make bail that night. She did not have enough money to bail out both Mr. and Mrs. Wells. Mr. Wells's mother called Cheryl Wells's father to ask if they were coming to help. Cheryl's father told her no on the cellular telephone. I wanted to help, so I took Mr. Wells's mother to Brookshire Brother's on South Street. At that time, Mrs. Well's



EXHIBIT

F

mother wrote a personal check for cash in order to bail out Tommy and Cheryl. I then took Mr. Wells's mother to the EZ Mart to get a money order. During my time with Mr. Wells's mother, the children, Cassie, Chase, and Clay were playing well together. I dropped Tommy's mother and the Wells's two boys off at the Jail and took the baby back to Tommy's house to get the frozen breast milk from the freezer and fed the baby on the way back to the jail. Throughout the time I baby set none of the children were crying or upset. After approximately 5 to 6 hours, after Mrs. Cheryl Wells and Mr. Tommy Wells were arrested they were bailed out. At that point, I turned over three tired but happy children.

Our mobile home was in one of the worst sections plagued with septic problems. It was an everyday occurrence to have green slime in our yard. When the aerobic sprinklers went off, it smelled worse than a chicken house; it would make us sick to our stomachs. Something has to be illegally hooked up when you have green wet slime during a summer where we did not have any rain (summer of 2000). I know that Tommy had put in big round concert colberts, with no bottoms in them, for septic tanks. My daughter had impetigo approximately four times during the last two months before we moved. After we moved, our daughter has had no relapse of impetigo.

At the time of the arrest (December 1999) of Mr. and Mrs. Wells, I felt that the arrest was justified and only hoped that this opened their eyes to the fact that things needed to change at Naconiche Village Trailer Park. After a few months and they continued illegal boot legged septic systems, I realized that things were not going to change. That is why I decided to put my babies in daycare and get a job so we could move from the cesspool. I had the privilege of staying home with my children and intended to stay home until our daughter entered kindergarten (2002-2003), but I had to get a job, so I could have a safe and healthy environment for my children to ride their bicycles and play in a safe yard. I have no regrets about my involvement with the county health department trying to report all of the illegal boot legged septic systems.

Further Affiant sayeth not."

*Melissa Dixon*

SWORN TO AND SUBSCRIBED before me on the 16th day of August, 2001.

JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

*Jerri Finchum*
Notary Public, State of Texas

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| **TOMMIE WELLS, JR. AND** | § | |
| **CHERYL WELLS** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 9:00CV142** |
| | § | **JUDGE: HOWELL COBB** |
| **NACOGDOCHES COUNTY, TEXAS and** | § | |
| **EDWARD THORNTON** | § | |

### AFFIDAVIT OF LLOYD GILLESPIE

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF NACOGDOCHES** | § |

Before me, the undersigned authority, personally appeared ____Lloyd Gillespie____, who being by me duly sworn, deposed as follows:

"My name is ___Lloyd Gillespie___. I am above the age of eighteen (18) and I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

Tommy Wells came wanting me to finance and take the lien over on the Naconiche trailer park for him and his wife Cheryl. I agreed and at the closing of the deal, in front of Attorney Bill Peterson, Tommy and Cheryl swore there were no problems with the septic systems on the property.

Soon after that, I went out to check the property and caught Tommy pumping sewage from the trailer park with a hose across the street into the ditch. I had already financed the property at that time and Tommy told me he was going to run the park the way he wanted. I believed at the time he would correct the problem.. Tommy lied to me time and time again about what was going on in the park.

Mr. Wells came to me again and told me that he was in trouble with the County and needed to put in more septic systems. I agreed to finance another thirty five thousand dollars to protect my first investment. Tommy used 8000.00 dollars and then I found out he tried to get Kevin Dillon an installer to falsify receipts for work that had not been done so he could get more money from me. Tommy Wells later told me he had sold lots for 1500.00 dollars each and wanting me to sign off on the titles. About one week later Tommy faxed me a copy of a closing statement on a piece of property for the amount of 3500.00. I later faxed the same closing statement to Heritage Titles Services and they called to tell me that the closing statement I had was wrong. Heritage faxed me a copy of the statement Tommy Wells gave them, it was the same property but this time priced at 7500.00 dollars. In fact the Wells's were selling lots for several time more then he was telling me and falsifying Closing statements. Tommy and Cheryl Wells filed for bankruptcy and left their mess for me to deal with.

The Wells's violated the County Health Regulations and should have been put in jail.



Page 1

The County was just doing their job.

Further Affiant sayeth not."

