IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1. | TOMMY WELLS, JR. | § |
| | and | § |
| 2. | CHERYL WELLS | § |
| | | § |
| | Plaintiff | § |
| | | § |
| v. | | § CIVIL ACTION NO. 9:00CV142 |
| | | § |
| 1. | NACOGDOCHES COUNTY, TEXAS | § JUDGE COBB |
| | and | § |
| 2. | EDWARD THORNTON | § |
| | | § |
| | Defendants | § |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I

## Introduction

Plaintiffs Tommy and Cheryl Wells were arrested and hauled off to jail on the basis of criminal complaints filed by Nacogdoches County Heath & Environmental Services Administrator Edward Thornton. Plaintiffs sued Defendant Thornton because their arrests were unlawful; Defendant Thornton maliciously prosecuted them; and Defendant Thornton tortiously interfered with a business relationship. Plaintiffs sued Defendant Nacogdoches County because Defendant Thornton is Defendant Nacogdoches County's ultimate repository of authority concerning what action, if any, to take against trailer park owners involved in disputes with Nacogdoches County.

Both defendants filed a motion for summary judgment. Plaintiffs will demonstrate below that the motion for summary judgment is without merit.

1

## II

### Issues Presented

1.   Whether the arrests of plaintiffs were lawful.

2.   Whether Defendant Thornton maliciously prosecuted the plaintiffs.

3.   Whether Defendant Thornton tortiously interfered with plaintiffs' business relationship.

4.   Whether Defendant Nacogdoches County is jointly liable for the unlawful arrests.

## III

### Documents Relied On

Plaintiffs' Exhibit 1:    Affidavit of Tommy Wells

Plaintiffs' Exhibit 2:    Affidavit of Cheryl Wells

Plaintiffs' Exhibit 3:    Deposition of Tommy Wells [excerpts]

Plaintiffs' Exhibit 4:    Deposition of Cheryl Wells [excerpts]

Plaintiffs' Exhibit 5:    Deposition of Edward Thornton [excerpts]

Plaintiffs' Exhibit 6:    *State of Texas v. Cheryl Wells,* Cause No. 99-12-2993, Order of Dismissal [Bates No. 2]

Plaintiffs' Exhibit 7:    *State of Texas v. Tommy Wells,* Cause No. 99-12-2992, Order of Dismissal [Bates No. 3]

Plaintiffs' Exhibit 8:    Affidavit of Danny Simmons

Plaintiffs' Exhibit 9:    Affidavit of Michael Porter

## IV

## Facts

**A.    Tommy Wells**

### 1.    Affidavit

Plaintiff Tommy Wells testified by Affidavit that he and his wife owned a trailer park in Nacogdoches County.  (Pl. Ex. 1, §II).  A corporation was set up to run the trailer park, but the Wells still own the land. (Pl. Ex. 1, §II).

Mrs. Wells was listed as the CEO of the corporation.  However, Mr. Wells actually ran the trailer park and made the decisions regarding the trailer park.  Mrs. Wells had very little to do with it.  (Pl. Ex. 1, §III).  Mr. Wells specifically asked Defendant Thornton not to tell Mrs. Wells about the problems at the trailer park and Defendant Thornton, to his credit, agreed not to tell her. (Pl. Ex. 1, §XXVIII).

Mr. Wells originally planned to install a wetlands septic system for the trailer park.  (Pl. Ex. 1, §IV). However, this became economically impossible when the original estimate was changed from $60,000 to $150,000. (Pl. Ex. 1, §IV).  Mr. Wells was in the process of designing and permitting the wetlands when his engineer, who was partially paid, quit. (Pl. Ex. 1, §V).  This caused severe problems because Mr. Wells was already leasing lots. (Pl. Ex. 1, §V).

Mr. Wells discussed with Defendant Thornton the fact that the law allows a landowner to install septic systems.  (Pl. Ex. 1, §VI).

3

Defendant Thornton gave Mr. Wells permission to install temporary septic systems until the aerobic systems could be installed. (Pl. Ex. 1, §VII). Defendant Thornton approved each of the septic tanks when they were installed. (Pl. Ex. 1, §VII).

Defendant Thornton and his assistant began harassing Mr. Wells for no good reason. (Pl. Ex. 1, §VII). For example, Mr. Wells was first told that the septic system could not exceed 5000 gallons after he had already installed a system that exceeded 5000 gallons. (Pl. Ex. 1, §VII). Simply put, Mr. Wells' hands were tied because Defendant Thornton changed the rules of the game after tenants were already in the trailer park (Pl. Ex.1, §§VII & X) when he abruptly reversed himself and would no longer allow additional work on the septic tanks. (Pl. Ex. 1, §VII). Defendant Thornton exacerbated the problem by not giving Mr. Wells permission to get anything done. (Pl. Ex. 1, §VII).

A tenant's toilet overflowed about a week before the Wells were arrested.  Mr. Wells took immediate care of the problem, but in the meantime the yard was saturated (Pl. Ex.1,  §§XI & XII).

Most of the problems were caused by the tenants themselves. One of the main problems was that the tenants would turn off the sprinkler heads.  (Pl. Ex. 1, §XIX).

Lloyd Plunkett's Affidavit refers to Lou Marshall's yard being covered with human waste and stinking.  Mr. Wells tried to find out where the leak was coming from.  It turned out that the leak was coming from Mr. Marshall's trailer over which Mr. Wells had no control.  (Pl. Ex. 1, §XIV).

4

Tenant Daniels' problems were caused by the fact that she clogged up her pipe trying to flush tampons. (Pl. Ex. 1, §XV).

Tenant Brook's problem was caused when he ran over a sprinkler head with his lawn mower. (Pl. Ex. 1, §XVI).   Mr. Wells also unclogged his pipes several times because Tenant Brooks tried to flush items that could not be flushed. (Pl. Ex. 1, §XVI).

Tenant Dixon's main problem was that she would cap off her sprinklers without anyone's permission. (Pl. Ex. 1, §XVII).

Tenant Frazier's problem was caused by licenced installer Kevin Dillon and Mr. Wells corrected the problem as soon as he learned about it. (Pl. Ex. 1, §XVIII).

Defendant Thornton prepared and filed separate criminal complaints against both Mr. & Mrs. Wells on November 8, 1999. (Pl. Ex. 1, §XXI). Defendant Thornton filed additional complaints on December 10, 1999 against Mr. Wells. (Pl. Ex. 1, §XXI). All of the complaints contained material false information and an arrest warrant would not have been issued but for the material false information. (Pl. Ex. 1, §§XXII & XXIII).

The Wells were arrested in front of their children on December 19, 1999 and their arrests appeared on the front page of the Nacogdoches Daily Sentinel. (Pl. Ex. 1, §§XXIV & XXV). The negative publicity ruined the business and dried up Mr. & Mrs. Wells' credit, forcing them to file bankruptcy.  (Pl. Ex. 1, §XXV).

Defendant Thornton maliciously prosecuted Mr. and Mrs. Wells. (Pl. Ex. 1, §XXVI).   It is undisputed that the criminal charges

filed against Mr. & Mrs. Wells were dismissed on May 2, 2000. (Pl. Ex. 1, §XXVII).

The State of Texas later filed a civil suit in connection with the trailer park, and Mr. Wells believes that this is how the situation should have been taken care of in the first place. (Pl. Ex. 1, §XXVII).

### 2. **Deposition**

Mr. Wells confirmed at his deposition that he had received Defendant Thornton's permission to install the temporary systems. (Tommy Wells depo p. 72, ln. 7-13). Mr. Wells started installing septic tank systems after he talked to Defendant Thornton. (Tommy Wells depo p. 71, ln. 18-23). Defendant Thornton knew that Mr. Wells was installing temporary systems until the aerobic systems were installed. (Tommy Wells depo p. 83, ln. 11 thru p. 84, ln. 4).

In September of 1998 Defendant Thornton's assistant, Benny Serrano, told Mr. Wells for the first time that he would have to bring the trailer park up to state standards before other people could move in. (Tommy Wells depo p. 86, ln. 22 thru p. 87, ln. 2). Mr. Wells altered some systems installed by a licensed installer with the consent of Defendant Thornton who told him that he could take some of the sprinklers off of the system because the system had more sprinklers than was necessary. (Tommy Wells depo p. 101, ln. 14 thru p. 102, ln. 1). Later, Mr. Wells was told for the first time - after the work was already done and the trailers were already in - of the 5000 gallon rule. (Tommy Wells depo p. 104, ln. 24 thru p. 105, ln. 1).

There were more aerobic systems hooked up to the trailers than the system was designed to handle. (Tommy Wells depo p. 106, ln. 20-23). However, the reason there were more trailers on the aerobic system than it was designed for was because of the recently imposed 5000 gallon limitation. (Tommy Wells depo p. 108, ln. 19-21).

Mr. Wells never pumped raw sewage. (Tommy Wells depo p. 118, ln. 5-9). Mr. Wells did receive a complaint in December of 1999 about a plastic pipe pumping effluent into a ditch. (Tommy Wells depo p. 107, ln. 2-6). However, it was not pumping raw effluent but was pumping water from the aerobic system that had been through the treatment process. (Tommy Wells depo p. 107, ln. 11 thru p. 108, ln. 11). The plastic pipe was installed for drainage problems and Mr. Wells was not aware that he was not supposed to pump treated water. (Tommy Wells depo p. 108, ln. 4-15).

Defendant Thornton took samples after the January 2000 arrest when there began to be more complaints. (Tommy Wells depo p. 109, ln. 7-14). Mr. Wells was aware of the fact that the samples that were taken in March of 2000 came back bad because he had not serviced the systems at all following his December arrest because **Defendant Thornton specifically told Mr. Wells after he was arrested not to work on the septic tanks.** (Tommy Wells depo p. 110, ln. 5 thru p. 112, ln. 16; p. 143, ln. 7-25). Mr. Wells later began servicing the systems again because he was tired of waiting for something to be worked out. (Tommy Wells depo p. 112, ln. 19-21).

Pumping sewage from the septic tank to the ditch is ok if the water is properly treated. (Tommy Wells depo p. 120, ln. 18-25).

## B. __Cheryl Wells__

### 1. __Affidavit__

Cheryl Wells' affidavit is very similar to her husband's affidavit. (Pl. Ex. 2, §§II-VI). Mrs. Wells specifically confirmed that she knew nothing about her husband's agreement with Defendant Thornton and that her involvement in the trailer park was very limited. (Pl. Ex. 2, §III). She also believes that this situation should have been handled with a civil suit, rather than criminal charges, in the first place. (Pl. Ex. 2, §VI).

### 2. __Deposition__

Mrs. Wells was technically CEO of the corporation. (Cheryl Wells depo p. 7, ln. 13-23). However, she got pregnant and was not involved in the inner workings of the business. (Cheryl Wells depo p. 8, ln. 4-18). Mr. Wells handled the finances and she helped when she could. (Cheryl Wells depo p. 10, ln. 17-19).

Mrs. Wells was only vaguely aware of the problems with the septic systems. (Cheryl Wells depo p. 14, ln. 3-6). She very rarely went on the property and never saw effluent. (Cheryl Wells depo p. 38, ln. 10-14).

Mrs. Wells' children were 6, 4 and 9 months. (Cheryl Wells depo p. 18, ln. 19-20). Mrs. Wells was taken to the police station where she was fingerprinted, mugshot, and put in a cell. (Cheryl Wells depo p. 19, ln. 15 thru p. 20, ln. 24). She was very uncomfortable and her clothes got wet because she was breast

feeding and was not allowed breast feed in the jail. (Cheryl Wells depo p. 21, ln. 2-15). She left the jail after one of her parents paid bail, although Mr. Wells did not get out until several hours later. (Cheryl Wells depo p. 22, ln. 9-17). She believes that her screaming infant made the process quicker. (Cheryl Wells depo p. 22, ln. 18-24).

Mrs. Wells only received one letter from Defendant Thornton before her arrest. (Cheryl Wells depo p. 34, ln. 3-8). Mrs. Wells did not call Defendant Thornton because her husband was handling it. (Cheryl Wells depo p. 34, ln. 12-23).

The Wells' financier got scared and pulled out after the arrests. (Cheryl Wells depo p. 41, ln. 9-15). Unfortunately, by this time the Wells had already made promises that they could no longer keep. (Cheryl Wells depo p. 42, ln. 1 thru p. 43, ln. 8).

C. **Employee Simmons' Affidavit**

Mr. Simmons worked for Mr. Wells at the trailer park from the summer of 1998 through the summer of 1999. (Pl. Ex. 8, §II). Mrs. Wells had very little to do with the trailer park. (Pl. Ex. 8, §III). Employee Simmons also confirmed that Mr. Wells' had Defendant Thornton's permission to install the systems. (Pl. Ex. 8, §§IV & V).

Defendant Thornton knew that Mr. Wells had permits for some of the systems. (Pl. Ex. 8, §V). Further, Defendant Thornton knew that Mr. Wells was pumping water from the septic tank into the aerobic system because Defendant Thornton saw Mr. Wells do it. (Pl. Ex. 8, §VI). Finally, Employee Simmons confirmed that the Mr. Wells

always did his best to promptly respond to complaints. (Pl. Ex. 8, §VI).

**D.    Tenant Porter's Affidavit**

Tenant Porter confirmed that Mr. Wells is a good man who runs a good trailer park. (Pl. Ex. 9, §§III-VII). Tenant Porter also confirmed that Mrs. Wells never worked at the trailer park. (Pl. Ex. 9, §VII).

**E.    Defendant Edward Thornton's Admissions**

Defendant Thornton did not admit very much. However, Defendant Thornton did admit that he signed the criminal complaints, but at the same time denied that he had anything to do with getting the Wells arrested. (Thornton depo p. 5, ln. 1-18). Defendant Thornton signed the complaint in his capacity as Nacogdoches County Environmental Health Administrator. (Thornton depo p. 9, ln. 3 thru p. 10, ln. 5). He also admitted that full authority had been delegated to him by the Commissioners Court. (Thornton depo p. 10, ln. 6-10). The Commissioners Court specifically gave him full authority to decide whether or not to file criminal charges and the decision was left solely up to his good judgment and discretion. (Thornton depo p. 109, ln. 11-22).

Defendant Thornton admitted that he had no evidence that Mrs. Wells was guilty of any offense, other than the fact that she was the landowner. (Thornton depo p. 118, ln. 6-11). He further acknowledged that just because you are a landowner does not mean a charge is automatically filed. (Thornton depo p. 119, ln. 3-10).