*Lloyd Gillespie*

SWORN TO AND SUBSCRIBED before me on the 14th day of August, 2001.

JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

*Jerri Finchum*

Notary Public, State of Texas

Page 2

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| TOMMIE WELLS, JR. AND | § | |
| CHERYL WELLS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS and | § | |
| EDWARD THORNTON | § | |

## AFFIDAVIT OF LUTHER FRAZIER

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF NACOGDOCHES | § |

Before me, the undersigned authority, personally appeared __Luther Frazier__, who being by me duly sworn, deposed as follows:

"My name is __Luther Frazier__. I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

I have lived in the Naconiche trailer park for about two years. I live at 160 Cheryl st. Garrison Texas. One week after I moved my house into the trailer park. Tommy Wells installed a Aerobic sprinkler in my yard, right in front of my front door. When it goes off sometimes, I can not get in my house until it stops spraying. Everyday at 3:00 or 4:00 pm the septic system goes off and sprays around my front door, porch and house. There is also a sprinkler next to the driveway, before when I first moved in, it would spray my truck with human waste water. I complained long enough that Tommy Wells finally came out and turned the sprinkler in the direction of my neighbors yard.

I remember when there were more trailers in the park sewage ran down the ditch in front of my house. One of my neighbors had sewage backing up in their house, They finally just moved. Many people moved out because of the problems in the park. I told the Wells two or three times to fix the problem in the park but they did nothing. I can smell human waste in the park. I think it is dangerous to peoples health. We still have lots of problems but not as bad as before, because before there were about 40 houses, now there's about half as many. I believe the Wells's broke the Health department regulations.

I got a note on my door saying not to pay the Well's but to pay a man named Mitch Uresti and if I had any questions to call Gay Carter at 569-6158.

Further Affiant sayeth not."



Page 1 of 2

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| TOMMIE WELLS, JR. AND | § | |
| CHERYL WELLS | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | JUDGE: HOWELL COBB |
| NACOGDOCHES COUNTY, TEXAS and | § | |
| EDWARD THORNTON | § | |

### AFFIDAVIT OF MELANIE LYLES

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF NACOGDOCHES | § |

Before me, the undersigned authority, personally appeared ___Melanie Lyles___, who being by me duly sworn, deposed as follows:

"My name is ___Melanie Lyles___. I am above the age of eighteen (18) and have never been convicted of a crime of moral turpitude. I am of sound mind and capable of making this affidavit. The following facts are within my personal knowledge and are true and correct.

My two children and I lived in Naconiche trailer park from Nov. 1999 to July 2001. Tommy Wells told me that the rent was 150 a month and that he was going to make improvements to our lot. The Wells's promised to build us a driveway, put grass in our yard, build a play ground and put in and Aerobic Septic System. I agreed to move in and paid two years rent in advance. Tommy put in a septic tank with no field lines. Two months after we moved in the tank began to over flow, for a long time someone came out every week to pump the tank because it would backup. Then one day Tommy came out and ran a hose from our tank to the neighbors tank, which solved nothing. The tank continued to flood the yard. One day one of the children told me that you could go to the bathroom and flash the toilet and run to the kitchen window and watch it come up in the yard. I was embarrassed to have anyone over, but I was more concerned for the health of my children. I called the Wells's and most of the time they were not home so I would leave a message but they would never return my calls. When I did catch them there, Tommy would say I will be out there tomorrow, but he never would come out. I was not in the trailer park long before I realized the Wells's were nothing but liars. They lied to me in the lease. They took my money and never intended to do any of the things they had promised.

The Wells did not care about the health of my children or anyone else in that trailer park. They broke the law, violated Health Department regulations and they deserved to be put in jail. The only thing the County did wrong was to release them from jail.

Further Affiant sayeth not."



EXHIBIT
I



SWORN TO AND SUBSCRIBED before me on the 16th day of August, 2001.

Notary Public, State of Texas

JERRI FINCHUM
NOTARY PUBLIC
State of Texas
My Commission Expires 03-20-2004

# EXHIBIT J

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

STATE OF TEXAS            §
                         §
VS.                      §            CAUSE NO. 99-12-2993
                         §
CHERYL WELLS             §

### DEFENDANT CHERYL WELLS MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, Cheryl Wells, Defendant herein, by and through the undersigned counsel of record and files this, Defendant Cheryl Wells Motion to Dismiss, or Alternatively, for Trial Setting, and in support thereof would respectfully show as follows:

I.