Defendant Thornton knew that the Wells could be arrested as a result of his criminal complaint. (Thornton depo p. 18, ln. 3-9; p. 20, ln. 18-22; p. 22, ln. 7-9). Defendant Thornton thought the Sheriff would pick Mr. Wells up, arrest him, and take him before a judge. (Thornton depo p. 28, ln. 8-15). Defendant Thornton also knew that Mrs. Wells could be hauled off to jail because in his view as co-owner she was just as guilty as Mr. Wells. (Thornton depo p. 48, ln. 21-25). This was his view despite the fact that when he first met Mr. Wells, Mr. Wells told him that he was the owner of the property and not to bother his wife. (Thornton depo p. 49, ln. 15-21; p. 152, ln. 2-5).

Defendant Thornton denied knowing about Tenant Ford's broken toilet during the week of December 3, 1999. (Thornton depo p. 73, ln. 4-12). However, Defendant Thornton acknowledged that Mr. Wells had numerous problems with leaky and broken toilets.[1] (Thornton depo p. 74, ln. 1-5).

Defendant Thornton admitted that he had never met Mrs. Wells between July of 1998 and the time she was hauled off to jail in December of 1999. (Thornton depo p. 76, ln. 18-25). He also admitted that he knew Mr. Wells was calling the shots with regard to the trailer park. (Thornton depo p. 79, ln. 7-15).

Defendant Thornton admitted that neither his assistant nor anyone else ever indicated that Mrs. Wells knew anything at all about the pump. (Thornton depo p. 135, ln. 17-22; p. 154, ln. 17-

---

[1]The leaky and broken toilets were not Mr. and Mrs. Wells' fault because it is undisputed that the Wells did not own the trailers.

11

20). Defendant Thornton also admitted that except for one letter in March 1999 [over eight months before the arrest] he never made any effort to contact Mrs. Wells about the problem. (Thornton depo p. 157, ln. 22 thru p. 158, l n. 2). Further, he did not give Mr. Wells any time to correct the last problem.[2]  (Thornton depo p. 135, ln. 3-10).

The County Attorney told Defendant Thornton that he would have to drop the charges because they were deficient. (Thornton depo p. 143, ln. 5-20). Defendant Thornton reluctantly acknowledged that as a result of his charges a nice lady and her husband were taken to jail. (Thornton depo p. 144, ln. 10-17).

Defendant Thornton acknowledged that a number of trailer parks in Nacogdoches County had sewage problems. (Thornton depo p. 159, ln. 13-16).

Defendant Thornton acknowledged that nobody ever claimed that Mr. Wells' trailer park contaminated wells. (Thornton depo p. 170, ln. 8-19).  He also admitted that he did not have a single documented case of illness caused by the trailer park. (Thornton depo p. 164, ln. 7-10).

Defendant Thornton acknowledged that he may have approved permits exceeding 5000 gallons.[3] (Thornton depo p. 187, ln. 20 thru p. 188, ln. 1). He also admitted that at the time of installation he permitted the systems that he was claiming were not set up

---

[2]Standing water caused by the leaky toilet.

[3]The trailer park owner is supposed to obtain a permit before installing a septic tank system.  The system is "permitted".

right. (Thornton depo p. 185, ln. 4-10). Finally, he admitted that he never tested for effluent prior to the arrest. (Thornton depo p. 183, ln. 5-12). Defendant Thornton admitted that he did not consider either plaintiff to be a flight risk at the time of the arrest. (Thornton depo p. 195, ln. 15-18). He also said that he did not contact either of the Wells on November 8, 1999 when he decided to file the first set of charges. (Thornton depo p. 200, ln. 17-20).

**F.    Dismissal of Charges**

The charges were dismissed on May 2, 2001. *See* Plaintiffs' Exhibits 6 & 7.

**V**

**Argument**

**A.    Standard for Summary Judgment**

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Harper v. Harris County, 21 F.3d 597, 600 (5th Cir. 1994). This Court must first consult the applicable substantive law to determine the material factual issues. Id. The court must view the evidence bearing on those issues in the light most favorable to the non-movant. Id.

Pursuant to *Fed.R.Civ.P.* 56(c), summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The

party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for his motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which he believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Court's inquiry in ruling on a motion for summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). At the same time, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970).

B.    **Arrests**

1.    **Law**

As our Supreme Court has succinctly stated:

> No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

Terry v. Ohio, 392 U.S. 1, 9 (1868), quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891).

The right to be free from an unlawful arrest is guaranteed by the Fourth Amendment. Sorenson v. Ferrie, 134 F.3d 325, 328 (5th Cir. 1998).

14

The legality of a warrant is determined in light of the information available at the time the warrant is obtained. Maryland v. Garrison, 480 U.S. 79, 85-86, 107 S.Ct. 1013, 1017-18, 94 L.Ed.2d 72 (1987); Richardson v. Oldham, 12 F.3d 1373, 1381 (5th Cir. 1994).

It is well-established that a facially valid warrant may be invalid.  Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).  A facially valid warrant is void when it is obtained on the basis of an affiant's false statement that is knowingly and intentionally made, or made with reckless disregard of the truth, if the false statement is necessary to the finding of probable cause.  Id. at 155-156, S.Ct. at 2676; Husband v. Bryan, 996 F.2d 27, 30 (5th Cir. 1991).

An officer who submits a supporting affidavit to a judge that issues a warrant is liable "unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause." Malley v. Briggs, 475 U.S. 335, 339, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986).

Simply put, an arrest is illegal if it is made without probable cause.  Baker v. McCollum, 443 U.S. 137, 144-45 (1979).

Probable cause depends "upon whether, at the moment the arrest was made, . . . the facts and circumstances within [defendants'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the

[citizen] had committed or was committing an offense." <u>Beck v.</u> <u>Ohio</u>, 379 U.S. 89, 91 (1964).

**2.    Both Arrests Were Unlawful**

The arrest of Mr. Wells is unlawful because it was not supported by probable cause. Assuming *arguendo* that the arrest of Mr. Wells was supported by probable cause, the arrest of Mrs. Wells was still unlawful because she had virtually nothing to do with the trailer park and the only "evidence" connecting Mrs. Wells with any crime is her co-ownership of the trailer park. Stated differently, Mrs. Wells' relationship with Mr. Wells provides absolutely no justification for her arrest, assuming *arguendo* that probable cause existed for the arrest of Mr. Wells.

Mr. Wells was the victim of an overzealous governmental official, Defendant Thornton, who converted an essentially civil dispute into the arrest of two innocent citizens. There is substantial evidence that Mr. Wells was doing what he had been given permission to do by Defendant Thornton and that Defendant Thornton changed the rules of the game after tenants had already moved into the trailer park. Defendant Thornton, by commanding Mr. Wells not to do any further work on the septic systems, doomed Mr. Wells to failure.

**C.    Tortious Interference with a Business Relationship**

**1.    Law**

Tortious interference with a business relationship is an intentional tort. <u>Southwestern Bell Telephone Company v. John</u> <u>Carlo Texas, Inc.</u>, 843, S.W. 2nd 470, 471 (Tex. 1992). The victim

16

must prove four things. First, there must be a reasonable probability that he would have entered into the prospective relationship or contract without the interference. Second, the defendant's conduct must have been independently tortious or wrongful. Third, the defendant's misconduct must have resulted in actual harm to the plaintiff. Finally, the defendant's acts must be the proximate cause of the damages. <u>Wal-Mart Stores, Inc. v. Sturges</u>, 44 F.Supp. Ct. J. 486-193 (March 8, 2001).

### 2.  <u>Defendant Thornton Tortiously Interfered with a Business Relationship</u>

First, there is substantial evidence that the plaintiffs would have entered into prospective relationships and contracts without the interference. In fact, Mr. and Mrs. Wells were put out of business. Second, there is substantial evidence that Defendant Thornton's conduct was wrongful. Specifically, he filed trumped up charges against Mr. and Mrs. Wells who were hauled off to jail for no reason. Third, there is substantial evidence that Defendant Thornton's misconduct resulted in actual harm to Mr. and Mrs. Wells. Fourth, it is uncontroverted that Mr. and Mrs. Wells filed bankruptcy and there is substantial evidence that Defendant Thornton's misconduct was the cause of the bankruptcy. Finally, there is substantial evidence that Defendant Thornton's acts are a proximate cause of damages. Mr. and Mrs. Wells have been humiliated and embarrassed and lost their dream.

D.    **Malicious Prosecution**

    1.    **Law**

A malicious prosecution victim must show the following:

      1.    That a criminal action was commenced against him;

      2.    That the prosecution was caused by Defendant or with his aid;

      3.    That the action terminated in the victim's favor;

      4.    That the victim is innocent;

      5.    That the Defendant acted without probable cause;

      6.    That the Defendant acted with malice; and

      7.    That the criminal proceeding damaged the victim.

Taylor v. Gregg, 36 F.3d at 455.

    Malice may be inferred by proof of lack of probable cause. Dahl v. Akin, 645 S.W.2d 515 (1982).

    2.    **Law Applied to Facts**

    It is undisputed that a criminal action was commenced against Mr. and Mrs. Wells; the prosecution was caused by Defendant Thornton; the action terminated in Mr. and Mrs. Wells' favor when the charges were dismissed; and the criminal proceeding damaged plaintiffs. Therefore, the only disputes involve elements (4)(5) and (6).

    There is substantial evidence that Mr. and Mrs. Wells are innocent of the charges. Whether Defendant Thornton had probable cause depends on what evidence is believed. Finally, the jury is entitled to infer malice from the lack of probable cause. *See* Dahl, *supra*.

### E.    **Qualified Immunity**

#### 1.    **Law**

An individual is not shielded by qualified immunity in his individual capacity when his unconstitutional acts violate well-established law.  In Harlow, *supra* our Supreme Court eliminated the subjective element previously incorporated into the qualified immunity/good faith defense.  Specifically, the Court held that governmental officials are not shielded by qualified immunity when their conduct violates clearly established constitutional rights. Harlow, 457 U.S. at 818.  Simply put, qualified immunity is defined in terms of objective conduct, not subjective state of mind. Harlow, *supra*; Mitchell v. Forsyth,  472 U.S. 511, 517 (1985). Qualified immunity should ordinarily fail when the law is well-established because public officials should know the law governing their conduct.   Harlow, 457 U.S. at 818.

In Anderson v. Creighton, 483 U.S. at 641, a warrantless search/qualified immunity case, our Supreme Court again succinctly set out the proper focus in qualified immunity cases:

> The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly  established law and the information the searching officers possessed.  Anderson's subjective beliefs about the  search are irrelevant. [Emphasis added.]

The Court must perform a two-step analysis in determining whether a defendant is shielded from qualified immunity by considering: (1) whether the plaintiff has asserted a violation of the clearly established rights; and (2) whether the defendant's

19

conduct was objectively unreasonable in light of clearly established law at the time of the alleged violation. <u>Goodson v. City of Corpus Christi</u>, 202 F.3d 730, 736 (5th Cir. 2000). Objective reasonableness is a matter of law for the court to decide when the facts are undisputed. <u>Id.</u>  On the other hand, a court may not grant summary judgment based on qualified immunity when a determination of whether the defendant's actions were objectively reasonable necessarily involves a question of fact. <u>Lampkin v. City of Nacogdoches</u>, 7 F.3d 430, 433-34 (1993).

> **2.  <u>Defendant Thornton is Not Shielded by Qualified Immunity</u>**

Defendant Thornton is not shielded by qualified immunity because no reasonably competent Environmental Health Administrator could have reasonably believed that the arrest and other harassment were objectively reasonable.  Further, no Environmental Health Administrator could have reasonably believed that converting this essentially civil dispute into a criminal prosecution was objectively reasonable.

**F.  <u>Municipal Liability</u>**

> **1.  <u>Law</u>**

>> **a.  <u>Deficient Actual Customs, Practices, Policies or Procedures</u>**

It is now well-established that municipalities are liable under 42 U.S.C. §1983 for constitutional torts that are in compliance with and triggered by the municipality's customs, practices, policies or procedures. <u>Monell v. New York Department of Social Services</u>, 436 U.S. 658 (1978).  In fact, a municipality is liable for constitutional deprivations visited pursuant to

governmental custom even though such custom has not received formal approval through the body's official decisionmaking channels. Monell, 436 U.S. at 690-91.

### b.   Final Repository

Where one individual, alone, is the final authority or ultimate repository of the municipality's power the municipality is liable for the individual's wrongful acts because his decisions represent official policy. Turner v. Upton County, Texas, 915 F.2d 133 (5th Cir. 1990); Familias Unidas v. Briscoe, 619 F.2d 391, 404 (5th Cir. 1980).



### c.   Single Incident

A "single incident" is sufficient if the wrongful act is pursuant to the municipal's custom or policy. Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).  The Court recognized that where the action is directed by those who establish governmental policy:

> the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.  To deny compensation to the victim would therefore be contrary to the fundamental purpose of §1983.

Pembaur, 475 U.S. at 481. See also Oklahoma City v. Tuttle, 471 U.S. 808, 822 (plurality opinion).  (Once a municipal policy is established, "it requires only one application . . . to satisfy fully Monell's requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.").

See also Bd. of County Com'rs of Bryan Co., Ok. v. Brown, 117 S.Ct. 1382 (1997).

### d.    Failure to Train/Supervise

A constitutional policy may still be unconstitutionally applied in which case the municipality is liable if it did not adequately train the officer and the constitutional wrong is caused by the failure to train. Canton v. Harris, 489 U.S. 378, 387 (1989). The failure to train must amount to a deliberate indifference to the rights of the person with whom the law enforcement officer comes into contact. Id. Likewise, a municipality's failure to supervise triggers liability for the constitutional torts committed by the individual officer. Kersh v. Derozier, 851 F.2d 1509, 1513 n. 6 (5th Cir. 1988); Lozano v. Smith, 718 F.2d 756, 768-771 (5th Cir. 1983); Douthit v. Jones, 641 F.2d 345, 346 (5th Cir. 1981); McClelland v. Facteau, 610 F.2d 693, 697 (10th Cir. 1979).

### 2.    Defendant Nacogdoches County is Liable for the Unlawful Arrest

It is uncontroverted that Defendant Thornton was the ultimate repository of authority over what action, if any, to take against trailer park owners involved in a dispute with Nacogdoches County. Therefore, Defendant Nacogdoches County is liable for the wrongful acts done by Defendant Thornton in the case at bar.

It is also undisputed that Defendant Nacogdoches County's actual policy was to provide Defendant Thornton with absolute discretion in determining whether to get citizens arrested. This deficient actual policy, once established, required only one incident to trigger Defendant Nacogdoches County's liability.