Defendant Cheryl Wells was arrested on or about December 17, 1999 and charged in the above-referenced and numbered cause. This Honorable Court set the matter for hearing to be held January 10, 2000. By agreement with the County Attorney, the matter was continued in contemplation that legally sufficient complaints would be filed. The County Attorney further assured that the filing would not occasion the re-arrest of Defendant. To date, no such amended complaints have been filed.

II.

Ms. Wells is charged with violations of Chapter 366 of the Texas Health and Safety Code and with violations of the Texas Administrative Code. The criminal penalty for these alleged violations were repealed in 1997 by Act of 175th Legislative Session, Chapter 1072, Section 60(4). Therefore, no offense is stated and the matter should be dismissed ~~with~~ Without prejudice.





Filed  JP1
Date  4-26-00
By  _Jill K. Lunsford_

III.

Alternatively, Ms. Wells asks the case be set for trial.

Wherefore, premises considered, Defendant respectfully prays that the instant case be in all things dismissed or alternatively, set for trial.

Respectfully submitted,

John W. Tunnell
State Bar No. 20292100
WELCH & TUNNELL
Attorneys at Law
Post Office Box 1574
Lufkin, Texas 75902-1574
Telephone: (409) 639-3311
Facsimile: (409) 639-3049

### Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on the _18th_ day of _April_, 2000.

Mr. Bryan Davis
Nacogdoches County Attorney
101 West Main Street
Nacogdoches, Texas 75961

John W. Tunnell

000005

# EXHIBIT K

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

STATE OF TEXAS §
§
VS. §           CAUSE NO. 99-12-2993
§
CHERYL WELLS §

### ORDER OF DISMISSAL

On this date came to be considered the Defendant's Motion for Dismissal and the Court, having considered the motion, together with any response thereto, finds that the same should be granted. Accordingly,

IT IS ORDERED that the Complaint in the above-referenced matter should be and is hereby dismissed.

SO ORDERED this ___2___ day of ___May___, 2000.

_____
JUDGE PRESIDING





000002

# EXHIBIT L

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO. 99-12-2992 |
| | § | |
| TOMMY WELLS | § | |

## DEFENDANT TOMMY WELLS MOTION TO DISMISS

### TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, Tommy Wells, Defendant herein, by and through the undersigned counsel of record and files this, Defendant Tommy Wells Motion to Dismiss, or Alternatively, for Trial Setting, and in support thereof would respectfully show as follows:

I.

Defendant Tommy Wells was arrested on or about December 17, 1999 and charged in the above-referenced and numbered cause. This Honorable Court set the matter for hearing to be held January 10, 2000. By agreement with the County Attorney, the matter was continued in contemplation that legally sufficient complaints would be filed. The County Attorney further assured that the filing would not occasion the re-arrest of Defendant. To date, no such amended complaints have been filed.

II.

Mr. Wells is charged with violations of Chapters 366 and 341 of the Texas Health and Safety Code. The criminal penalty for these alleged Chapter 366 violations were repealed in 1997 by Act of 175th Legislative Session, Chapter 1072, Section 60(4). Therefore, no offense is stated and these charges should be dismissed ~~with~~ *Without* prejudice.



EXHIBIT
tabbies
L

PLAINTIFF'S
EXHIBIT
4
9:00 CV 142

Filed JP 1
Date 04-26-00
By Jill R. Lunsford

000006

III.

Mr. Wells would further show that the present complaints are legally insufficient and should be dismissed or alternatively set for trial.

Wherefore, premises considered, Defendant respectfully prays that the instant case be in all things dismissed or alternatively set for trial.

Respectfully submitted,

John W. Tunnell
State Bar No. 20292100
WELCH & TUNNELL
Attorneys at Law
Post Office Box 1574
Lufkin, Texas 75902-1574
Telephone: (409) 639-3311
Facsimile: (409) 639-3049

### Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on the 28th day of April, 2000.

Mr. Bryan Davis
Nacogdoches County Attorney
101 West Main Street
Nacogdoches, Texas 75961

John W. Tunnell

000007

# EXHIBIT M

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| VS. | § | CAUSE NO. 99-12-2992 |
| | § | |
| TOMMY WELLS | § | |

### ORDER OF DISMISSAL

On this date came to be considered the Defendant's Motion for Dismissal and the Court, having considered the motion, together with any response thereto, finds that the same should be granted. Accordingly,

IT IS ORDERED that the Complaint in the above-referenced matter should be and is hereby dismissed.

SO ORDERED this 2 day of May, 2000.

_____
JUDGE PRESIDING

EXHIBIT

PLAINTIFF'S
EXHIBIT
2
9:00Cv142

000003