Defendant Nacogdoches County did not provide Defendant Thornton with any relevant training concerning what factors to consider in deciding whether to convert an essentially civil dispute into a criminal proceeding or the requirements for a lawful arrest. There is substantial evidence that this lack of training is a proximate cause of the unlawful arrests which is sufficient to trigger Defendant Nacogdoches County's liability.

## VII

## Conclusion

Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be in all things denied for the reasons set out above.


Respectfully Submitted,

Curtis B. Stuckey
Attorney in Charge for Plaintiff
Bar Card No. 19437300

Stuckey, Garrigan & Castetter Law Offices
2803 C North Street
P.O. Box 631902
Nacogdoches, Texas 75963-1902
(936) 560-6020 FAX: 560-9578

## CERTIFICATE OF SERVICE

I hereby certify that I have served all counsel of record in this case including the following with a true and correct copy of the foregoing Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment by sending same United States regular mail, postage prepaid to:

    Robert S. Davis
    Flowers, Davis, Fraser,
    Derryberry & Van Cleef, L.L.P.
    815 Rice Road
    Tyler, Texas 75703

on this the ___9th___ day of November, 2001.

                                    Curtis B. Stuckey

24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1. TOMMY WELLS, JR. | § | |
| and | § | |
| 2. CHERYL WELLS | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | |
| 1. NACOGDOCHES COUNTY, TEXAS | § | JUDGE COBB |
| and | § | |
| 2. EDWARD THORNTON | § | |
| | § | |
| Defendants | § | |

### AFFIDAVIT OF TOMMY WELLS

Comes now Affiant Tommy Wells who being duly deposed upon his oath states as follows:

#### I

I am the plaintiff in the above styled case. I am over 21 years of age, of sound mind, and otherwise competent to give this affidavit.

#### II

My wife Cheryl Wells and I owned a trailer park in Nacogdoches County. I set up a corporation but my wife and I still owned the land.

#### III

My wife was listed as the CEO of the corporation and I was listed as the registered agent for process. However, I was the one who ran the trailer park and made the decisions regarding the trailer park. My wife had very little to do with it.

#### IV

I originally planned to install a wetlands septic system for the trailer park. However, this became economically impossible

1



PLAINTIFF'S
EXHIBIT
tabbies
1
9:00CV142

when the original estimate that I received was changed from $60,000 to $150,000.

## V

I was in the process of designing and permitting the wetlands when my engineer, partially paid, quit. I had a problem because people were already leasing lots.

## VI

I met with Defendant Thornton and his assistant in order to solve the problem. We discussed the fact that the law says that a landowner can install septic systems.

## VII

Defendant Thornton gave me permission to install septic systems. I had not installed any septic systems before I talked to him. I put in temporary systems until aerobic systems could be installed. Defendant Thornton knew that I was doing this.

## VIII

Defendant Thornton and his assistant began harassing me for no good reason. He told me that the septic system could not exceed 5000 gallons after I had already installed it and it already exceeded 5000 gallons. In fact, Defendant Thornton had approved each of the septic tanks when they were installed. However, Defendant Thornton abruptly reversed himself and would not allow me to work on the septic tanks and would not give me permission to get anything done. My hands were tied.

## IX

I am a law abiding citizen and had never been arrested.

## X

A tenant's toilet overflowed about a week before my wife and I were arrested.

## XI

Defendant Thornton changed the rules of the game after tenants were already at the trailer park. This put me in an untenable situation after he tied my hands and would not let me work on the septic tanks or give me permits to get anything done.

## XII

When the tenant's toilet overflowed about a week before my wife and I were arrested. I took immediate care of the problem, but in the  meantime the yard was saturated.

## XIII

I used a pump to dry out the area as best I could and the water itself was not contaminated because it was chlorinated. However, I did have a mess on my hands until I was able to dry out the area.

## XIV

The trailer park is on clay soil. Therefore, when it rains it leaves water standing.

## XV

I now know that on November 8, 1999 Defendant Thornton prepared and filed separate criminal complaints against me and my wife. On December 10, 1999 Defendant Thornton prepared and filed three additional complaints against me.

## XVI

All of the complaints contained material false information and Defendant Thornton had actual, or at least constructive knowledge that the complaints contained material false information.

## XVII

Defendant Thornton knew or should have known that an arrest warrant would not have been issued with out the material false information.

## XVIII

My wife and I were arrested on December 17, 1999 in front of our kids.  We were taken to jail where we were finger printed and mugshotted.  We stayed locked up until we were able to post bond.

## XIX

We made the front page of the Nacogdoches Daily Sentinel.  The harassment and negative publicity ruined my business and dried up our credit forcing my wife and I to file bankruptcy.

## XX

Defendant Thornton maliciously prosecuted me.  A prosecution was commended against me.  The prosecution was caused by Defendant Thornton or through his aid and cooperation.  I believe that Defendant Thornton acted with malice in the institution of the proceeding.  The criminal proceeding terminated in my favor.  I am innocent of the charges. I suffered damages.

## XXI

The criminal charges against me were dismissed on May 2, 2000.  The State of Texas later filed a civil suit.  I believe this is how the situation should have been taken care of in the first place.

## XXII

I specifically asked Defendant Thornton not to tell my wife about problems at the trailer park and he agreed not to tell her. I did not want to bother her.

Further affiant sayeth not.

_Tommy Wells_
TOMMY WELLS

STATE OF TEXAS          *
                        *
COUNTY OF _Nacogdoches_ *

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public on this the _2nd_ day of _November_ , 2001.

_Toni J. Tomlin_
Notary Public in and for

_Nacogdoches_ County, Texas

My commission expires: _5/6/04_

TONI J TOMLIN
Notary Public
State of Texas
My Commission Expires
May 6, 2004

5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1. TOMMY WELLS, JR. | § | |
| and | § | |
| 2. CHERYL WELLS | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | |
| 1. NACOGDOCHES COUNTY, TEXAS | § | JUDGE COBB |
| and | § | |
| 2. EDWARD THORNTON | § | |
| | § | |
| Defendants | § | |

## AFFIDAVIT OF CHERYL WELLS

Comes now Affiant Cheryl Wells who being duly deposed upon her oath states as follows:

### I

I am the plaintiff in the above styled case. I am over 21 years of age and am otherwise competent to give this affidavit which is based on my person knowledge.

### II

I was technically the CEO of the corporation set up in connection with the trailer park. However, I had very little to do with the operation of the trailer park. My husband was responsible for the day to day operation of the trailer park and I knew very little about problems with the trailer park.

### III

I was shocked when I was arrested. I knew nothing about my husband's agreement with Defendant Thornton. My involvement in the trailer park was very limited.

1



PLAINTIFF'S
EXHIBIT
2
9:00CV142

### IV

My husband and I were arrested on December 17, 1999 in front of our kids.  We were taken to jail where we were finger printed and mugshotted.  We stayed locked up until we were able to post bond.

### V

We made the front page of the Nacogdoches Daily Sentinel.  The harassment and negative publicity ruined the business and dried up our credit forcing my husband and I to file bankruptcy.

### VI

I have read Dwayne Brook's Affidavit.  He says that he talked to me two or three times to fix a problem.  I never talked to Dwayne Brook about that problem.

### VII

Defendant Thornton maliciously prosecuted me.  A prosecution was commended against me.  The prosecution was caused by Defendant Thornton or through is aid and cooperation.  I believe that Defendant Thornton acted with malice in the institution of the proceeding.  The criminal proceeding terminated in my favor.  I am innocent of the charges. I suffered damages. The criminal charges against me were dismissed on May 2, 2000.  The State of Texas later filed a civil suit.  I believe this is how the situation should have been taken care of in the first place.

Further affiant sayeth not.

*Cheryl Wells*
CHERYL WELLS

STATE OF TEXAS                    *
                                 *
COUNTY OF *Nacogdoches*           *

    SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary

Public on this the *2nd* day of *November* , 2001.

          *Toni J. Tomli*

Notary Public in and for

*Nacogdoches* County, Texas

My commission expires: *5/6/04*

TONI J TOMLIN
Notary Public
State of Texas
My Commission Expires
May 6, 2004

3

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

TOMMIE WELLS, JR. AND          }
CHERYL WELLS                   }
                               }
VS.                            }          CA NO. 9:00CV142
                               }
NACOGDOCHES COUNTY, TEXAS      }
AND EDWARD THORNTON            }


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
TOMMIE WELLS, JR.
OCTOBER 17, 2000
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL DEPOSITION OF TOMMIE WELLS, JR., produced as a

witness duly sworn by me at the instance of the DEFENDANT,

taken in the above styled and numbered cause on the 17th day

of September, 2000 from 10:56 a.m. to 3:35 p.m., before DEENA

L. WHITFIELD, Certified Shorthand Reporter No. 3241 in and

for the State of Texas, reported by oral stenography method

at the Stuckey, Garrigan & Castetter Law Offices, 2803 C

North Street, Nacogdoches, Texas; taken pursuant to Notice

and in compliance with the Federal Rules of Civil Procedure

and Local Rules by the Eastern District of Texas; signature

required.

PLAINTIFF'S
EXHIBIT
3
9:00 CV142

1    Q.    All right.  How many systems initially did you put

2    in?

3    A.    Several, that's been a while back, I couldn't tell

4    you exactly how many.  Several.

5    Q.    Was there a certain point when they told you that

6    they didn't think that you could, as a landowner, put systems

7    in unless you were going to live on the property yourself or

8    live in the house itself?

9    A.    No.

10   Q.    Did they ever talk to you about the differences

11   between regular property and commercial property in terms of

12   landowner installation of septic systems?

13   A.    Just that initial conversation that we had.  At

14   that point in time, we didn't know how it would fall.

15   Q.    So they didn't tell you that you could put them in

16   yourself or you couldn't put them in --

17   A.    They told me I could, yes.

18   Q.    All right.  And then is it your testimony that you

19   went out and started putting them in?

20   A.    Yes.

21   Q.    Had you put any septic systems in before you went

22   in and talked to them, --

23   A.    No.

24   Q.    -- Mr. Serrano and Mr. Thornton?

25         Did you ever go in and talk to Mr. Serrano and Mr.

TOMMIE WELLS, JR.                                    71

1    Thornton and tell them that you were having trouble with your

2    time line and your engineer?

3        A.    Yes, yes, we discussed that.

4        Q.    And at that time, you actually had homes already

5    moving in, didn't you?

6        A.    Yes.

7        Q.    And did you tell them basically that the engineer

8    and doing this wetlands deal was messed up?

9        A.    Yeah, the engineer was dragging his feet, wasn't

10   moving as fast as what we had anticipated, and at that time I

11   had asked Ed if it was okay if we put temporary systems until

12   we figured out what we were going to do, we were still

13   pursuing the wetlands at that time, and he told me yeah.

14       Q.    Did they tell you that anything over 5,000 GPD

15   would fall under TNRCC?

16       A.    No, they did not.

17       Q.    Did you permit anything through TRNCC?

18       A.    No.

19       Q.    How many trailers did you tell Mr. Serrano and Mr.

20   Thornton that you were going to put in initially?

21       A.    Forty was what our ultimate goal was.

22            MR. STUCKEY:  Robert, I hate to do this.  I

23   need to go to the little boys' room.

24            MR. DAVIS:  Oh, that's all right.

25            (Break from 1:34 p.m. to 1:38 p.m.)

```
 1        Q.   No, five --
 2             MR. DAVIS:  You'll have to come down here and
 3   whisper in my ear --
 4             MR. STUCKEY:  Well, just let him ask it, I
 5   don't give a shit, Robert.
 6             (Sotto voce discussion between Mr. Davis
 7             and Mr. Thornton)
 8        Q.   (BY MR. DAVIS)  Oh, five houses on one tank each.
 9             MR. THORNTON:  With separate systems, one tank
10   with graveless each -- for each house.
11        A.   He's talking about the temporary systems that they
12   gave me authority to do.  Yes.
13        Q.   Tell me what you did on these temporary systems.
14        A.   We just installed one 500 gallon tank and some
15   places we put 60, some we put 80 foot of field line in a
16   temporary situation until we got aerobic systems installed.
17        Q.   Did Mr. Serrano ask you to install the systems?
18        A.   He knew we were installing systems.
19        Q.   Did he ask you to install the systems?
20        A.   To be honest, I don't -- I can't recall him asking
21   me flat out.  If he would have asked me, I would have told
22   him.
23        Q.   Well, do you recall if he did or if he didn't?
24        A.   I don't recall him asking that question, no.
25        Q.   Are you saying he didn't or are you just saying you
```

TOMMIE WELLS, JR.                                    83

1  don't know one way or the other?

2      A.   I don't know, I mean I don't remember him asking me

3  that question, but they knew, I mean they knew I was doing

4  that.

5      Q.   Well, do you remember -- are you saying he didn't

6  ask you that question or you just don't know?

7      A.   I don't remember him asking that question.

8      Q.   Okay.  He may have, he may not have?

9      A.   Yeah, he may have, I mean . . .

10     Q.   All right.  Did he ask you to fix those systems?

11     A.   Yeah.

12     Q.   And did you tell them that you couldn't get anyone

13 to install them anytime soon and that people were already

14 moving in?

15     A.   Yeah, we had -- most installers were just flooded

16 at the time.

17     Q.   These families were moving in, right?

18     A.   Right.

19     Q.   Did you warn these families that you had effluent

20 surfacing on the property?

21     A.   Well, we wouldn't have effluent if nobody was

22 living there.

23     Q.   The families moving in, did you warn the families

24 that were moving in that there was effluent surfacing on the

25 properties -- on the property?

TOMMIE WELLS, JR.                           84

1    Q.    And a lot of these families had children, didn't

2    they?

3    A.    Yes.

4    Q.    Are you aware of what the health dangers are?

5    A.    Yes.

6    Q.    Are you aware that people can get sick, very, very

7    sick if they're exposed to effluent, aren't you?

8    A.    Yes.

9    Q.    In fact, it can breed and spread very harmful

10    diseases, can't it?

11    A.    I guess so, I mean yeah, I guess, I mean I'm not a

12    biology major, but . . .

13    Q.    Do you recall a complaint being filed with the

14    TRNCC on September 3rd of 1998?

15    A.    No.

16    Q.    Do you recall a September 9th, 1998 complaint being

17    filed against you?

18    A.    Through TNRCC?

19    Q.    No, with the County from one of the -- from one of

20    the people on your property.  In fact, two complaints on that

21    day.

22    A.    I knew there was complaints being made, but as far

23    as telling you what date, no, I couldn't tell you what date.

24    Q.    In September, 1998 did Mr. Serrano basically tell

25    you that before any additional homes could be brought in that

TOMMIE WELLS, JR.                                86

1    you would have to bring the other places up to state

2    standards?

3         A.    Yes.

4         Q.    And you didn't do that before moving other homes

5    in, did you, sir?

6         A.    We had one system that we had a problem with that

7    was -- the people moved out it, the trailer was vacating, and

8    that was the last system that we had problems with.

9              MR. DAVIS:  I'll object to the nonresponsive

10    nature of the answer to that last question.

11         Q.    (BY MR. DAVIS)  I'll repeat the question.  You

12    allowed people to move onto the property, additional people,

13    before you brought the other places up to state standards,

14    correct?

15         A.    Yes.

16         Q.    On November 25th of 1998, do you recall Mr. Serrano

17    calling you to the -- or calling you and asking you to come

18    into the office, and then when you came in, telling you not

19    to install any more systems until the ones that were

20    previously installed were brought up to the state's minimum

21    standards?

22         A.    Repeat the question.

23         Q.    November of 1998, do you recall Mr. Serrano calling

24    you and you coming into the office and Mr. Serrano telling

25    you not to install any more systems until the ones that you

TOMMIE WELLS, JR.                                    87

1    coming to the surface.  That's what we're talking about,

2    isn't it, sir?

3         A.   That's what you're talking about.

4         Q.   Well, we've just been through these numerous

5    incidents where that has occurred, correct?

6         A.   Yes.

7         Q.   And regardless of what you want to blame it on, it

8    all comes back to the sewage systems, the septic systems that

9    you had in place out there, doesn't it?

10        A.   That's my understanding.

11        Q.   Did you ever alter any systems that had been put in

12   on the property?

13        A.   What's your definition of alter?

14        Q.   Well, did you ever have any systems put in by a

15   licensed septic system installer that you then later went

16   back to and altered in some manner?

17        A.   Yes, we did.  With the consent of Ed Thornton.

18        Q.   How many --

19        A.   We were told -- we were told on several occasions

20   that if a sprinkler -- just because the design and layout of

21   a engineer and a sprinkler doesn't work here, it's okay to

22   move it.  One system we had 11 sprinklers on, we thought that

23   was overkill.  I was told, hey, if you need to, take a

24   sprinkler off.

25        Q.   And you're saying Mr. Thornton told you that?

TOMMIE WELLS, JR.                    101

1      A.    Yes, I have a witness to that also.

2      Q.    Any additional alterations that you made, Mr.

3   Wells, to septic systems out there?

4      A.    Be more specific, please.

5      Q.    Well, you tell me.  Tell me each alteration that

6   you made to the septic systems --

7      A.    We moved sprinkler --

8      Q.    -- that you can recall.

9      A.    -- heads, we tied other homes onto the systems.

10     Q.    Other homes onto systems that were designed for one

11  home, correct?

12     A.    Right.

13     Q.    How many systems did you have in place that were

14  designed for more homes when you actually ran more than one

15  home into it?

16     A.    Two.

17     Q.    And how many homes did you run in there?

18     A.    Four per system.

19     Q.    And as a result of that, you had effluent surfacing

20  and other septic system problems, didn't you?

21     A.    No.  Well, the reason that we ended up having to do

22  that, we moved some homes in there and we tried to get

23  another permit to install a system and we were told that we

24  couldn't have any more permits.

25     Q.    Until you cleaned up the situation that you had,

TOMMIE WELLS, JR.                                        102

1    kinds of things out there --

2            MR. STUCKEY:  Object to the nonresponsiveness,

3    yours, Robert.

4        Q.    (BY MR. DAVIS)  While you were out there on this

5    piece of property that was, as you've described it yourself,

6    a serious health hazard to everyone living out there --

7        A.    I didn't describe it as a serious health hazard.

8        Q.    Don't interrupt, Mr. Wells.

9        A.    That was you.

10           MR. STUCKEY:  Well, but don't misstate what he

11   said, Robert.  He has never said --

12           MR. DAVIS:  I'm -- look, Curtis, if you want

13   to make statements during the course of the deposition and if

14   these gentlemen wants to interrupt me halfway through my

15   questions, there's a way that we can solve that.

16           MR. STUCKEY:  But don't say things that he

17   never said, Robert.

18           MR. DAVIS:  Well, I think that is exactly what

19   he said.  I mean he is -- well, we'll read the deposition

20   transcript and find out.

21       Q.    (BY MR. DAVIS)  I'll rephrase my question, but try

22   not to interrupt me if you will, sir.

23       A.    Yes, sir.

24       Q.    You were informed at some point of the 5,000 gallon

25   rule or 5,000, yeah, 5,000 gallon rule, weren't you, sir?

1      A.    Yes.

2      Q.    And at that point you had how many houses leading

3  into one system?

4      A.    At that point we didn't have any houses -- well, I

5  mean what's the question?  Repeat the question.

6      Q.    How many houses did you have hooked or bootlegged

7  into one system?

8      A.    Bootlegged?

9      Q.    How many houses did you have hooked into one system

10  that was designed to operate for one house?

11      A.    None.  We're talking about --

12      Q.    Didn't you have four houses hooked into one septic

13  system --

14      A.    Aerobic system, a 750 gallon aerobic system.

15             (Sotto voce discussion between Mr. Davis

16             and Mr. Thornton)

17      Q.    Well, you would agree with me that on some of these

18  aerobic systems, you were running more houses into the system

19  than the system was designed for?

20      A.    Yes.

21      Q.    Okay.  We don't have any dispute about that,

22  correct?

23      A.    No.

24      Q.    And that causes problems with the system as well,

25  doesn't it?

1    A.    If it's not properly chlorinated, no -- I mean yes,

2    it will.

3    Q.    And in fact, what happens in an aerobic system, if

4    it's not properly chlorinated, the aerobic system will spray

5    out in the form of sprinkler heads effluent onto surrounding

6    property, won't it?

7    A.    Yes.

8    Q.    And that also spreads bacteria and viruses and all

9    other types of diseases, doesn't it?

10    A.    That's my understanding, yes.

11    Q.    Well, you were aware that type of thing was

12    dangerous, weren't you?

13    A.    Yes.  That's why we -- we made sure it had chlorine

14    in it at all times.

15            MR. DAVIS:  Well, I will object to the

16    nonresponsive nature of the answer.

17            THE WITNESS:  Well, I responded to your

18    question.

19            MR. DAVIS:  Well, I don't think you did, sir.

20    Q.    (BY MR. DAVIS)  You had more homes hooked into the

21    aerobic systems than they were designed to handle, didn't

22    you, sir?

23    A.    Yes.

24    Q.    Thank you.  Do you recall that in November of 1999

25    that there were several cases filed with the JP court?

TOMMIE WELLS, JR.                                          106

1      A.   Yes.

2      Q.   And then do you recall that in December of 1999

3  there was another complaint that there was a plastic pipe

4  that was pumping effluent through it to the ditch on Simmons

5  Road?

6      A.   Yes.

7      Q.   And in fact, there was a plastic pipe that was

8  dumping effluent onto the ditch on Simmons Road, wasn't

9  there?

10     A.   No.

11     Q.   Okay.  Are you telling the folks on the jury panel

12 that you were not pumping effluent from septic systems onto

13 the ditch on Simmons Road?

14     A.   That pipe that we had installed in there was a

15 drain.

16     Q.   Were you pumping effluent onto Simmons Road from

17 the septic systems?

18     A.   Yes.

19     Q.   Thank you.

20     A.   But this was water from a aerobic system that had

21 been through treatment process.

22     Q.   On one of the systems that you -- well, strike

23 that.

24          You were pumping effluent through a pipe into a

25 ditch on Simmons Road, weren't you, sir?

TOMMIE WELLS, JR.                          107

1    A.    Not through a pipe.

2    Q.    Well, through a drain?

3    A.    Drain.

4    Q.    Well, it was a plastic pipe, wasn't it?

5    A.    We had a plastic pipe installed back there for a

6    drain, for a drainage problem that we had.

7    Q.    Well, and you were pumping through that pipe onto

8    Simmons Road or into the ditch alongside Simmons Road

9    effluent from your septic systems, weren't you, sir?

10    A.    We were pumping treated water from an aerobic

11    system through there, yes.

12    Q.    Now you're aware that you're not supposed to pump

13    water, even if it's treated, onto a ditch alongside the road,

14    aren't you, sir?

15    A.    I was not aware of that.

16    Q.    Well, you were aware of what a aerobic system is

17    designed to do is spray out water, correct?

18    A.    Correct.

19    Q.    And you were running more houses on the aerobic

20    systems than they were designed for, weren't you?

21    A.    Because of the 5,000 gallon, yes.

22    Q.    And I think you've already testified, you're not

23    any type of expert in sanitation systems or treating water

24    that's in aerobic systems, are you, sir?

25    A.    No, but it's a pretty simple process.

TOMMIE WELLS, JR.                                        108

1      Q.   Well, if it's so simple, sir, why have you been

2   having problems for a year and four months at this point?

3      A.   I did learn something.

4      Q.   Why had you been having problems if this is so

5   simple for a year and four months?

6      A.   I don't know.

7      Q.   Do you recall Mr. Thornton's office taking water

8   samples in the problem areas around the mobile home park in

9   January of 2000?

10     A.   After the arrest, yes.

11     Q.   And during this period of time, there were more

12  complaints being made, weren't there, sir, to you and to the

13  county?

14     A.   Yeah.

15     Q.   Complaints of sewage in people's yards, complaints

16  of sewage being pumped out into the roadway?

17     A.   Not during that time, no.

18     Q.   In January there weren't, sir?

19     A.   Pumping sewage, no.

20     Q.   How about January, were there complaints of sewage

21  in people's yards?

22     A.   I think there were some complaints made to the

23  county, but not directly to us.

24     Q.   On February 7th of 2000 after you appeared before

25  the JP, did you send a letter or have your attorney send a

TOMMIE WELLS, JR.                    109

1    letter to Mr. Thornton's office stating that you'd be willing

2    to meet with Mr. Thornton and to fix and inspect all the

3    systems then?

4         A.    Our lawyer did, yes.

5         Q.    And do you recall the county taking more water

6    samples in March of 2000 out there?

7         A.    Yes.

8         Q.    And do you recall the fact that the results were

9    still returned as dangerous?

10        A.    Our lawyer got the results.

11        Q.    Well, were you ever told that the results revealed

12   dangerous conditions out there even as late as March 20th of

13   2000?

14        A.    I'm not sure on exact dates, no.

15        Q.    Well, do you recall that water samples that were --

16        A.    I know that some of the samples came back bad, yes.

17        Q.    Well, very bad, didn't they?

18        A.    I don't know.  I don't know what the scale is, I'm

19   not educated in that area.

20        Q.    Well, on the water being pumped out onto the

21   ditches along the side of the road, those were high, weren't

22   they, sir, from the aerobic systems?

23        A.    There wasn't any water samples taken of those.

24        Q.    Are you sure about that?

25        A.    Positive.

TOMMIE WELLS, JR.                                110

1    Q.    Where were the water samples taken?

2    A.    They took them from different places.

3    Q.    Well, if you've never --

4    A.    After the arrest.

5    Q.    If you've never seen the water samples, sir, then

6    how do you know where they were taken?

7    A.    Because they -- or said -- they listed everywhere

8    they got their samples.

9    Q.    Well, if you've never seen that, sir, then I mean

10    --

11    A.    I didn't say I had never seen it, I said I didn't

12    understand exactly what -- I don't know the range of good and

13    bad.

14    Q.    Well, did you ever think that it might be important

15    to find out the range of good and bad?

16    A.    Yeah.

17    Q.    Well, have you ever taken it on yourself to do

18    that?

19    A.    Yes.

20    Q.    Did you know that the percentage of fecal coliform

21    and other confluent growth in some of these areas was too

22    numerous to count even for the laboratory?

23    A.    Yes, after the arrest, yes.  We were -- the systems

24    wasn't get serviced at all.  We were afraid to touch them.  I

25    tried to get Kevin Dillon to take care of the systems and he

TOMMIE WELLS, JR.                    111

1    was told not to touch them.  So nobody was servicing the

2    systems like they were supposed to be serviced.

3         Q.   So is it your testimony that you weren't servicing

4    the systems out at --

5         A.   (Inaudible)

6         Q.   -- Naconiche Village?

7              From what period of time to what period of time

8    were not --

9         A.   After the arrest.

10        Q.   -- servicing the -- excuse me, you have to let me

11   finish my question, sir.

12        A.   Excuse me.  I'm sorry.

13        Q.   You're excused.  Are you telling me that you were

14   not servicing the systems out at Naconiche Village for a

15   substantial period of time?

16        A.   Yes.

17        Q.   Have you serviced them since December of 1999?

18        A.   Yes.

19        Q.   Well, when did you start servicing the systems?

20        A.   When I got fed up with waiting on something to get

21   worked out.

22        Q.   Well, when was that, sir?

23        A.   I'm not sure what date that was.

24        Q.   Well, and you had known for --

25        A.   And --

TOMMIE WELLS, JR.                          112

1      A.    I guess, yeah.

2      Q.    Well, you were the one doing it, you know, don't

3  you?

4      A.    I was not discharging raw sewage, no.

5      Q.    Is this the type of hose that you were using when

6  you would pump sewage out of the septic system --

7      A.    I never pumped --

8      Q.    -- on your property?

9      A.    -- sewage, raw sewage out without being treated.

10            (Exhibit No. 5 marked)

11      Q.    Do you recognize that picture?

12      A.    No, I don't.

13      Q.    Do you recognize that trailer?

14      A.    No, I don't.

15      Q.    In those pictures, does it appear that there are

16  once again hoses from the pump down in a septic system?

17      A.    Yes.

18      Q.    And have you ever put hoses in a pump down in a

19  septic system on your property?

20      A.    Yes.

21      Q.    And were those -- what type of systems were those?

22      A.    Could you -- do what now?

23      Q.    What type of system is that?

24      A.    I don't know, I don't know where that's at.

25      Q.    Well, what type of systems would you put hoses and

1    it's that same trailer house?

2         A.    I'm not sure.

3         Q.    Well, let's compare the two.  Does it look like the

4    same trailer house?

5         A.    I'm not sure, I mean it's too hard to tell.  Most

6    of them look alike.

7         Q.    Well, let's see, there's a door there, correct, you

8    can see that in both pictures?  And then there's a big power

9    pole right there, isn't there?

10        A.    Uh-huh.

11        Q.    And does that look to you to be the same trailer?

12        A.    Most Fleetwoods are set up the same way, it's hard

13   to tell.

14        Q.    Well, anyway in this picture, sir, you can

15   certainly see the hose ending there kind of in the ditch,

16   can't you?

17        A.    I see the hose, yes.

18        Q.    And that would be the hose going from -- if this is

19   the same trailer, going from the septic system down in this

20   ditch area, correct?

21        A.    Correct.

22        Q.    And is that something that you believe is a proper

23   thing to do assuming that's at Naconiche Village to pump

24   effluent or sewage from a septic system into a ditch?

25        A.    If it's been treated, yes.

1   Village?

2       A.   I don't know.

3       Q.   You say in here that Nacogdoches County and

4   Defendant Thornton didn't allow you to work on your septic

5   tanks, is that what you're saying?

6       A.   I guess I need a copy of that to read.

7       Q.   Well, just let me ask you if it's true.  Did

8   Nacogdoches County or Mr. Thornton ever tell you not to work

9   on your septic tanks?

10      A.   After the arrest, yes, we were told not to touch

11  anything.

12      Q.   Mr. Thornton told you not to touch anything?

13      A.   Mr. Thornton, yes.

14      Q.   Said don't touch anything?

15      A.   Right.

16      Q.   Are you claiming in this case that the complaints

17  that were filed against you contained material or false

18  information?

19      A.   Yes.

20      Q.   What material or false information did the

21  complaint contain?

22      A.   That we were discharging raw sewage.

23      Q.   And as you sit here today, you're claiming that's

24  not true?

25      A.   Yes.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

TOMMIE WELLS, JR. AND⠀⠀⠀⠀}
CHERYL WELLS⠀⠀⠀⠀⠀⠀⠀⠀⠀}
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀}
VS.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀}⠀⠀CA NO. 9:00CV142
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀}
NACOGDOCHES COUNTY, TEXAS⠀}
AND EDWARD THORNTON⠀⠀⠀⠀⠀}

*********************************************************
ORAL DEPOSITION OF
CHERYL WELLS
OCTOBER 17, 2000
*********************************************************

ORAL DEPOSITION OF CHERYL WELLS, produced as a witness duly sworn by me at the instance of the DEFENDANT, taken in the above styled and numbered cause on the 17th day of September, 2000 from 3:35 p.m. to 4:35 p.m., before DEENA L. WHITFIELD, Certified Shorthand Reporter No. 3241 in and for the State of Texas, reported by oral stenography method at the Stuckey, Garrigan & Castetter Law Offices, 2803 C North Street, Nacogdoches, Texas; taken pursuant to Notice and in compliance with the Federal Rules of Civil Procedure and Local Rules by the Eastern District of Texas; signature required.

PLAINTIFF'S
EXHIBIT
4
9:00 CV142

1    might say?

2         A.    (Moving head up and down)

3         Q.    Okay.

4         A.    Or the guy who worked with him sometimes, if he was

5    over, I'd hear them talking, but not --

6         Q.    Okay.  Who is the guy that -- but as far as

7    something that you know of your own personal knowledge,

8    there's really nothing, is there?

9         A.    No.

10        Q.    All right.  And who was the guy that you were

11   talking about that worked with your husband some?

12        A.    Danny Simmons.

13        Q.    And what did he do for your husband?

14        A.    Pretty much everything I think, just kind of a --

15        Q.    Kind of a handyman, kind of fix-it-all person?

16        A.    Uh-huh.

17        Q.    Now I think that -- and you may know a little

18   better what your title is than your husband did, but it's my

19   understanding that you're an officer of Naconiche Village,

20   Inc., is that right?

21        A.    Yes.

22        Q.    And do you know your title?

23        A.    I believe it's CEO.

24        Q.    Okay.  Chief executive officer?

25        A.    I believe so, yes.

1    Q.    And do you recall offhand what your husband is?

2    A.    I remember the agent, the registered agent, but I'm

3    not sure if there's anything else.

4    Q.    That's okay.  And is that really just from hearing

5    your husband testify?

6    A.    That was from -- no, we talked about it vaguely, I

7    was -- I had intended to be more involved, but ended up

8    getting pregnant and having, you know, so my involvement was

9    out the door, so . . .

10    Q.    Okay.

11    A.    I started out, is what I'm trying to say, trying to

12    be involved, and then it didn't work out.

13    Q.    Okay.  One of those situations where really you

14    started out and you intended to be probably really involved?

15    A.    Yeah.

16    Q.    But then got pregnant and basically weren't

17    involved in the inner workings of the business?

18    A.    Uh-huh.

19    Q.    Is that a yes?

20    A.    Yes.  I'm sorry.

21    Q.    No, that's okay.  It's very natural to say uh-huh

22    and huh-uh, --

23    A.    I know.

24    Q.    -- it is.  And I'll try to correct you when you do

25    that.

1    occurred, you were record owners of the land, correct?

2         A.    I believe so.

3         Q.    All right.  And still may be?

4         A.    Uh-huh.

5         Q.    All right.  When you and your husband went into

6    this venture, this Naconiche Village, did you think it was

7    going to be a whole lot easier than it turned out to be?

8         A.    Didn't anticipate some of the problems, I mean I

9    knew there would be problems, there's, you know, anytime you

10   deal with people, there's problems, you know, but it wasn't

11   always the problems I expected, but it, you know, yeah.

12        Q.    All right.  How long were y'all without an income

13   after y'all -- after your husband left his job and started

14   Naconiche Village, Inc.?

15        A.    I'm really not sure how long it was.  I really

16   honestly don't know.

17        Q.    That's all right.  Do you handle the family

18   finances or does your husband?

19        A.    He does.  Help when I can.

20        Q.    But basically he would be the one --

21        A.    Basically, uh-huh.

22        Q.    -- with the knowledge and experience --

23        A.    Yes.

24        Q.    -- of doing that?

25              Thank you.  And I'll try to remind you on the yes

CHERYL WELLS                                                      10

1          Q.    All right.

2          A.    Yes, sir.  Sorry.

3          Q.    Now I take it you became aware at some point that

4    there were problems with the septic systems out at Naconiche

5    Village, Inc.?

6          A.    Yes, vaguely.

7          Q.    And then at some point, I believe that you and your

8    husband, who were the record owners of the property, were

9    visited by a constable, is that correct?

10         A.    When we were arrested?

11         Q.    Yes.

12         A.    Yes.

13         Q.    And did the constable bring papers with him or

14    what?  If you will, just tell me more or less what occurred.

15         A.    He said that he had a warrant -- he said were you

16    aware that there was a warrant for your arrest, and I said

17    no, and he --

18                    MR. STUCKEY:  Tommy Hinton's not a constable,

19    Robert.

20                    MR. DAVIS:  Oh, I thought you said he was a

21    constable.

22                    TOMMIE WELLS:  Yeah, he's a constable -- he's

23    not a justice of the peace.

24                    MR. THORNTON:  He's a deputy constable.

25                    MR. STUCKEY:  He used to be a deputy sheriff.

1   don't know for sure, follow me.  And so she followed him to

2   the house and followed us up to the sheriff's department to

3   watch the kids until one of our parents could get there.  My

4   parents live in Tyler and his parents live in Lufkin.

5        Q.   Okay.  And so you drove your vehicle down to the

6   police station or sheriff's department?

7        A.   I don't know, I don't even know where we were.

8        Q.   Was it a -- well, you went down to some police or

9   sheriff's station, one or the other?

10        A.   Yes.

11        Q.   All right.  And had the deputy constable hand-

12   cuffed you or anything?

13        A.   No.

14        Q.   Okay.  Hadn't pulled his gun on you or anything

15   like that?

16        A.   No.

17        Q.   Or used any type of force on you?

18        A.   No, he was apologetic.

19        Q.   All right.  And how old were your kids?

20        A.   They were six, four, and nine months.

21        Q.   So in terms of what you might see on TV on one of

22   those police shows, this is a little different in that the

23   constable basically told you what the situation was and

24   allowed you to drive your own vehicle down to the police

25   station or jail and followed you, is that correct?

CHERYL WELLS                               18

1    A.    Yes.

2    Q.    All right.  And then once you arrived at the police

3  station or sheriff's department, whichever the case may have

4  been, would you describe for me what occurred then?

5    A.    I'm sorry.  Would --

6    Q.    Sure.  Once you -- that's all right.

7          MR. STUCKEY:  What happened after you got to

8  --

9          MR. DAVIS:  Curtis, --

10          MR. STUCKEY:  Well, --

11          MR. DAVIS:  Curtis.  Curtis, let me ask the

12  questions, please, sir.

13          MR. STUCKEY:  (Pretending to zip lips)

14          MR. DAVIS:  Thank you.

15    Q.    (BY MR. DAVIS)  What happened after you arrived at

16  the police station or sheriff's department?

17    A.    I don't remember.  Went in, they -- yeah, they take

18  your shoes, they take everything from you, you know, if you

19  have anything on you they take that.  And then you go through

20  the doors, you know, the gate there and they take you to this

21  thing and they frisk you, and they took us back to a cell and

22  locked the door.

23    Q.    Same cell like a holding cell?

24    A.    It's a holding cell, yes.

25    Q.    All right.  And did you and your husband, were

CHERYL WELLS                              19

1    y'all both in that cell together?

2         A.    No.

3         Q.    Okay.  Take females to one, males to the other?

4         A.    Yes.

5         Q.    All right.  And I think they had taken your shoes

6    from you at the time, is that right?

7         A.    Yes, sir.

8         Q.    Did you stay in the remainder of your street

9    clothes, the clothes that you were wearing before you came

10   in?

11        A.    Yes.

12        Q.    Okay.  So dressed basically like you are here today

13   or in a similar fashion, shirt and pants and belt?

14        A.    Jeans, yeah.

15        Q.    All right.  And how long did you stay in that

16   holding cell?

17        A.    Five hours.

18        Q.    Until approximately what time, do you recall?

19        A.    It was probably 10:30.

20        Q.    And what occurred at 10:30?

21        A.    They finally came and -- I guess it was probably

22   around 10:00 when they finally came in and got me and then

23   took me in, and you have to go through all the mugs shots and

24   fingerprinting and --

25        Q.    Paperwork stuff?

CHERYL WELLS                          20

1    A.    Yes.

2    Q.    All right.  In the cell during that five hour period, what, if anything, occurred?

4    A.    Well, the worst part of it for me was that I was breast feeding -- I hate to talk about this, but it's a problem, you know, when you're breast feeding, and so anyway, it was just really uncomfortable, I had some physical problems from that.

9    Q.    All right.  Related to the fact that you had been breast feeding a child during that period of time?

11    A.    Uh-huh.

12    Q.    All right.  Some discomfort associated with that?

13    A.    Yes.

14    Q.    All right.

15    A.    Wet clothes associated with that.

16    Q.    I understand, I have two children myself.

17    After you were taken out and went through the paperwork part of it, what occurred then?

19    A.    I got to go to -- out to where my children were.

20    Q.    And where were your children?

21    A.    They were in a -- just that hall, that little -- I don't know what it would be called, just a little hallway as you come in.

24    Q.    Just waiting out there for you?

25    A.    Uh-huh.

CHERYL WELLS                    21

1    Q.    And had they -- had they been up there while you

2    were --

3    A.    Most of the time.

4    Q.    -- in the holding cell?

5    A.    They did go to McDonald's to get something to eat,

6    but my son didn't want to leave, so . . . [weeping].

7    Q.    Okay.  And then you were released and went on home?

8    A.    Yes, my parents took me home.

9    Q.    All right.  Did your parents come in and pay your

10    bail, was that the deal?

11    A.    I can't remember who paid it, one of our parents

12    paid it.

13    Q.    All right.  And how about your husband, did they

14    bail him out too or did they leave him there?

15    A.    They paid, but it took him -- I don't know what

16    happened, but he didn't get to leave when I did, it was

17    several hours later.

18    Q.    And being processed out of the male's side of the

19    jail?

20    A.    I guess so, yes, and I believe, you know, that my

21    screaming daughter out there probably had something to do

22    with it.

23    Q.    With being processed out fast?

24    A.    Faster than him anyway.

25    Q.    Okay.  Were the --

CHERYL WELLS                           22

1    between the county and him?

2        A.    Afterwards he told me some things.

3        Q.    Before that, had he told you about the contact or

4    the letters or any of that?

5        A.    I saw one letter, I saw that letter.

6        Q.    When did you see that?

7        A.    I cannot remember for the life of me.

8        Q.    Was it after the arrest?

9        A.    No, I saw it before the arrest.

10       Q.    Did you pick up the phone and call the county?

11       A.    No.

12       Q.    Call Mr. Thornton?

13       A.    No, because --

14       Q.    You were letting your husband handle it, weren't

15   you?

16       A.    Yes, I was, and what I understood from Mr. Simmons

17   also, you know, everything was being done, you know, with

18   permission, I mean that they were doing everything, you know,

19   informing the county of what they were doing and had

20   permission.

21       Q.    Now who is Mr. Simmons?

22       A.    He is the man I mentioned earlier that worked along

23   with my husband.

24       Q.    All right.  Did you talk to him about things?

25       A.    No, I didn't really talk to him, I just, you know,

CHERYL WELLS                                           34

1    Q.    (Moving head up and down)

2    A.    Yes, but I don't know that jail would be the, you

3  know, the answer.

4    Q.    Well, --

5    A.    Action, yes, but I don't know that that would be

6  the action.

7    Q.    It's certainly within their rights to do whatever

8  was within the limit of the law, correct?

9    A.    It depends on what they would find.

10    Q.    How often did you go out to the property?

11    A.    Very, very rarely.

12    Q.    So in terms of you actually seeing the effluent

13  that surfaced, did you ever see that?

14    A.    No, I never did.

15    Q.    Did you ever see the hoses going from -- if the

16  evidence establishes that this liquid that appears in this

17  picture and some of the others is effluent, if you were the

18  parent of the children that had their toys sitting in this

19  stuff and were playing in it, how would you feel about the

20  landowners?

21    A.    I would be upset, but my children wouldn't be

22  playing in it, their toys wouldn't be in it either, but I

23  would be upset if that's what that was.

24    Q.    Now I think you had talked about some of the

25  problems that occurred out there at the mobile home park.

CHERYL WELLS                    38

1    A.    To begin with, no.

2    Q.    But by the time the houses started moving in out

3    there, were y'all pretty well hamstrung financially?

4    A.    No, we were really fine for quite some time.  I

5    mean we weren't rich by any means, but we had help, we had

6    support from our parents because, you know, they knew that

7    this was something that we really wanted to do and it would

8    work, and I mean we had some unfortunate problems, but . . .

9    Q.    Well, and I guess what I'm getting at, and you can

10   tell me if I'm right or if I'm wrong -- and I tell you this,

11   if y'all had the money necessary to have corrected these

12   problems and you didn't do it, then I would find that very

13   upsetting.

14   A.    Right.  No, this was after the fact, our financier

15   pulled out on us because he got scared.

16   Q.    When did he pull out?

17   A.    I'm not sure of the exact date, he would say -- you

18   know, we explained the situation and it was really, you know,

19   important we had to do this, we had to do this, and he would

20   put us off a week, and he'd put us off another week

21   [weeping].  And then finally, you know, a few months down the

22   road, he said I just, you know, I'm scared, I don't want to

23   do this, and so here we are stuck with this, you know, he's

24   promised us this and we've promised people things and this is

25   what we ended up with, yeah.

CHERYL WELLS                                41

Q.    Who was your financier?

A.    Mr. Singleton.

Q.    And so I guess when y'all found out how much the wetlands septic system was going to be, and it was apparently outlandish financially --

A.    Oh, yeah, it was unreal, so we went to Mr. Singleton.

Q.    And told him I guess what that problem was and that y'all would have to do something else?

A.    And he agreed.

Q.    And then I guess initially he provided some financing for it?

A.    Uh-huh.

Q.    I'm sorry, you have to answer verbally.

A.    I'm sorry.  Yes.

Q.    And then as the problems developed, did he just say sorry, I'm not going to finance you anymore, is that right?

A.    Basically.

Q.    Okay.  And by that time, y'all had made promises to the people who were leasing from you?

A.    Yes.

Q.    Made promises about how you were going to clean up with the situation, fix up the septic system, right?

A.    Yes.

Q.    And made promises, for that matter, to Mr. Thornton

CHERYL WELLS                                          42

1    and Nacogdoches County?

2        A.    From what I understand.

3        Q.    And because Mr. Singleton backed out on y'all

4    financially, you weren't able to honor those promises, were

5    you?

6        A.    Not for a while.  We got another person to finance,

7    you know, explained the situation to him and he helped us

8    out.

9        Q.    When did that person get involved?

10       A.    Oh, I'm terrible with dates, I'm sorry.

11       Q.    That's okay, you don't have to give me an exact

12   date.  In fact, if you want to say it was before the arrest

13   --

14       A.    I'm trying to remember if it was before.  I think

15   -- yes, I think we started to him before, but I don't think

16   it was final.  I don't know.

17       Q.    Well, your best recollection, did the new finance

18   person not come in until after the arrest?

19       A.    I cannot -- I really can't remember.  I remember I

20   believe we signed papers in January, but I think we had

21   started before, but --

22       Q.    Started discussions --

23       A.    -- I could be wrong on that, --

24       Q.    -- with them?

25       A.    -- I'm not sure.

CHERYL WELLS                              43

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

TOMMIE WELLS, JR. AND          }
CHERYL WELLS                   }
                               }
VS.                            }          CA NO. 9:00CV142
                               }
NACOGDOCHES COUNTY, TEXAS      }
AND EDWARD THORNTON            }

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION OF
EDWARD THORNTON
OCTOBER 18, 2000
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


ORAL DEPOSITION OF EDWARD THORNTON, produced as a

witness duly sworn by me at the instance of the PLAINTIFFS,

taken in the above styled and numbered cause on the 18th day

of September, 2000 from 10:40 a.m. to 4:30 p.m., before DEENA

L. WHITFIELD, Certified Shorthand Reporter No. 3241 in and

for the State of Texas, reported by oral stenography method

at the Stuckey, Garrigan & Castetter Law Offices, 2803 C

North Street, Nacogdoches, Texas; taken pursuant to Notice

and in compliance with the Federal Rules of Civil Procedure

and Local Rules by the Eastern District of Texas; signature

required.

PLAINTIFF'S
EXHIBIT
5
9:00 CV 142

EDWARD THORNTON                                          1

Q.    You did not.  So would it be your testimony then that any arrest warrant or complaint that has your name on it is a forgery, you never signed any complaint?

A.    I filed a complaint against --

Q.    Go ahead.

A.    --- the Wells for sewage being dumped, but I cannot arrest -- cannot issue arrest warrant --

Q.    Well, I understand, you had to go to the Court to get the arrest warrant issued?

A.    No, I did not get an arrest warrant.  I have no authority to do that.

Q.    Who got the arrest warrant?

A.    That would be up to the JP, he has the authority to do that.

Q.    So you're telling this -- you're telling this jury -- or are you telling this jury that you had nothing to do with getting Tommie and Cheryl Wells arrested?

A.    No, I did not.

Q.    Okay.  Let me direct your attention to what on the bottom has been -- it's marked Plaintiff's Exhibit 6, Bates number nine.  Do you see that document?

A.    (No response)

Q.    You're not looking at the -- it's not Bates number nine.

MR. DAVIS:  Hold on just a second, let us look

EDWARD THORNTON                                          5

1    and say hey, prepare this complaint for me, did he?

2         A.    No, no, sir.

3         Q.    This was Edward Thornton's doing?

4         A.    Yes, sir.

5         Q.    But you were doing that in your capacity, --

6         A.    Yes.

7         Q.    -- in your capacity as the head of the Nacogdoches

8    -- what's that called again?

9         A.    Health Environmental office.

10        Q.    Okay.  In terms of the Nacogdoches Health and

11   Environmental office, you are the top dog there, the head

12   guy, correct?

13        A.    I work for the Commissioner's Court.

14        Q.    Well, and who runs the office?

15        A.    I run the office, yes, sir, correct.

16        Q.    Did somebody at the Commissioner's Court tell you

17   to fill out this --

18        A.    No, sir.

19        Q.    -- what's been marked as --

20        A.    No, sir.

21        Q.    Did anybody -- did you do -- did the Commissioner's

22   Court in your capacity as the administrator, --

23        A.    Yes.

24        Q.    -- you understand what administrator is, --

25        A.    Yes, sir.

EDWARD THORNTON                                            9

1    Q.    -- don't you?

2    A.    Yes, sir.

3    Q.    You did that in your capacity as the administrator,

4    did you not?

5    A.    Yes.

6    Q.    And that full authority to do that had been

7    delegated to you --

8    A.    Yes.

9    Q.    -- by Commissioner's Court, had it not?

10    A.    You are correct.

11    Q.    And in fact, you didn't even run this by anybody in

12    Commissioner's  --

13    A.    No, sir.

14    Q.    -- Court, did you?

15    A.    No, sir.

16    Q.    So that was Ed Thornton --

17    A.    Yes.

18    Q.    -- and Ed Thornton alone's doing, this Defendant's

19    Exhibit 1?

20    A.    Yes.

21    Q.    And then you say, did and there unlawfully and

22    willfully discharge sewer, chapter 341.014.

23    A.    Yes, sir.

24    Q.    Is it you that either wrote that in or had that --

25    A.    Yes.

EDWARD THORNTON                              10

1    Q.    You didn't know that people could be arrested --

2    A.    They don't always get arrested.

3    Q.    Well, did you understand that sometimes you file a

4    complaint, people can get arrested?

5    A.    That could be.

6    Q.    Pardon?  Did you know that back on November the 8th

7    of 1999 when you filed the complaint that there was a chance

8    that Cheryl and her husband would be arrested?

9    A.    There is always a chance, yes.

10    Q.    Well, I mean what did -- for what purpose did you

11    file the complaint?

12    A.    To get the sewage cleaned up, to stop the

13    discharge.

14    Q.    Did you ever tell Judge -- what's the Judge's name?

15    A.    Hubert Johnson.

16    Q.    Have you filed complaints in Hubert Johnson's court

17    in the past?

18    A.    Yes.

19    Q.    On one occasion or many occasions?

20    A.    I think with his court, no, this is the first

21    complaint I've had to file in his court.

22    Q.    Okay.  How long have you been the boss out there?

23    A.    About six years.

24    Q.    Okay.  And in this six year period of time, this is

25    the very first criminal complaint that you ever filed in

EDWARD THORNTON                                    18

1    A.    Just let me think a second.  When I filed it, I

2    knew there was a -- it was criminal and civil.

3    Q.    Okay.

4    A.    On this one here, it's --

5    Q.    Defendant's Exhibit 1's the one we're talking about

6    now?

7    A.    Yes.

8    Q.    Sometimes you file civil complaints, correct?

9    A.    Correct.

10    Q.    Sometimes you file criminal complaints, correct?

11    A.    Yes.

12    Q.    And you know the difference, correct?

13    A.    If the law states it, yes.

14    Q.    And on this particular occasion when you filed

15    what's been marked as Defendant's Exhibit 1, you knew that

16    you were filing both a criminal and a civil complaint?

17    A.    No, I'm not sure I understand your question here.

18    Q.    All right.  When you filed Defendant's Exhibit 1,

19    you knew it was a criminal complaint?

20    A.    Yes, it is a criminal complaint.

21    Q.    Okay.  And you knew that?

22    A.    Yes.

23    Q.    And you knew that when you filed criminal

24    complaints, people get arrested?

25    A.    No, I do not.

EDWARD THORNTON                    20

1    Q.    -- provisions of the statute, didn't you?

2    A.    Yes.

3    Q.    You knew that you had filed criminal complaints

4    before under this same or similar criminal statute, didn't

5    you?

6    A.    Yes.

7    Q.    And you knew that when you filed the criminal

8    complaints before, sometimes people got arrested?

9    A.    Yes.

10    Q.    They had -- you didn't ask for any civil relief at

11    all when you filed your criminal complaint, did you?

12    A.    Please explain civil relief.

13    Q.    You don't know what civil relief is?

14    A.    No, I'm asking.

15    Q.    They had -- did you -- when you filed this

16    Defendant's Exhibit 1, the criminal complaint, were you

17    trying to file anything in the whole wide world other than a

18    criminal complaint

19    A.    On this one complaint?

20    Q.    Yes, sir.

21    A.    No.

22    Q.    All right.  So at least with regard to Defendant's

23    Exhibit 1, I think that we may be able to get it clean, be in

24    agreement --

25    A.    Yes.

EDWARD THORNTON                                    22

1    filed one of these criminal complaints was that Elizabeth

2    Dillon was picked up by the sheriff's department and taken to

3    the judge, in front of the judge, is that correct?

4        A.    That is correct, what I understood after.

5        Q.    Okay, after.  So after -- I assume that you figured

6    this Tommie Wells' situation would be handled the same way?

7        A.    It would be so.

8        Q.    Okay.  Specifically what you thought would happen

9    when you filed the criminal complaint that has been marked by

10   our very able court reporter as Exhibit No. 1 to your

11   testimony, what you thought would happen was that the sheriff

12   would go and pick Tommie Wells up, arrest him, and take him

13   before the judge because that's what had happened before,

14   correct?

15       A.    Correct.

16       Q.    And that's what you wanted to happen, --

17       A.    No, sir.

18       Q.    -- that's the reason that you -- now you filed the

19   complaint --

20       A.    Yes.

21       Q.    -- and understood that that would happen, but

22   that's not what you wanted to happen?

23       A.    I did not want it to happen, no, sir.

24            MR. DAVIS:  Do you understand that they can

25   also be summoned before the judge?  The judge makes the

EDWARD THORNTON                                    28

1    Nac Village.

2        Q.    Duh.

3            MR. DAVIS:  Curtis, if you're going to do that

4    type of thing, then we'll just cancel the deposition.  I

5    treated your client with respect, I expect the same treatment

6    from you.  And when my client is answering a question, it's

7    entirely improper of you to make comments like that before he

8    has finished his answer.  It's entirely improper of you to

9    make comments like that period, and I truly will walk out of

10   here.

11       Q.    (BY MR. STUCKEY)  Okay, finish your answer.

12       A.    Yes, sir.  Tommie and Cheryl Wells are both the

13   owner of the property.  As owners of the property, they are

14   both responsible, so she is as guilty as he.

15       Q.    Now answer my question.

16       A.    Yes, sir.

17            MR. DAVIS:  He did.

18            MR. STUCKEY:  Read the question back, the last

19   question that I asked.

20            (Last question and answer played back)

21       Q.    I understand that it is your position that Cheryl

22   could be hauled off to jail and is just as guilty as Tommie

23   because she is the co-owner of the property, of the land, is

24   that correct?

25       A.    That is correct.

1      Q.   But that wasn't really the question that I asked,

2   sir.  The question that I asked was do you have any evidence

3   from any source that on December the 10th of 1999 that Cheryl

4   Wells did anything wrong?

5      A.   As I stated, the complaints were filed and she is a

6   landowner, she shares that responsibility with her husband,

7   she makes decisions, she's a CEO of the company.

8      Q.   When did you first learn that Cheryl was the CEO of

9   the company?

10     A.   Found that out yesterday.

11     Q.   Okay.  Had anybody in the whole wide world ever

12   told you that Cheryl was the CEO of any company on or before

13   December the 10th of 1999?

14     A.   No, sir.

15     Q.   Did you know anything about Tommie Wells'

16   corporation or Cheryl and Tommie Wells' corporation?

17     A.   Yes.

18     Q.   Okay.  What did you know about that?

19     A.   What I knew first was Tommie Wells had informed us

20   that he was the owner, that we did not need to bother his

21   wife, he was the sole owner of the property.

22     Q.   Okay.  Of the land?

23     A.   Of the land.

24     Q.   Okay.

25     A.   That's the reason all things were filed against

1     was trying -- did they tell you about them being

2     fingerprinted and mug shotted?

3     A.    No, sir.

4     Q.    Tell the jury about the broken toilet during the

5     week of I guess it would be December the 3rd of 1999, the

6     flooding out there.

7     A.    At Nac Village?

8     Q.    Yes, sir.

9     A.    I'm not aware of that.

10    Q.    Who is Jack Ford?

11    A.    I can't recall the name, sir, there's been so many

12    out there.

13    Q.    Do you recall a tenant named Jack Ford whose

14    commode broke and flooded the area where they went trying to

15    dry it out on or about December the -- in early December of

16    1999?

17    A.    I don't have recollection of that.

18    Q.    What are you referring to?

19    A.    Notes that I -- what do you call those things, --

20          MR. DAVIS:  Your disclosures.

21    A.    Disclosures.

22    Q.    All right.  Are they disclosures --

23          MR. STUCKEY:  Have you given me all this,

24    Robert?

25          MR. DAVIS:  (Moving head up and down)

Q.   (BY MR. STUCKEY)  Okay.

A.   I don't recall.  I remember Mr. Wells had had numerous problems with tenants, either leaky toilets or broken toilets, so whether that was one of the cases or not, I could not tell you at this time.

Q.   And leaky toilets or broken toilets aren't Mr. Wells' fault?

A.   I would say not.

Q.   Okay.  They had -- I started to ask you and you started to tell me that --

(Mr. Stuckey leaves room and returns)

Q.   -- you started to tell me how many times you had met -- that you'd met Tommie Wells several times after July of 1998, between then and the day of his arrest, correct?

A.   Yes, we have met numerous of times.

Q.   Would meet out at the trailer park on occasion?

A.   Yes, sir.

Q.   Would meet in your offices on occasion?

A.   Yes.

Q.   And where are your offices?

A.   Nacogdoches County Courthouse.

Q.   On which floor?

A.   First floor, Suite 112.

Q.   How many people are you the boss of?

A.   We have three in our office and two janitors.

EDWARD THORNTON                                                    74

1    Q.    Okay.

2    A.    But if Mr. Wells came into the office, we were

3    usually both there.

4    Q.    Okay.  And what about when you went to the trailer

5    park, you would both go too?

6    A.    No, sir, not always.

7    Q.    Some of the times you'd meet him there and some of

8    the times Mr. Sarrano would meet him there?

9    A.    Yes.

10   Q.    And that would be just whoever had time to do it?

11   A.    Yes, basically.

12   Q.    All right.  Now during this 18 months -- from July,

13   17 month period of time that you're working with Tommie, you

14   never had any meetings with Mrs. Wells, did you?

15   A.    No, sir, I did not.

16   Q.    Never a time?

17   A.    No, sir.

18   Q.    There was never a time from July of 1998 until this

19   lady was hauled off to jail in December of 1999 when you got

20   on the phone and said look, Ms. Cheryl, these are the

21   problems out here?  You never did anything like that, did

22   you?

23   A.    No, sir, I never talked to her personally.

24   Q.    And Mr. Serrano never did either, did he?

25   A.    No, sir.

EDWARD THORNTON                                    76

1      A.    Yes.

2      Q.    Husband's and wives always own the land together,

3  right?

4            MR. DAVIS:  Well, no.

5            MR. STUCKEY:  Well, no, but I thought they

6  did, but that don't mean nothing.

7      Q.    (BY MR. STUCKEY)  All right.  In any event, in any

8  event, let me back up, let me back up.  You sid that you

9  learned yesterday that she was the CEO.  In terms of your

10 dealings with the trailer park, was there ever any doubt in

11 your mind who was calling the shots in terms of the trailer

12 park?

13     A.    No, sir, it was not.

14     Q.    And who was calling the shots?

15     A.    Mr. Wells.

16     Q.    Mr. Wells.  And when you say Mr. Wells, you're

17 referring to Tommie Wells?

18     A.    Tommie Wells.

19     Q.    Did you ever have any evidence from any source that

20 Mrs. Wells was calling any of the shots?

21     A.    No, sir.

22     Q.    Because I guess if she had been the person who you

23 thought for even one nano-second was calling any of the

24 shots, you would have talked to Mrs. Wells, correct?

25     A.    Yes.

EDWARD THORNTON                    79

1    A.    Correct.

2    Q.    I mean during your tenure, you said you've only

3    filed criminal charges outside of against the Wells only one

4    time before that you could remember, correct?

5    A.    Yes.

6    Q.    And that's not -- there's been more than one time I

7    am sure during your experience given the soils in East Texas

8    particularly when you could have filed charges if you had

9    wanted to?

10    A.    Yes.

11    Q.    Now with regard -- and of course, the

12    Commissioner's Court delegated to you full authority to make

13    those decisions, correct?

14    A.    Correct.

15    Q.    Based on your good judgement and discretion,

16    correct?

17    A.    Correct.

18    Q.    Now on November the 8th of 1999 for whatever

19    reason, and we'll go back to that set of charges in a minute,

20    but you chose on that occasion to file charges against both

21    Tommie and Cheryl Wells, correct?

22    A.    Correct.

23    Q.    Fast forwarding to December the 10th, a little over

24    a month later, you chose to file criminal charges only

25    against Tommie Wells, correct?

1     Q.    Administrative?

2     A.    Yes, sir.

3     Q.    Do you know when, if ever, section 285.58(a)(6) was

4  repealed?

5     A.    No, sir, I do not.

6     Q.    In any event, are we in agreement that you don't

7  have -- except for being the landowner, you never had any

8  evidence that Cheryl was guilty of any of these offenses?

9     A.    No, sir.

10     Q.    She was just the landowner?

11     A.    Correct.

12     Q.    And I guess, of course, that in using your good

13  judgement and discretion the same way that you've told us,

14  that you didn't file charges in every case where there was a

15  criminal violation exercising your good judgement and

16  discretion, correct?

17     A.    Correct.

18     Q.    I guess if you chose to in those cases where you

19  filed criminal charges, you can file them against one person

20  and not the other, correct?

21     A.    Correct.

22     Q.    For example, you chose to do that in December the

23  10th of 1999, correct?

24     A.    Um, November 8th we did both.

25     Q.    Right.    November the 8th, you chose to file them on

EDWARD THORNTON                        118

1    both?

2        A.    Correct.

3        Q.    And on December the 10th, you chose to file against

4    only one?

5        A.    Correct.

6        Q.    So it needs to be made clear to the jury that just

7    because you're a landowner doesn't automatically mean that

8    the head of the Nacogdoches Environmental Services is going

9    to file a criminal complaint on you?

10       A.    No, not just because you're a landowner, no.

11       Q.    Okay.  As a matter of fact, can you ever remember

12   filing a criminal complaint against anybody else from the

13   beginning of time through today simply because they were a

14   landowner where you felt like there were criminal violations

15   occurring on the property?

16       A.    Once, she was the homeowner, landowner and

17   homeowner.

18       Q.    Okay.  She was both?

19       A.    Yes.

20       Q.    But it was also her -- her tank that was in

21   dispute, wasn't it?

22       A.    Correct.

23       Q.    So we don't have -- I mean that situation's in no

24   way analogous to Ms. Cheryl's situation, is it?

25       A.    Yes.

EDWARD THORNTON                                      119

1          Q.    Okay.  And so at least on November the 8th of 2000,

2     the date that you filed the charges, two things happened,

3     okay?

4          A.    Correct.

5          Q.    Number one, you received the complaint about the

6     improperly -- what do you call it?

7          A.    A new trailer house being moved in.

8          Q.    -- a new trailer without permitted.

9          A.    Well, it was just being moved in, we didn't know

10    where it was going.

11         Q.    But when you got out there, you found out that was

12    no problem?

13         A.    Correct.

14         Q.    Okay.  And then Benny told you that he also saw a

15    hose with effluent coming out of it?

16         A.    Correct.

17         Q.    And that he told Tommie this is it?

18         A.    Correct.

19         Q.    -- no more patience, no chance to fix, no nothing,

20    this is it, in effect?

21         A.    Correct.

22         Q.    Had there ever been any complaint -- first of all,

23    had any tenant ever complained to anybody in your agency

24    about that pump?

25         A.    Not about the pump --

1    A.   I asked him, I said what is wrong with the

2    complaints that we filed, and he said well, there's some

3    discrepancies, there's -- but he never would give me a

4    answer.

5    Q.   Okay.  So you're telling this jury under oath that

6    at some point in time, Bryan Davis, the state's attorney,

7    county attorney Bryan Davis told you that the charges were

8    going to have to be dismissed?  In substance.

9    A.   He said we may have to drop them.

10   Q.   Okay.  Well, and you understand we may --

11   A.   Yes.

12   Q.   -- have to drop them, what that means?  What,

13   they're going to be dismissed?

14   A.   More than likely.

15   Q.   And in fact, that's what happened?

16   A.   Yes, at which time I do not know.

17   Q.   And Bryan told you that the reason that the

18   complaints were going to have to be dismissed is because they

19   were deficient, there were problems with them?

20   A.   That's correct.

21   Q.   But he would never tell you --

22   A.   No, sir.

23   Q.   -- what those problems were?  Did you ask him what

24   those problems were?

25   A.   Yes.

EDWARD THORNTON                          143

1    Q.    And what would he say?

2    A.    Well, there's just some problems, I'll get with you

3    some time next week.

4    Q.    Okay.  And did he ever do that?

5    A.    No, sir.

6    Q.    Were you in favor of dismissing the charges?

7    A.    No, sir.

8    Q.    Were you opposed to it?

9    A.    Yes, sir.

10    Q.    Okay.  So earlier -- and I wanted to make that

11    clear, and go way back to the very first of your deposition,

12    but the fact of the matter is that you filed these charges

13    against this nice lady and her husband, correct?

14    A.    Correct.

15    Q.    As a result of those charges, they were taken to

16    jail, correct?

17    A.    Correct, so I'm understanding.

18    Q.    And even after being taken to jail and being told

19    by the state's attorney that the charges are no good, they're

20    deficient, you still wanted the state to press the charges,

21    didn't you?

22    A.    We had problems, I wanted it cleaned up, yes.  I

23    didn't know what laws to use, that's why we contacted Bryan

24    Holt Davis again and said what do we need to do.  He went out

25    there with us, looked at the situation --

EDWARD THORNTON                                    144

1   weren't counting days.

2       A.   Yes.

3       Q.   So did you glean from that that Tommie did not want

4   his wife involved in this fiasco?

5       A.   No, I respected that part.

6       Q.   Okay.  So you admired Tommie for wanting to keep

7   his wife out of it?

8       A.   Correct.

9       Q.   At the same time, sometime at least by November the

10  8th of 2000, you had decided --

11            MR. DAVIS:  1999.

12      Q.   (BY MR. STUCKEY)  I mean 1999, I'm sorry.  You had

13  decided in your own mind that you were going to file the

14  charges on Cheryl, correct?

15      A.   Correct.  May I explain?

16      Q.   Did you ever --

17            MR. DAVIS:  Sure, go ahead and finish your

18  answer.

19      A.   This was a serious problem, but when he's pumping

20  it down out of a system without going through any treatment

21  of ground whatsoever, down.  It was a deliberate act.  You

22  know, something had to be done.  We had gone over a year

23  trying to get this cleaned up, and this one thing, 165 has

24  been over and over and over again and he started pumping it

25  down.  That's like running down the highway deliberately

EDWARD THORNTON                                                  152

1    Q.   Wait a minute, I thought you said the deliberate

2    act was Tommie pumping the effluent, --

3    A.   Correct.

4    Q.   -- correct?

5    A.   Yes, sir.

6    Q.   Do you have any information from any source that

7    Cheryl knew anything at all about the pumping effluent based

8    on what you heard yesterday or any other time?

9    A.   Like I say, I only know that she is the wife of

10   that man and she had means to know.

11   Q.   Now answer my question.

12   A.   Yes.

13   Q.   Do you have any -- you have testified under oath

14   that Tommie told you to keep his wife out of it, correct?

15   A.   He said he would like to keep his wife out of that,

16   yes.

17   Q.   Do you have any information from any source that

18   Tommie ever told his wife or she knew anything at all about -

19   -

20   A.   No, I do not have evidence.

21   Q.   And you agree with me that whoever received the

22   March 20, 1999 letter could not tell from reading the letter,

23   Defendant's Exhibit 9, what the complaint was about?

24   A.   Yes, they could tell it's about lot 165.

25   Q.   But what about lot 165?

EDWARD THORNTON

154

1    Q.    Okay.  Early 1999?

2    A.    Yes.

3    Q.    So it's your testimony that from early 1999 on when

4    you would call and try to get Tommie Wells, you wouldn't --

5    nobody would answer the phone?

6    A.    Nobody would answer the phone.

7    Q.    I had understood, I thought that up until November

8    the 8th of 1999 you were in regular contact with Mr. Wells?

9    A.    Oh, yes, we could show up at the Naconiche Village,

10   within 15 minutes, Mr. Wells drove up.

11   Q.    Okay.

12   A.    I don't know how he knew, somebody was telling him,

13   but he showed up.

14   Q.    Well, did you object to that?

15   A.    No, sir.

16   Q.    Okay.  Did you ever -- do you know where Mr. Wells'

17   home is?

18   A.    Yes.

19   Q.    Did you ever go out and tell the Mrs.?

20   A.    He showed up most of the time, so there was no

21   sense in --

22   Q.    Okay.  I mean the fact of the matter is that other

23   than you say mailing this letter that we've gone through in

24   some detail, you never made any effort to contact Cheryl

25   about the letter, did you?

EDWARD THORNTON

157

A.   No, we got with Mr. Wells and he would agree to fix the problem.

Q.   Did Mr. Wells appear to you, when problems would come up, to be concerned about them?

A.   Say again, please.

Q.   Yeah, did Mr. Wells appear to you to be concerned about the problems?

A.   Yes, always concerned.

Q.   Okay.  And you don't fault him for that?

A.   No, sir, I do not.

Q.   You said that you understood he had some financial difficulties.

A.   He explained that to us.

Q.   Okay.  When did he explain that to you or did he explain it to you on more than one occasion?

A.   On more than one occasion, he explained to us that he had -- he was trying to get more trailers in because he could pay for the others, we said we can't allow that, the systems need to be brought up to standards that you have. But then I understand his thinking, but that does not fix the problem.

Q.   Okay.  Tell the jury about the Ideal Trailer Park.

MR. DAVIS:  The ideal trailer park?

MR. STUCKEY:  The Ideal Trailer Park.

A.   I feel the Ideal Trailer Park was owned by -- what

1    was his name?

2                    MR. SERRANO:  W.D. Weems.

3        A.    Mr. Weems.

4                    MR. DAVIS:  You're talking about a real

5    trailer park?

6                    THE WITNESS:  Ideal Trailer Park.

7                    MR. DAVIS:  I thought you meant the ideal as

8    in what would be the perfect trailer park in your mind.

9        Q.    (BY MR. STUCKEY)  You know what I'm talking about,

10   don't you?

11       A.    Correct.

12                   MR. DAVIS:  Cure world hunger.

13       Q.    (BY MR. STUCKEY)  That trailer park -- I mean there

14   are a number of trailer parks in Nacogdoches County that have

15   soil that transfers into sewage problems, correct?

16       A.    Correct.

17       Q.    And that's because a lot of the land in Nacogdoches

18   County is clay?

19       A.    Correct.

20       Q.    And tell the jury what it is about clay soil that

21   makes it harder to have effective --

22       A.    Clay soil is the ideal cleanser of effluent, but it

23   will not perk very fast, which causes the problem of it

24   surfacing or backing up.

25       Q.    Okay.  Now the systems, the aerobic system that you

EDWARD THORNTON

159

1    A.    Yes.

2    Q.    And you don't think Benny would say something like

3    that?

4    A.    No, I do not think he would say that.

5    Q.    As a matter of fact, if he did, he's gone, correct?

6    A.    Correct.

7    Q.    During the two years or over two years now that the

8    trailer park has been functioning, do you have a single

9    documented case of any illness?

10    A.    I don't have it in my office, no.

11    Q.    Okay.  Well, does anybody else in your office have

12    it?

13    A.    No, no, not in our office.

14    Q.    Now I was asking you about the Ideal Trailer Park

15    and see if there are things that we can agree on.  Is that --

16         MR. DAVIS:  If this is a new area, can we take

17    a break?

18         MR. STUCKEY:  Yeah, if you want to get gone

19    early, it's not going to happen if we keep taking breaks.

20         MR. DAVIS:  Well, I've got to go to the

21    bathroom.

22         MR. STUCKEY:  All right.

23         (Break from 3:35 p.m. to 3:40 p.m.)

24    Q.    (BY MR. STUCKEY)  Septic tank installers, as a

25    result of the business they're in work closely with your

EDWARD THORNTON                                    164

1  here get contaminated.

2      Q.  That's right, they get bad water in them?

3      A.  Correct.

4      Q.  And that's something that you want to stop?

5      A.  Correct.

6      Q.  And that poses a serious health problem?

7      A.  Correct.

8      Q.  Now there's no -- nobody has ever claimed that

9  anything that happened at the trailer park -- when I say the

10  trailer park, I'm referring to my client's trailer park now,

11  okay?

12      A.  Okay.

13      Q.  That anything that happened at that trailer park

14  ever contaminated any wells?

15      A.  Any wells?  No, I do not --

16      Q.  That claim's not been --

17      A.  No, sir.

18      Q.  -- made, has it?

19      A.  No, sir.

20      Q.  That would be a serious problem?

21      A.  Right, the only complaint -- well, no.

22      Q.  Okay.  The only complaint what?

23      A.  We received concerning water was when a water line

24  was broke and we did have effluent surfacing close to that.

25      Q.  But when you say a water line broke, --

EDWARD THORNTON

170

1    A.    No.

2    Q.    -- would that be one of the -- well, would it be a

3  way to dry the area?

4    A.    A illegal way, yes.

5    Q.    Okay.  When did you last test the effluent prior to

6  December the 10th of 1999?

7    A.    We didn't.

8    Q.    Okay.  So at least are we in agreement that prior

9  to December the 10th of 1999, that is the date of my clients'

10  arrest, that the effluent out there at the trailer park, to

11  your knowledge, had never been tested?

12    A.    Correct.

13         MR. DAVIS:  Is it hot in here to you?

14         MR. STUCKEY:  Tell them to turn the air

15  conditioner on.  I don't know, I guess it is.  They had --

16         MR. DAVIS:  Of course, I am wearing a sweater.

17    Q.    (BY MR. STUCKEY)  Of course, you have the power to

18  get the effluent tested if you wanted to?

19    A.    Correct.

20    Q.    As a matter of fact, after these clients -- my

21  clients were arrested and hauled off to jail, you had the

22  effluent tested on how many occasions?

23    A.    Three different occasions.

24    Q.    Okay.  When is the first time after my clients were

25  arrested and hauled off to jail that the effluent was tested?

EDWARD THORNTON                                    183

1  deemed to be an inappropriate manner, that he shouldn't be

2  using the pump for that purpose?

3      A.   Correct.

4      Q.   And you had told Tommie before he was arrested that

5  some of his systems weren't set up right, correct?

6      A.   Correct.

7      Q.   Even though -- even though at the time of the

8  installation of all of his systems you had permitted those

9  systems?

10     A.   Correct.

11     Q.   Now do you see --

12          MR. DAVIS:  He said all of the systems you

13  --

14     Q.   (BY MR. STUCKEY)  Do you see where --

15          MR. DAVIS:  -- had permitted.  Listen to the

16  question.

17          THE WITNESS:  Yeah.

18     Q.   (BY MR. STUCKEY)  Do you see --

19          MR. STUCKEY:  And I object to your constant

20  coaching, Robert, but I'm sure that she got those comments on

21  the record as well.

22     Q.   (BY MR. STUCKEY)  Do you agree with me that from

23  the victim's point of view, it could appear to them like you

24  were harassing them almost from the beginning?

25     A.   No, sir.

EDWARD THORNTON

185

1    A.    When this started out in July of '98, he --

2    Q.    Yeah, go ahead.  I just want you to tell me when

3    you're done and I'll ask you another question for the record.

4    A.    There was constructed wetlands in the process of

5    being designed.  At that time, he was not going to put in but

6    a few trailer houses on an on-site waste water treatment

7    plants.  When the constructed wetlands thing fell through, he

8    was going -- he was going to end up going over the 5,000

9    gallons.

10    Q.    Are you finished, sir?

11    A.    Yes, sir.

12    Q.    At some point in time, did you tell Tommie Wells

13    that he was exceeding the 5,000 gallon limit or was about to

14    exceed the 5,000 gallon limit?

15    A.    Yes.

16    Q.    Are you the same person who did the permits that

17    added up to over 5,000 gallons?

18    A.    They did not -- he had 11 permits to start out

19    with.

20    Q.    Did you ever permit in excess of 5,000 gallons?

21    A.    I'd have to count the permits, but there may be a

22    chance that we went over, yes.

23    Q.    Okay.  And when there may have been a chance that

24    we went over, yes, you're talking about the 5,000 gallons,

25    correct?

EDWARD THORNTON

187

1      A.    Yes, correct.

2      Q.    And you say we went over the 5,000 gallons, that

3   was Mr. -- would you consider it to be reasonable for Mr.

4   Wells to rely on what you had told him?

5      A.    He is the one who added extra trailers to those

6   systems, which would cause that to go way over 5,000 gallons

7   per day.

8      Q.    Did your permits standing alone exceed 5,000

9   gallons a day, yes or no?

10      A.    I do not know right now, I would have to check.

11      Q.    Do you deny that they -- your permits exceeded

12   5,000 gallons a day?

13      A.    I do not know.

14      Q.    Do you admit that you first told -- well, when did

15   you first tell Tommie not to exceed 5,000 gallons?

16      A.    When he was -- this is the question we answered

17   when you were gone.  When he first started this, he was in

18   the process of getting a constructed wetlands that would

19   handle the whole piece of property through an engineer and

20   TNRCC.  The engineer was running long on his time line, he

21   asked if he could put conventional systems in or put on-site

22   waste water systems in, I said yes, but you cannot go over

23   the 5,000 gallons per day.  This was a temporary setup until

24   they got the constructed wetlands, and then he would tie it

25   to the constructed wetlands.

EDWARD THORNTON

188

1        A.   No, sir.

2        Q.   Did you expect the court to rely on everything in

3   your complaint as being accurate?  Did you expect the court

4   to rely on your complaint?

5        A.   Yes.

6        Q.   Do you agree that on December the 19th of -- 17th

7   of 1999 both Plaintiffs were arrested in front of their

8   children?

9        A.   I did not know, I do now.

10       Q.   And that they were fingerprinted and mug shotted?

11       A.   As of yesterday, yes, I do.

12       Q.   And that they stayed in jail until they were able

13   to post bond?

14       A.   Yes, as of yesterday.

15       Q.   Do you have any information from any source that

16   either of my Plaintiffs would have run off or fled the

17   jurisdiction if they had not been arrested?

18       A.   No.

19       Q.   Do you have any reason to believe that they would

20   have run off or fled the jurisdiction if they had not been

21   arrested?

22       A.   No, sir.

23       Q.   I think that you've -- do you of your own knowledge

24   know whether the arrest at all cost them any business?

25       A.   No, I do not.

EDWARD THORNTON

195

1    Q.   And finally in terms of what you did in connection

2  with Mr. and Mrs. Wells, you didn't receive any supervision

3  from anybody else, you were the supervisor as opposed to the

4  supervisee?

5    A.   (No response)

6    Q.   You were the person -- there wasn't nobody

7  supervising you, if any supervising was going on, it was

8  being done by you?

9    A.   I have supervision from TNRCC.

10    Q.   Okay.  So did you contact TRNCC when you filed the

11  charges?

12    A.   Prior to, yes.

13    Q.   How long prior to?

14    A.   We had been keeping them abreast of this since -- I

15  don't know what time, but we have stayed with them on this

16  and asking their advice, what to do.

17    Q.   Well, let's be more specific, sir.  On November the

18  8th of 1999 when you say you decided to file the first set of

19  charges, are you with me?

20    A.   Yes, I am.

21    Q.   You didn't contact them on that date, did you?

22    A.   Not on that date, but prior to, that's the reason

23  they said use that form.

24    Q.   They had, okay.  So they told you a form to use?

25    A.   Correct.

EDWARD THORNTON                    200

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

STATE OF TEXAS      §
     §
VS.      §       CAUSE NO. 99-12-2993
     §
CHERYL WELLS      §

## ORDER OF DISMISSAL

On this date came to be considered the Defendant's Motion for Dismissal and the Court, having considered the motion, together with any response thereto, finds that the same should be granted. Accordingly,

IT IS ORDERED that the Complaint in the above-referenced matter should be and is hereby dismissed.

SO ORDERED this 2 day of May, 2000.

_Richard Johnson_
JUDGE PRESIDING

Received   05-09-00   10:05     From-409 639 3049      To-



PLAINTIFF'S
EXHIBIT
tabbies
6
9:00 CV142

IN THE JUSTICE COURT, PRECINCT NO. ONE
OF NACOGDOCHES COUNTY, TEXAS

STATE OF TEXAS       §
                           §
VS.                   §        CAUSE NO. 99-12-2992
                           §
TOMMY WELLS       §

## ORDER OF DISMISSAL

On this date came to be considered the Defendant's Motion for Dismissal and the Court, having considered the motion, together with any response thereto, finds that the same should be granted. Accordingly,

IT IS ORDERED that the Complaint in the above-referenced matter should be and is hereby dismissed.

SO ORDERED this 2 day of May, 2000.

_____ Hubert Johnson
JUDGE PRESIDING

PLAINTIFF'S
EXHIBIT

7
9:00cv142

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1. | TOMMY WELLS, JR. | § |
| | and | § |
| 2. | CHERYL WELLS | § |
| | | § |
| | Plaintiff | § |
| | | § |
| v. | | § CIVIL ACTION NO. 9:00CV142 |
| | | § |
| 1. | NACOGDOCHES COUNTY, TEXAS | § JUDGE COBB |
| | and | § |
| 2. | EDWARD THORNTON | § |
| | | § |
| | Defendants | § |

### AFFIDAVIT OF DANNY SIMMONS

Comes now Affiant Danny Simmons who being duly deposed upon his oath states as follows:

#### I

I am over 21 years of age, of sound mind, and otherwise competent to give this affidavit.

#### II

I am a friend of Tommy and Cheryl Wells.   I am presently the Oaklawn Baptist Church Youth & Music Minister in Texarkana, Texas.   I was a youth & music minister at Bethel Baptist Church in Appleby, Texas and Tommy and Cheryl attended the church.   I was also owner/operator of a tree trimming business.  Finally, I worked for Tommy Wells at the trailer park from the summer of 1998 through the summer of 1999.

#### III

Cheryl Wells had very little to do with the trailer park. The only time I saw her at all is when she would come and deliver messages to Tommy.  I never saw her get out of the vehicle.

1



PLAINTIFF'S
EXHIBIT
8
9:00CV142

### IV

I helped Tommy install the septic systems. I know that Ed Thornton knew we were installing the systems because he would come by and see us and we had Ed Thornton's permission to install the systems.

### V

Ed Thornton knew that we did not have permits for some of the systems that we were installing.

### VI

I was helping Tommy when Ed Thornton came by and saw us pumping water from a septic tank into the aerobic system. Ed Thornton asked what we were doing. We told him. Thornton told us that it was okay to do that until we got the new aerobic plant installed. We were to throw the hose away when finished.

### VII

We did not have very many problems while I was working for Tommy. We did our best to promptly respond to the few complaints that we did have.

### VIII

The soil at the trailer park was mostly clay. Water will stand on clay soil when it rains.

### IX

I never saw Tommy do anything that he was told not to do in connection with the trailer park, as it pertains to septic systems.

Further affiant sayeth not.

_____

DANNY SIMMONS

STATE OF TEXAS                    *
                                  *
COUNTY OF Bowie____               *

    SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary

Public on this the  7  day of November    , 2001.

_____
Notary Public in and for

Bowie_____ County, Texas

My commission expires: 6-22-02

SHEILA HACKETT
MY COMMISSION EXPIRES
June 22, 2002

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1.   TOMMY WELLS, JR. | § | |
|    and | § | |
| 2.   CHERYL WELLS | § | |
| | § | |
|       Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | |
| 1.   NACOGDOCHES COUNTY, TEXAS | § | JUDGE COBB |
|    and | § | |
| 2.   EDWARD THORNTON | § | |
| | § | |
|       Defendants | § | |



### AFFIDAVIT OF MICHAEL PORTER

Comes now Affiant Michael Porter who being duly deposed upon his oath states as follows:

#### I

I am over 21 years of age and otherwise competent to give this affidavit.  This affidavit is based on my personal knowledge.

#### II

I was a tenant at the Naconiche Village Trailer Park from almost the beginning.  I lived there from the summer of 1998 until I lost my job and had to move out earlier this year.

#### III

I know Tommy Wells very well.  He is a good man.  He ran a good trailer park.  He was always receptive to people's needs.

#### IV

Tommy let me slide on my rent on several occasions when I got in a bind.  I know that he also let other tenants slide on their rent.  Basically, if you needed help Tommy would help.



PLAINTIFF'S
EXHIBIT
9
9:00cv142

**V**

Tommy corrected problems as soon as he learned about them. However, there were not very many problems.

**VI**

I know that sometimes areas of the trailer park would flood. This was sometimes caused by rain.  Sometimes it was caused by tenants' clogged up toilets.  Sometimes it was caused by tenants setting the timers and altering on the aerobic systems for too long.

**VII**

Cheryl never worked at the trailer park.

Further affiant sayeth not.

MICHAEL PORTER

STATE OF TEXAS                    *
                                 *
COUNTY OF Nacogdoches            *

     SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public on this the 8th day of November , 2001.

Notary Public in and for

Nacogdoches County, Texas

My commission expires: 5-10-05



LISA SANDERS
Notary Public, State of Texas
My Commission Expires
May 10, 2005

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| 1. TOMMY WELLS, JR. | § | |
| and | § | |
| 2. CHERYL WELLS | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:00CV142 |
| | § | |
| 1. NACOGDOCHES COUNTY, TEXAS | § | JUDGE COBB |
| and | § | |
| 2. EDWARD THORNTON | § | |
| | § | |
| Defendants | § | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant having filed Defendant's Motion for Summary Judgment; plaintiff having filed Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment; it appearing that the motion is without merit; and the Court being otherwise sufficiently advised;

IT IS ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, in all things DENIED.

SIGNED this _____ day of _____, 2001.

_____
HONORABLE HOWELL COBB
UNITED STATES DISTRICT JUDGE